IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

|  |  |
|---|---|
| CHRIS LACIVITA, an individual, and ADVANCING STRATEGIES, LLC, | Case No.   3:25cv227 |
| Plaintiffs, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| THE DAILY BEAST COMPANY, LLC d/b/a/ THE DAILY BEAST, |  |
| Defendant. |  |

Plaintiffs Chris LaCivita and Advancing Strategies, LLC, by and through their undesigned counsel, hereby file this Complaint against the defendant, The Daily Beast Company, LLC d/b/a The Daily Beast ("The Daily Beast"), and allege as follows:

**NATURE OF THE ACTION**

1. This action arises from The Daily Beast's malicious publication of numerous articles about Mr. LaCivita in the weeks and days leading up to the 2024 presidential election, in which The Daily Beast falsely reported that Mr. LaCivita personally received $22 million[1] over the course of two years for his role in Donald Trump's 2024 presidential campaign. The Defendant's defamatory reporting created the false impression that Mr. LaCivita was personally profiting excessively from his work on the campaign and that he was prioritizing personal gain over the campaign's success, causing Mr. LaCivita substantial professional and personal damages. Despite the availability of public campaign finance records demonstrating the falsity of the

---

[1] This figure was later reduced by The Daily Beast to $19.2 million.

contentions it published, and even after Mr. LaCivita, through counsel, sent Defendant a correction and retraction demand directing Defendant to publicly available data disproving its claims, Defendant failed to retract or meaningfully correct its false reporting.

## PARTIES

2.  Plaintiff Chris LaCivita is a citizen of the Commonwealth of Virginia. He is, and was at all relevant times, the Republican National Committee's Chief of Staff and a co-manager of the Donald J. Trump for President 2024 campaign. Mr. LaCivita conducts business through his consulting firm, Advancing Strategies, LLC. He resides in Northumberland County, Virginia.

3.  Plaintiff Advancing Strategies, LLC is a Virginia limited liability company whose sole member is Mr. LaCivita. Its principal place of business is in Powhatan County, Virginia.

4.  Defendant The Daily Beast Company, LLC d/b/a/ The Daily Beast is a Delaware limited liability company with its principal place of business in New York, New York. The Daily Beast owns and operates an online news website. It was previously reported that The Daily Beast has more than 1.1 million readers per day, with the highest engagement of any digital first news site. According to The Daily Beast itself, The Daily Beast "reaches more than 1 million readers a day." https://www.thedailybeast.com/company/about/. The Daily Beast also has a weekly podcast called The Daily Beast Podcast which is co-hosted by Joanna Coles and Samantha Bee. On information and belief,[2] The Daily Beast Podcast has approximately 60,000 subscribers.

5.  The Daily Beast's members are TDB Holdings Inc. and IAC Group LLC.

---

[2] Throughout this Complaint, allegations made on information and belief are, consistent with Federal Rule of Civil Procedure 11(b)(3), being specifically identified as allegations that "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

2

6.  TDB Holdings Inc. is a Delaware corporation with its principal place of business in New York, New York.

7.  The sole member of IAC Group LLC is IAC/InterActiveCorp.

8.  IAC/InterActiveCorp is a Delaware corporation with its principal place of business in New York, New York.

9.  Non-party Michael Isikoff is an investigative journalist and was, at all times relevant to the matters alleged in this complaint, the national investigative correspondent for NBC News and the chief investigative correspondent for Yahoo News.  On information and belief, he has never been an employee or agent of The Daily Beast, but rather has occasionally contributed content as a freelance, independent contributor and, in so doing, has retained and exercised significant autonomy over his work and working conditions and the form, content, and nature of his contributions.

## JURISDICTION AND VENUE

10. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because this action is between "citizens of different States" and the amount in controversy exceeds the jurisdictional threshold of $75,000, exclusive of interest and costs.

11. The Court has personal jurisdiction over The Daily Beast under Virginia's long-arm statute, Va. Code § 8.01-328.1, because the causes of action in the Complaint arise from The Daily Beast transacting business in Virginia and causing tortious injury by an act or omission in the Commonwealth.  Specifically, The Daily Beast is a nationwide news organization which does business in Virginia, it regularly circulates its publication to a national audience including an audience within the state of Virginia, it targeted a Virginia audience by exclusively focusing on and publishing defamatory statements about a Virginia resident and a Virginia business, and the

false and defamatory statements caused harm to Plaintiffs in their home state of Virginia, among other places.

12. The defamatory Articles, which focus on the receipt of funds by a Virginia LLC, highlight Plaintiffs' connection to Virginia. *See, e.g.,* Exhibit 1 (noting that "Advancing Strategies, LaCivita's company, has no apparent website and appears to be headquartered in his home, which is outside Richmond, Virginia, according to state corporate records."); Exhibit 2 (making five separate references to "Virginia" and noting that Mr. LaCivita "lives in a relatively modest home in Powhatan, outside Richmond with his wife of 31 years, Catherine."); Exhibit 4 (noting that "[t]he issue burst into the spotlight when the Daily Beast revealed how LaCivita's consulting firm—headquartered in his Virginia home—had already collected $22 million from the campaign and two Trump super PACs since 2022. . ."). The Articles also rely on a Virginia source. *See* Exhibit 1 (quoting a University of Virginia professor who "has known LaCivita for decades"); Exhibit 2 (same). Upon information and belief, Mr. Isikoff made phone calls to the University of Virginia professor in the forum state of Virginia seeking comment on Mr. LaCivita. Furthermore, one of the articles authored by Mr. Isikoff focuses in large part on the allegation in its byline that "millions were funneled from campaign to 'overcharging' firms," one of which the Article identifies as Strategic Media Services in Arlington, Virginia. Exhibit 4. Local media outlets who reported on The Daily Beast's allegations about Mr. LaCivita's exorbitant pay prominently noted Plaintiffs' connection to Virginia. *See, e.g., Daily Beast Reports VA Political Operative Raking Cash In From Trump Campaign While Fundraising Lags,* 106.1 THE CORNER (last visited Mar. 17, 2024), https://1061thecorner.com/news/208802-daily-beast-reports-va-political-operative-raking-cash-in-from-trump-campaign-while-fundraising-lags/ ("The Daily Beast reports long-

4

time Virginia GOP political operative Chris LaCivita has 'raked in $22-million' over the last two years for his Richmond-area consulting business as senior campaign advisor for Donald Trump.").

13.     Exercising personal jurisdiction over The Daily Beast in Virginia would not offend traditional notions of fair play and substantial justice because The Daily Beast could have, and certainly should have, reasonably foreseen being haled into a Virginia court to account for their false and defamatory publications about Mr. LaCivita, a Virginia resident, and his Virginia-based business, and Plaintiffs' alleged receipt of funds in the state of Virginia.

14.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and Division as a result of the transmission and publication of the false and defamatory statements in this District and Division, and elsewhere, and pursuant to 28 U.S.C. § 1391(b)(3) because Defendant is subject to this Court's personal jurisdiction with respect to this action. Virginia has a substantial interest in protecting its citizens from defamatory statements and ensuring fair processes to safeguard their reputation in their home state.

## STATEMENT OF FACTS

15.     Beginning several weeks before the November 2024 presidential election, The Daily Beast published a string of defamatory articles about Mr. LaCivita, falsely claiming that Mr. LaCivita received compensation in the amount of $22 million over the course of two years for Mr. LaCivita's role in Donald Trump's 2024 presidential campaign.

16.     Specifically, on October 15, 2024, The Daily Beast published an article entitled *Trump In Cash Crisis-As Campaign Chief's $22m Pay Revealed*, authored by Michael Isikoff, https://www.thedailybeast.com/donald-trumps-campaign-manager-chris-lacivitas-multi-million-payday-revealed/ (hereafter "Article 1," a copy of which is attached as Exhibit "1").

5

17. The title of Article 1 refers to "Campaign Chief's $22m Pay" and elsewhere claims that "[t]he co-manager of Donald Trump's White House campaign [Chris LaCivita] has raked in $22 million and counting from the Republican nominee's political operation in just two years, the Daily Beast has learned."). Article 1 also features a photograph of Mr. LaCivita and notes in the caption that he "has been paid $22m so far via the campaign."

18. On October 15, 2024, The Daily Beast published an article entitled *How Trump's Campaign Chief Made Himself a Multi-Millionaire,* authored by Hugh Dougherty, https://www.thedailybeast.com/meet-chris-lacivita-the-donald-trump-campaign-manager-who-is-making-millions-win-or-lose/ (hereafter "Article 2," a copy of which is attached as Exhibit "2").

19. Article 2 states that "the Daily Beast revealed Tuesday how [Chris LaCivita] has banked $22 million already and is on track to cash in even more before the election." Article 2 also features a photograph of Mr. LaCivita and notes in the caption that "he has not until now had large sums of cash like the $22million he has already been paid through Trump's campaign and PACs").

20. On October 24, 2024, The Daily Beast published an article entitled *'Sucker' Trump Mocked for Campaign Chief's Multi-Million Haul,* authored by Hugh Dougherty, https://www.thedailybeast.com/fool-donald-trump-mocked-by-lincoln-project-for-letting-campaign-chiefr-chris-lacivita-make-22-million/ (hereafter "Article 3," a copy of which is attached as Exhibit "3"). Article 3 refers to "the veteran investigative journalist Michael Isikoff's discovery that LaCivita made $22 million (and counting) in just two years"). Article 3 also features a photograph of Mr. LaCivita and notes in the caption that "Trump is being mocked over allowing Chris LaCivita (right), the co-chief of his campaign, to make $22 million and counting").

6

21. On October 28, 2024, The Daily Beast published an article entitled *Trump Campaign Worker Blows Whistle on 'Grift' and Bugging Plot*, authored by Michael Isikoff, https://www.thedailybeast.com/donald-trump-campaign-worker-blows-whistle-on-grift-and-bugging-plot-in-bombshell-email/ (hereafter "Article 4," a copy of which is attached as Exhibit "4"). Article 4 states that "[t]he issue burst into the spotlight when the Daily Beast revealed how LaCivita's consulting firm—headquartered in his Virginia home—had already collected $22 million from the campaign and two Trump super PACs since 2022, much of it from commissions on placing ads, with millions more due him by the end of the campaign." Article 4 also features a photograph of Mr. LaCivita and notes in the caption that he "has been paid $22m so far via the campaign."

22. On November 2, 2024, The Daily Beast published an article entitled *Trump Raged at Daily Beast Revelation that Campaign Boss Got $22 Million*, authored by Lily Mae Lazarus and published on November 2, 2024, https://www.thedailybeast.com/donald-trump-raged-at-daily-beast-revelation-that-campaign-boss-chris-lacivita-got-22-million/ (hereafter "Article 5," a copy of which is attached as Exhibit "5," and collectively with Articles 1-4, the "Articles"). The title of Article 5 refers to the "Daily Beast Revelation that Campaign Boss Got $22 Million." Article 5 also states that "[s]ources told *The Atlantic* allegations that LaCivita had pocketed $22 million from his work on the Trump campaign and related super PACs, left Trump 'fuming' and feeling like the story 'made him look like a fool.'"

23. The foregoing allegations, as well as many of the details in the Articles about the payments Mr. LaCivita allegedly received, are categorically false and belied by the publicly available campaign finance records themselves. Specifically, these records clearly show that the $22 million figure is the gross spend (the overwhelming majority of which was for ad buys), *not*

7

the money which Mr. LaCivita personally received, like the Articles falsely claim.

24. On information and belief, the false and defamatory allegations about Mr. LaCivita were made by Mr. Isikoff and published by The Daily Beast with actual malice and in knowing reliance on unreliable information provided by Corey Lewandowski and others in a blatant act of revenge against Mr. LaCivita and the Republican National Committee. Indeed, despite knowing that the statements about Mr. LaCivita were false and/or substantially likely to be false, The Daily Beast published, such defamatory statements with knowledge of their falsity and/or with reckless disregard for the truth.

25. The defamatory allegation that Mr. LaCivita pocketed $22 million from his work on the Trump campaign was republished by many other news and media outlets including The Lincoln Project, Yahoo News, Political Wire, The New Republic, The Economic Times, and many more.

26. Furthermore, to bring more attention to the defamatory allegations about Mr. LaCivita, this issue was discussed on The Daily Beast Podcast with Michael Isikoff (the author of Articles 1 and 4) on an episode entitled "How Has Trump's Campaign Manager Made $22 MILLION?," which first aired on October 23, 2024, and was previously available at [https://www.youtube.com/watch?v=u_nIFq7_b-I](https://www.youtube.com/watch?v=u_nIFq7_b-I). A true and correct copy of YouTube's autogenerated transcript of the podcast episode is attached as Exhibit "6." The podcast begins with co-host Joanna Coles stating: "Sam, let's go to the download to unpack the biggest Beast stories of the week. And certainly the scoop of the week at the Beast is an incredible story written by investigative reporter Michael Issikoff, who's won hundreds of awards about Trump's co-campaign manager, Chris LaCivita, and how much money he's made. $22 million over the last two years working for the Trump campaign."

27.     During the podcast, Mr. Isikoff states: "But while that's been, you know, these fundraising troubles for Trump have been, you know, playing out, we've learned that the top guy in the Trump campaign, or one of the two top people in the Trump campaign, Chris LaCivita, has been raking in some really astronomical sums of money working for the Trump campaign. We came up with the figure by looking at campaign finance records, talking to sources, and really digging into the contracts that LaCivita has with the Trump campaign. What we found is, number one, I mean, he is, you know, he had previously, right before joining the Trump campaign, he had worked for two Trump super PACs, Make America Great Again and Save America. Save America was the one that was paying all of Donald Trump's legal fees. And he was, as the strategic consultant, had collected his small firm, which doesn't have a website and works out of his house, took in about $19 million. Then since joining the campaign, he has signed contracts that give him not just an annual, a monthly retainer, retainers, actually he's had a couple of retainers that at times went up to $75,000 a month. Then on top of that, media commissions, and this is where the real money in campaigns comes from, making those media buys. LaCivita has been getting 3% of the first $100 million of media buys. So you can do the arithmetic on that. And he's got sort of millions more coming. He's also been doing direct mail. He's also been doing, you know, digital media ads. And so when you put it all together, it looks like he's going to collect over the last two years, something like, you know, well, in excess of $22, probably closer to $26 or $27 million dollars, which is not bad for attaching yourself to Donald Trump."

28.     During the podcast, Mr. Isikoff admitted that he had reviewed the campaign finance records before authoring his story (Article 1), noting that he was "able to piece together" the amounts Mr. LaCivita purportedly received from the campaign finance records.

29. Moreover, Mr. Isikoff conceded that his purported analysis was based on information obtained from Corey Lewandowski and his informal "audit." He stated: "And this is one of the issues that was being raised by, you know, Corey Lewandowski, quite a combative and polarizing figure. But he was brought back by Trump and, you know, then takes it upon himself to do this sort of informal audit of the campaign and was raising the question, is all this money that was spent by the campaign on direct mail in, during the primary, when Trump had leads of like 40% in the, 40 points in the polls, was all that necessary? And would it have taken place if the money hadn't been going to Chris LaCivita's company?"

30. Mr. Isikoff then highlighted the discrepancy between what he claimed Mr. LaCivita was making off the campaign, with what his campaign co-manager, Susie Wiles, was allegedly making, and he suggested that Mr. LaCivita's compensation was hidden from Trump and Ms. Wiles. Mr. Isikoff stated: "And [Ms. Wiles has] collected, I think, the figure, it was something like $685,000, which is not bad, but not anything at the Chris LaCivita level. Yeah, when I pressed how much both Trump and Susie Wiles knew about how much LaCivita was raking in, these were not questions that the campaign wanted to indulge."

31. To further falsely suggest that Mr. LaCivita had engaged in wrongdoing, the podcast's co-host, Joanna Coles, asked Mr. Isikoff, "Michael, what will be the repercussions? Because it's only three weeks to the election now, so even if Trump were upset to hear that his co-campaign manager had paid or had gotten paid in excess of $22 million, nearer to $30 probably by the time the whole thing is over, it's very late to fire him."

32. Mr. Isikoff opined that if Trump were to lose, "I think that's when you'd hear about this, because there'll be all sorts of, you know, post-mortems about, you know, where did the campaign go wrong and what did it do, you know, what strategic decisions were wrong, and they'll

be, you know, looking for scapegoats and Trump's got one.  Chris La Civita, the guy who was, you know, the grifter who was milking him for all this money."

33. The comments by average listeners of the podcast describe Mr. LaCivita, based on the false allegations made on the podcast, as a "grifter," a "scammer," "crooked," and as having "conned" Trump, among other things.

34. On November 5, 2024, attorneys for Mr. LaCivita sent The Daily Beast a correction and retraction demand, detailing the false statements contained in Articles 1 through 5.

35. On or about November 8, 2024, The Daily Beast modified its reporting, "after further review of FEC records," to claim that Mr. LaCivita received $19.2 million in compensation, rather than the $22 million figure originally reported.  The Daily Beast also clarified the entity to which the funds were paid.  However, the rest of the reporting remained substantially the same, and despite the addition of the editor's notes and corrections, the Articles continue to falsely imply that Mr. LaCivita personally pocketed $19.2 million over the course of two years from the Trump campaign.  Indeed, in an email sent by The Daily Beast's counsel on November 8, 2024, the Daily Beast "st[ood] by the central truth of [its] reporting" and requested supporting documentation demonstrating that the revised statements were false.

36. The episode discussing this issue on the Daily Beast Podcast was not removed, and the false claims on the podcast that Mr. LaCivita "raked in" more than $22 million in two years from the Trump campaign remained available online.

37. On November 12, 2024, counsel for Mr. LaCivita directed The Daily Beast to the publicly available FEC records showing the falsity of the defamatory statements in Articles 1 through 5, and again demanded that these Articles be retracted.

38. However, The Daily Beast failed to further correct or retract its false and

11

defamatory reporting, which have caused and continue to cause substantial damages to Mr. LaCivita.

39. On January 21, 2025, Mr. LaCivita's counsel sent The Daily Beast another retraction demand, asking that it immediately remove the defamatory podcast episode entitled "How Has Trump's Campaign Manager Made $22 MILLION?" from all available platforms.

40. On or about January 24, 2025, The Daily Beast removed the defamatory podcast about Mr. LaCivita from its platforms.

41. As noted above, the defamatory statements about Mr. LaCivita have caused and continue to cause Plaintiffs substantial damages.

42. The false accusations have created a negative perception of Plaintiffs within the political consulting industry, and on information and belief, hindered their ability to secure new clients. As for clients who have chosen to work with Mr. LaCivita, the opposition party has used the defamatory allegations against Mr. LaCivita to cast doubt on his honesty, transparency, loyalty, and integrity, and he has been forced to spend time, money, and resources to combat this false narrative.

43. It is estimated that it would cost millions of dollars to repair Mr. LaCivita's reputation as a result of the defamatory articles published about him which had mass circulation and international reach.

## COUNT ONE: DEFAMATION *PER SE*
## By Mr. LaCivita Against The Daily Beast

44. Mr. LaCivita repeats and realleges the allegations set forth in paragraphs 1 through 43 above as if set forth fully herein.

45. The statements identified above in Articles 1 through 5, and on The Daily Beast podcast, are false and defamatory.

12

46. The defamatory statements, which falsely imply that Mr. LaCivita was personally profiting excessively from his work on the campaign, that he was prioritizing personal gain over the campaign's success, and that he was doing so unbeknownst to President Trump and the campaign, impute a lack of integrity in Mr. LaCivita's performance of his job duties and prejudice him in his business and profession. The defamatory statements also subject Mr. LaCivita to hatred, ridicule, or distrust, thereby constituting defamation *per se*.

47. The Daily Beast published such statements with knowledge of the falsity of such statements and/or with reckless disregard of their truth or falsity.

48. The statements are substantially false.

49. The statements were not privileged.

50. Defendant possessed information and/or had access to information which demonstrated the falsity of such statements.

51. The false statements were made and published by Defendant with actual malice and a high degree of awareness of their probable falsity or with reckless disregard for the truth.

52. As a direct and proximate result of the publication of the defamatory statements, Plaintiff has suffered both special and general damages, including severe emotional distress, out-of-pocket costs, and damage to his business and professional reputation and standing.

53. The defamatory allegations by Defendant have been republished internationally and have negatively impacted Mr. LaCivita's business worldwide including in Albania. *See, e.g.,* https://www.gazetatema.net/politika/fatura-e-cmendur-e-berishes-per-fushaten-vetem-konsulenti-amerikan-i-ku-i479822; https://shqiptarja.com/home.

54. Defendant acted with reckless, willful, and callous disregard for Plaintiff's rights and with malice, fraud, and oppression toward Plaintiff, thereby entitling Mr. LaCivita to an award of punitive damages.

## COUNT TWO: DEFAMATION *PER QUOD*
## By Mr. LaCivita Against The Daily Beast

55. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 43 above as if set forth fully herein.

56. The statements identified in Articles 1 through 5, and on The Daily Beast podcast, are defamatory *per quod* because they require extrinsic facts and context to demonstrate their defamatory meaning.

57. The extrinsic facts are that Mr. LaCivita did not personally receive $22 million, later reduced to $19.2 million, as claimed by The Daily Beast. Rather, the vast majority of these funds were used for campaign advertising expenses.

58. Campaign finance records, readily available to The Daily Beast, and admittedly reviewed by Mr. Isikoff, clearly demonstrate that the multimillion-dollar figure represents gross expenditures, not Mr. LaCivita's personal compensation.

59. Defendant's false statements created the false impression that Mr. LaCivita was charging exorbitant rates for his services and personally enriching himself at the expense of the campaign, thereby harming his reputation as an honest, reasonable, and ethical political operative.

60. As a direct and proximate result of the publication of the defamatory statements, Mr. LaCivita has suffered special damages, including damage to his reputation and loss of business income. On information and belief, he has also lost business opportunities based on the false impression of the exorbitant fees he charges for his services.

61. Defendant published such statements with knowledge of the falsity of such statements and/or with reckless disregard of their truth or falsity.

62. The statements are substantially false.

63. The statements were not privileged.

64. Defendant possessed information and/or had access to information which demonstrated the falsity of such statements.

65. Defendant acted with reckless, willful, and callous disregard for Plaintiff's rights and with malice, fraud, and oppression toward Plaintiff, thereby entitling Mr. LaCivita to an award of punitive damages.

## COUNT THREE: CONSPIRACY TO INJURE ANOTHER IN TRADE, BUSINESS OR PROFESSION IN VIOLATION OF VA. CODE § 18.2-499
### By All Plaintiffs Against The Daily Beast

66. Plaintiffs repeat and reallege the allegation set forth in paragraphs 1 through 65 above as if set forth fully herein.

67. In the weeks and days leading up to the 2024 presidential election, Defendant The Daily Beast and Michael Isikoff acted in concert and agreed to publish defamatory statements about Mr. LaCivita and his firm, Advancing Strategies, LLC, for the purpose of willfully and/or maliciously injuring their reputation, trade, business, and profession.

68. As a direct and proximate result of Defendant and Mr. Isikoff's concerted actions, Plaintiffs suffered business-related damages, including but not limited to damage to their professional reputations and lost profits.

69. Pursuant to Va. Code § 18.2-500, Plaintiffs are entitled to recover three-fold the damages they sustained, as well as the costs of suit and their reasonable attorneys' fees.

**WHEREFORE,** Plaintiffs demand judgment against Defendant The Daily Beast Company, LLC d/b/a The Daily Beast and respectfully request the Honorable Court grant the following relief:

1. on the first two causes of action (defamation *per se* and defamation *per quod*), compensatory damages in an amount to be proven at trial, in excess of the statutory limit in 28 U.S.C. § 1332(a), exclusive of interest and costs;

2. on the first two causes of action (defamation *per se* and defamation *per quod*), punitive damages;

3. on the third cause of action (conspiracy to injure another in trade, business or profession), three-fold the damages Plaintiffs sustained;

4. on all three causes of action, costs and reasonable attorneys' fees; and

5. such other and further relief as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial as to all issues so triable.

Dated: March 24, 2025                    Respectfully submitted,

                                         s/Jonathan Shaw

                                         Jonathan Shaw (VSB No. 98497)
                                         Tel and Fax: (703) 574-1206
                                         jshaw@dhillonlaw.com
                                         Lee E. Goodman (VSB No. 31695)
                                         Tel and Fax: (703) 637-8754
                                         lgoodman@dhillonlaw.com
                                         DHILLON LAW GROUP, INC.
                                         2121 Eisenhower Avenue, Suite 608
                                         Alexandria, VA 22314

                                        Mark Geragos (Cal. Bar No. 108325)*
                                        Tina Glandian (Cal. Bar No. 251614)*
                                        Setara Qassim (Cal. Bar No. 283552)*
                                        GERAGOS & GERAGOS, APC
                                        644 S. Figueroa St.
                                        Los Angeles, CA 90017
                                        (213) 625-3900
                                        geragos@geragos.com

                                        *Attorneys for Plaintiffs*
                                        **pro hac vice* motions forthcoming*