**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

|  |  |
|---|---|
| CHRIS LACIVITA, an individual, and ADVANCING STRATEGIES, LLC, <br><br><br> Plaintiffs, <br><br> v. <br><br> THE DAILY BEAST COMPANY, LLC d/b/a THE DAILY BEAST, <br><br><br> Defendant. | Case No.: 3:25-cv-227 <br><br><br> **HEARING REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger (*pro hac vice*)
Meenakshi Krishnan (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone:  (212) 489-8230
katebolger@dwt.com
meenakshikrishnan@dwt.com

MCGAVIN, BOYCE, BARDOT,
THORSEN & KATZ, P.C.
John D. McGavin (VSB 21794)
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
Phone: (703) 385-1000
jmcgavin@mbbtklaw.com

*Attorneys for Defendant The Daily Beast Company LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

STATEMENT OF FACTS ....................................................................................................2

    A.    The Parties ....................................................................................................2

    B.    *The Daily Beast* Publications at Issue ........................................................2

        1.    Article 1 .............................................................................................3

        2.    Article 2 .............................................................................................4

        3.    The Podcast Episode .........................................................................5

        4.    Article 3 .............................................................................................5

        5.    Article 4 .............................................................................................6

        6.    Article 5 .............................................................................................6

    C.    *The Daily Beast* Clarifies Its Reporting ...................................................6

ARGUMENT ........................................................................................................................7

I.       THE COURT SHOULD APPLY NEW YORK LAW.................................................8

II.      LACIVITA'S DEFAMATION CLAIMS FAIL AS A MATTER OF LAW ....................9

    A.    LaCivita Fails to Allege Actual Malice .....................................................10

        1.    LaCivita Is Required to Plead Actual Malice ..........................10

        2.    LaCivita Does Not Allege Actual Malice .................................13

    B.    The Fair Report Privilege Protects the Publications .............................19

        1.    The Fair Report Privilege Applies to the FEC Records...........................20

        2.    The Publications Are a Fair and Accurate Report of the FEC Records ........................................................................................22

    C.    The Publications Are Not Defamatory ...................................................24

        1.    The Publications Are Not Defamatory *Per Se* ...........................................24

        2.    The Publications Are Not Defamatory *Per Quod*.....................................26

III.     PLAINTIFFS' BUSINESS CONSPIRACY CLAIM FAILS............................................27

    A.    Plaintiffs' Business Conspiracy Claim Fails With the Defamation Claim............28

    B.    Plaintiffs Do Not Plead the Required State-Law Elements ...................28

    C.    Plaintiffs Cannot Recover Treble Damages for Allegedly False Speech .............30

CONCLUSION.....................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1st Amend. Praetorian v. N.Y. Times*,
    2025 WL 949575 (S.D.N.Y. Mar. 28, 2025) ............................................................13

*Agbapuruonwu v. NBC Subsidiary (WRC-TV)*,
    821 F. App'x 234 (4th Cir. 2020) ......................................................................20

*Alexandria Gazette v. West*,
    198 Va. 154 (1956) ..............................................................................20, 24

*All. Tech. v. Achieve 1*,
    2013 WL 143500 (E.D. Va. Jan. 11, 2013) ..................................................29

*Andrews v. Ring*,
    266 Va. 311 (2003) ..................................................................................29

*Arthur v. Offit*,
    2010 WL 883745 (E.D. Va. Mar. 10, 2010) ..................................................8

*Ash v. PowerSecure Int'l*,
    2015 WL 5444741 (E.D.N.C. Sept. 15, 2015) ..............................................11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................7, 15

*Bay Tobacco v. Bell Quality Tobacco Prods.*,
    261 F. Supp. 2d 483 (E.D. Va. 2003) ..........................................................29

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................15

*Berisha v. Lawson*,
    973 F.3d 1304 (11th Cir. 2020) ..................................................................19

*Besen v. Parents & Friends of Ex-Gays*,
    2012 WL 1440183 (E.D. Va. Apr. 25, 2012) ................................................14

*Biro v. Condé Nast*,
    807 F.3d 541 (2d Cir. 2015) ..........................................................10, 14, 15

*Bobulinski v. Tarlov*,
    758 F. Supp. 3d 166 (S.D.N.Y. 2024) ....................................................13, 25

*Bose v. Consumers Union of U.S.*,
466 U.S. 485 (1984)......................................................................................14, 15

*Burns v. Times Argus Ass'n*,
430 A.2d 773 (Vt. 1981) .......................................................................................12

*Buschi v. Kirven*,
775 F.2d 1240 (4th Cir. 1985) ........................................................................28, 29

*BYD v. VICE Media*,
531 F. Supp. 3d 810 (S.D.N.Y. 2021), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022) ................................................................................................................12, 15

*Carnell Const. v. Danville Redevelopment & Hous. Auth.*,
745 F.3d 703 (4th Cir. 2014) ................................................................................27

*Carr v. Forbes*,
259 F.3d 273 (4th Cir. 2001) ................................................................................14

*Cassava Scis. v. Bredt*,
2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024) ......................................................17

*Celle v. Filipino Rep. Enters.*,
209 F.3d 163 (2d Cir. 2000).............................................................................9, 24

*Cestaro v. Prohaska*,
681 F. Supp. 3d 121 (S.D.N.Y. 2023).....................................................................9

*Chapin v. Knight-Ridder*,
993 F.2d 1087 (4th Cir. 1993) ..........................................................................8, 20

*Cobin v. Hearst-Argyle Television*,
561 F. Supp. 2d 546 (D.S.C. 2008).......................................................................19

*Cockrum v. Donald J. Trump for President*,
365 F. Supp. 3d 652 (E.D. Va. 2019) .....................................................................8

*Coles v. Wash. Free Wkly.*,
881 F. Supp. 26 (D.D.C. 1995), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996)...................25

*Covington Specialty Ins. v. Omega Rest. & Bar*,
666 F. Supp. 3d 528 (E.D. Va. 2023) ...................................................................28

*Cox Broad. v. Cohn*,
420 U.S. 469 (1975)..............................................................................................20

*Cummings v. City of New York*,
2021 WL 1163654 (S.D.N.Y. Mar. 26, 2021), *aff'd*, 2022 WL 2166585 (2d
Cir. June 16, 2022) .................................................................................................20, 22

*Davis v. Roessler*,
2022 WL 195496 (E.D. Va. Jan. 21, 2022) ...........................................................28

*Donald J. Trump for President v. WP Co.*,
2023 WL 1765193 (D.D.C. Feb. 3, 2023) .............................................................11

*Dunlap v. Cottman Transmission*,
287 Va. 207 (2014) .................................................................................................28

*Edward Lewis Tobinick, MD v. Novella*,
848 F.3d 935 (11th Cir. 2017) ...............................................................................18

*Fairfax v. CBS*,
2 F.4th 286 (4th Cir. 2021) ............................................................................. *passim*

*Fairfax v. CBS*,
534 F. Supp. 3d 581 (E.D. Va. 2020) ....................................................................13

*Folta v. N.Y. Times*,
2019 WL 1486776 (N.D. Fla. Feb. 27, 2019) ........................................................21

*Freedlander v. Edens Broad.*,
734 F. Supp. 221 (E.D. Va. 1990), *aff'd*, 923 F.2d 848 (4th Cir. 1991)...........................24, 25

*Freedom Newspapers of Tex. v. Cantu*,
168 S.W.3d 847 (Tex. 2005)...................................................................................17

*Friedman v. Bloomberg*,
884 F.3d 83 (2d Cir. 2017).....................................................................................20

*Fryfogle v. First Nat'l Bank of Greencastle*,
2009 WL 700161 (W.D. Va. Mar. 17, 2009).........................................1, 8, 16, 23

*Fuller v. Russell*,
842 S.W.2d 12 (Ark. 1992).....................................................................................12

*G.D. v. Kenny*,
15 A.3d 300 (N.J. 2011)..........................................................................................11

*Gertz v. Welch*,
418 U.S. 323 (1974)...........................................................................................29, 30

*Gleichenhaus v. Carlyle*,
597 P.2d 611 (Kan. 1979) .......................................................................................12

iv

*Gubarev v. BuzzFeed*,
340 F. Supp. 3d 1304 (S.D. Fla. 2018) ...............................................................21

*Hanks v. Wavy Broad.*,
2012 WL 405065 (E.D. Va. Feb. 8, 2012) (Virginia)..............................................27

*Harte-Hanks Commc'ns v. Connaughton*,
491 U.S. 657 (1989)..............................................................................................14

*Harvey v. CNN*,
48 F.4th 257 (4th Cir. 2022) ....................................................................14, 18, 20

*Henry v. Fox*,
629 F. Supp. 3d 136 (S.D.N.Y. 2022)..............................................................26, 27

*Horne v. WTVR*,
2017 WL 1330200 (E.D. Va. Apr. 6, 2017), *aff'd*, 893 F.3d 201 (4th Cir.
2018) .....................................................................................................................10

*Hourani v. Psybersolutions*,
164 F. Supp. 3d 128 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017).........12

*Ingenere v. ABC*,
1984 WL 14108 (D. Mass. Sept. 8, 1984) .............................................................21

*Jacob v. Lorenz*,
626 F. Supp. 3d 672 (S.D.N.Y. 2022)......................................................................9

*Kahl v. Bureau of Nat'l Affs.*,
856 F.3d 106 (D.C. Cir. 2017) .................................................................................8

*Kavanagh v. Zwilling*,
997 F. Supp. 2d 241 (S.D.N.Y.), *aff'd*, 578 F. App'x 24 (2d Cir. 2014)................27

*Kinsey v. N.Y. Times*,
991 F.3d 171 (2d Cir. 2021)............................................................................19, 24

*Liberty Lobby v. Dow Jones & Co.*,
838 F.2d 1287 (D.C. Cir. 1988) ............................................................................18

*Lindberg v. Dow Jones*,
2021 WL 3605621 (S.D.N.Y. Aug. 11, 2021) .......................................................13

*Lively v. Wayfarer Studios*,
2025 WL 1637019 (S.D.N.Y. June 9, 2025) ..........................................................14

*Logan v. D.C.*,
447 F. Supp. 1328 (D.D.C. 1978) ..........................................................................14

*Mayfield v. NASCAR*,
674 F.3d 369 (4th Cir. 2012) ...................................................14, 15, 17

*McCutcheon v. FEC*,
572 U.S. 185 (2014)........................................................................21

*Medcalf v. Walsh*,
938 F. Supp. 2d 478 (S.D.N.Y. 2013)..............................................26

*Miller v. Gizmodo Media*,
407 F. Supp. 3d 1300 (S.D. Fla. 2019), *aff'd*, 994 F.3d 1328 (11th Cir. 2021)......................11

*Mirafuentes v. Estevez*,
2015 WL 8177935 (E.D. Va. Nov. 30, 2015)....................................8

*N.Y. Times v. Sullivan*,
376 U.S. 254 (1964)..................................................................10, 15

*Nanji v. Nat'l Geographic Soc'y*,
403 F. Supp. 2d 425 (D. Md. 2005) .................................................20

*Nelson Auto Ctr. v. Multimedia Holdings*,
951 F.3d 952 (8th Cir. 2020) ...........................................................14

*New Times Inc. v. Isaacks*,
146 S.W.3d 144 (Tex. 2004)...........................................................14

*Nineteen Eighty-Nine, LLC v. Icahn Enters. L.P.*,
953 N.Y.S.2d 4 (2012)...............................................................20, 21

*Norris v. Bangor Publ'g*,
53 F. Supp. 2d 495 (D. Me. 1999) ...................................................12

*Page v. Oath*,
270 A.3d 833 (Del. 2022) ................................................................12

*Patel v. CNN*,
910 S.E.2d 532 (Va. 2025)..........................................................15, 16

*Price Auto. II v. Mass Mgmt.*,
2015 WL 300418 (W.D. Va. Jan. 22, 2015) .....................................27

*Prince v. Intercept*,
2023 WL 4492413 (S.D.N.Y. 2023)..................................................18

*Prince v. Intercept*,
634 F. Supp. 3d 114 (S.D.N.Y. 2022)...............................................10

*Quillen v. Int'l Playtex*,
　789 F.2d 1041 (4th Cir. 1986) ...................................................................8

*Ramey v. Kingsport Publ'g*,
　905 F. Supp. 355 (W.D. Va. 1995) ...........................................................19

*Reuber v. Food Chem. News*,
　925 F.2d 703 (4th Cir. 1991) ..............................................................19, 20

*Satanic Temple v. Newsweek*,
　774 F. Supp. 3d 688 (S.D.N.Y. 2025)........................................................13

*Schaefer v. Wash. Times*,
　1988 WL 6203 (D. Md. Jan. 29, 1988) ......................................................18

*Schlegel v. Bank of Am.*,
　505 F. Supp. 2d 321 (W.D. Va. 2007) ..................................................28, 29

*Sepmoree v. Bio-Med. Applications of Va.*,
　2014 WL 4444435 (E.D. Va. Sept. 8, 2014)................................................9

*Shirvinski v. U.S. Coast Guard*,
　673 F.3d 308 (4th Cir. 2012) ....................................................................28

*Sipple v. Found. for Nat'l Progress*,
　83 Cal. Rptr. 2d 677 (Cal. Ct. App. 1999)................................................11

*Spacecon Specialty Contractors v. Bensinger*,
　713 F.3d 1028 (10th Cir. 2013) .................................................................18

*Spirito v. Peninsula Airport Comm'n*,
　350 F. Supp. 3d 471 (E.D. Va. 2018) ............................................19, 20, 23

*St. Amant v. Thompson*,
　390 U.S. 727 (1968)...................................................................................14

*Sugarman v. Brown*,
　288 Cal. Rptr. 3d 165 (Cal. Ct. App. 2021)..........................................21, 22

*Theologis v. Weiler*,
　76 Va. App. 596 (2023) .............................................................................28

*Tika v. Jack*,
　2022 WL 2955153 (W.D. Va. July 26, 2022)..............................................8

*Tronfeld v. Nationwide Mut. Ins.*,
　272 Va. 709 (2006) ...................................................................................24

*Turbomin AB v. Base-X*,
2009 WL 1024713 (W.D. Va. Apr. 15, 2009) .......................................................29

*United States v. Sryniawski*,
48 F.4th 583 (8th Cir. 2022) ...........................................................................11

*Va. Citizens Def. League v. Couric*,
910 F.3d 780 (4th Cir. 2018) ..................................................................8, 9, 25

*Wash. Post v. McManus*,
355 F. Supp. 3d 272 (D. Md.), *aff'd*, 944 F.3d 506 (4th Cir. 2019) ......................21

*Weinstein v. Booz Allen Hamilton*,
2021 WL 12180434 (E.D. Va. June 1, 2021) .......................................................9

*White v. Fraternal Ord. of Police*,
909 F.2d 512 (D.C. Cir. 1990) ...........................................................................21

*Wilder v. Johnson Pub'g*,
551 F. Supp. 622 (E.D. Va. 1982) (Virginia) ......................................................26

*Yeagle v. Collegiate Times*,
255 Va. 293 (1998) ...........................................................................................26

*Zerangue v. TSP Newspapers*,
814 F.2d 1066 (5th Cir. 1987) ...........................................................................14

**Statutes**

52 U.S.C. § 30104 ..................................................................................................21

N.Y. Civ. Rights Law §§ 70-a, 76-a ............................................................10, 12, 13

N.Y. Civ. Rights Law § 74 .....................................................................................19

Va. Code Ann. § 8.01-223.2 ............................................................................10, 13

Va. Code Ann. § 8.01-388 .....................................................................................23

Va. Code §§ 18.2-499, 18.2-500 ............................................................................30

**Other Authorities**

Fed. R. Civ. P. 12(b)(6).....................................................................................1, 3, 7

Fed. R. Civ. P. 9(g) ...............................................................................................27

11 CFR §§ 100.16, 104.4 .......................................................................................21

Defendant The Daily Beast Company LLC ("*The Daily Beast*") submits this memorandum of law in support of its motion pursuant to Fed. R. Civ. P. 12(b)(6) for an order dismissing Plaintiffs Chris LaCivita ("LaCivita") and Advancing Strategies, LLC's ("Advancing Strategies") (collectively, "Plaintiffs") Complaint ("Compl."), Dkt. 1, with prejudice.

## PRELIMINARY STATEMENT

This lawsuit is a transparent attempt to punish *The Daily Beast* for accurate reporting about payments Chris LaCivita and his firm, Advancing Strategies, received for their work on President Donald Trump's 2024 electoral campaign. *The Daily Beast* publications straightforwardly reported the undisputed fact that LaCivita and the firm, of which LaCivita is the only listed officer and which is based in his home, received payments of many millions of dollars in connection with the campaign. The reporting was supported by publicly available Federal Election Commission (FEC) campaign finance disclosures ("FEC Records") and contained not only LaCivita's full and colorful response, but also the Trump campaign's statements that some of the payments passed through LaCivita's firm to other vendors.

From this reporting about their financial *success*, Plaintiffs try to conjure not only a defamation claim, but also a claim under Virginia's business conspiracy law. But Plaintiffs' efforts to fashion a tort fail. This Court should dismiss the Complaint with prejudice, for several independent reasons.

*First*, as to LaCivita's defamation claim, both because LaCivita is a public figure and the New York and Virginia anti-SLAPP laws apply, he must plead actual malice, which he does not. *Second*, as fair and accurate reports of the FEC Records—public records—the publications are also squarely protected by the fair report privilege. *Third*, none of the publications defame LaCivita, either *per se* or *per quod*. *Finally*, Plaintiffs' joint tag-along state-law business conspiracy claim fails for several reasons, specifically because (1) there can be no claim in light

of the untenable defamation claim; (2) Plaintiffs do not plead the required state-law elements; and (3) Plaintiffs' attempted recovery of treble damages on a repackaged defamation claim is unconstitutional under Supreme Court defamation damages precedent.

The publications at issue here are neither sensationalized nor falsified. Instead, they focus on an issue important to every American—where money goes in a presidential campaign—by reporting on information made public by the federal government. Plaintiffs may wish that *The Daily Beast* told the story of that information differently, but disagreement is not defamation. This Court should, therefore, dismiss the Complaint with prejudice.

## STATEMENT OF FACTS

### A.    The Parties

LaCivita was the co-manager of the Donald J. Trump for President 2024 campaign, Compl. ¶ 2, and recently, the Winter 2025 Visiting Pritzker Fellow at the University of Chicago, a position he obtained after the reporting at issue.[1]  Advancing Strategies is LaCivita's consulting firm of which he is the sole member. *Id.* ¶¶ 2-3.

*The Daily Beast* is an online news media company that publishes news and analysis at www.thedailybeast.com. *Id.* ¶ 4. *The Daily Beast* also publishes a podcast called "The Daily Beast Podcast," which, at all relevant times, was co-hosted by Joanna Coles and Samantha Bee. *Id.*

### B.    *The Daily Beast* Publications at Issue

Plaintiffs' claims principally arise from *one* portion of *one* article published by *The Daily Beast* reporting that Plaintiffs received $22 million over the course of two years for LaCivita's role in Trump's 2024 presidential campaign. Compl. ¶¶ 1, 15. Plaintiffs' claims are also based on

---

[1] "Chris LaCivita," University of Chicago Institute of Politics, https://politics.uchicago.edu/fellows/current-fellows/chris-lacivita.

2

several derivative articles (together, the "Articles") and a podcast episode (the "Podcast Episode") (collectively, the "Publications") re-reporting that same figure. Compl. ¶¶ 18-22, 26.[2]

### 1.      Article 1

On October 15, 2024, *The Daily Beast* published an article originally titled "Trump In Cash Crisis–As Campaign Chief's $22m Pay Revealed" ("Article 1").[3]  Compl. Ex. 1, Dkt. 1-2.  Article 1, which was authored by investigative journalist Michael Isikoff, reports on the fees earned from the Trump campaign by LaCivita and his consulting firm, Advancing Strategies.  The firm operates out of LaCivita's home, and LaCivita is the sole member.  *Id.* at 3.  Relying explicitly on publicly available FEC records, LaCivita's contracts, and campaign sources, Article 1 reports on LaCivita and his firm's earnings from two periods: (1) in 2022, for his consulting services to super political action committees (super PACs) affiliated with Trump, prior to his formally joining the Trump 2024 campaign; and (2) in 2023-2024, after formally joining the campaign and negotiating several contracts providing for the payment of percentages of the campaign's ad buys, direct mail, and other spending, along with retainers.  *Id.* at 1-2, 8-10.  Article 1 originally reported LaCivita's 2022 earnings to be $22 million (later reduced to $19.2 million, *see infra* Section C).  *Id.* at 1-2.

Article 1 also reports on an "'opposition research' dossier" circulated by a super PAC backing Florida Governor Ron DeSantis "contending the payments were far in excess of what

---

[2] In evaluating a complaint at the Rule 12(b)(6) stage, a court may also consider "documents integral to and relied upon in the complaint," such as the Publications attached to and discussed in the Complaint.  *Fairfax v. CBS*, 2 F.4th 286, 292 (4th Cir. 2021) (considering broadcasts at issue on motion to dismiss); *see* Compl. ¶¶ 16-22, 26-33 (characterizing the Publications) & Exs. 1-5 (Articles 1-5, as originally published).  The updated Publications, as revised in November 2024, the Podcast Episode, and a transcript of the Podcast Episode, as discussed in the Complaint, Compl. ¶ 35, are attached as Exhibits 1-7 to the Declaration of Katherine M. Bolger ("Bolger").

[3] The Complaint refers to the Articles at issue as Articles 1-5.  Compl. ¶¶ 16, 18, 20-22.  For ease of reference, this memorandum uses those same terms.

LaCivita had received in previous campaigns," as well as an "audit" performed by 2016 Trump campaign manager (and 2024 campaign adviser) Corey Lewandowski. *Id.* at 7-8. Plaintiffs do not assert any claims based on this reporting.

Article 1 does not suggest any unlawful behavior on LaCivita's part. Instead, Article 1 includes an extensive on-the-record response from LaCivita, in which he did not directly dispute the specific payments received:

> "This entire story is fabricated nonsense, cooked up by talentless grifters who lack the integrity and skill to contribute to President Trump's continued electoral success," he [LaCivita] said. "Every member of this team, myself included, has been fairly and responsibly compensated, with the priority of electing President Trump at the forefront of every strategic and financial decision we have made."
>
> "While the individuals responsible for attempting this kamikaze operation are known, their self-serving attempt to defame me will not distract us from continuing to deliver for President Trump and winning this election."

*Id.* at 3. Article 1 also includes two Trump campaign statements asserting that "the amounts recorded on campaign finance records as being paid to Advancing Strategies are misleading" because "a chunk" and "much" of these amounts were "'pass through' payments to other vendors," "not income" to LaCivita's company, and the contracts were all campaign-approved. *Id.* at 4, 9. Article 1 also reports that the campaign "disputes the figure for the additional monies owed to LaCivita, but did not offer an alternative estimate." *Id.* at 2.

The remainder of Article 1 describes LaCivita's background as a political operative, including his role in masterminding the "Swift Boat" ads against presidential candidate John Kerry in the 2004 race. *Id.* at 11-12. The challenged statements in the remaining Publications derive entirely from Article 1's reporting on the payments made to LaCivita and his firm.

### 2. Article 2

Also on October 15, 2024, *The Daily Beast* published a follow-up article titled "How Trump's Campaign Chief Made Himself a Multi-Millionaire" ("Article 2"), authored by its

executive editor Hugh Dougherty. Compl. Ex. 2 (Dkt. 1-3). Article 2 describes LaCivita as an "effective" operative with an "uncanny ability to turn losing races into victories" and states his "ability to turn around campaigns at the last minute is one of the reasons Trump has put so much faith in LaCivita." *Id.* at 5. Embedding a link to Article 1, Article 2 originally reported that LaCivita received $22 million based on his campaign work, as well as his statements published in Article 1, and his failure to "directly deny the huge sums of money revealed by the Beast." *Id.* at 2. Article 2 also reported on LaCivita's longstanding national political presence and his "help[ing] to win some of the toughest races in modern GOP history." *Id.* at 4.

### 3. The Podcast Episode

On October 23, 2024, *The Daily Beast* published an episode of its podcast "The Daily Beast Podcast." Compl. ¶ 26; Bolger Exs. 6 (episode) & 7 (transcript). Relevantly here, the Podcast Episode hosts interviewed Isikoff about his reporting in Article 1. Bolger Ex. 6 at 49:02-1:02:51. Citing his sources of "campaign finance records, talking to sources, and really digging into the contracts that LaCivita has with the Trump campaign," Isikoff reported that LaCivita received some "really astronomical sums," payments totaling $22 million from Trump super PACs, his contracts with the Trump 2024 campaign, and media buy commissions. Bolger Ex. 7 at 1.

### 4. Article 3

On October 24, 2024, *The Daily Beast* published an article titled "'Sucker' Trump Mocked for Campaign Chief's Multi-Million Haul" ("Article 3"), authored by Dougherty. Compl. Ex. 3, Dkt. 1-4. Article 3 hyperlinks to Article 1 and reports on a third-party political ad by The Lincoln Project referring to both LaCivita's multi-million-dollar payments and another former Trump campaign official's spending during the 2020 presidential campaign. *Id.* at 1-2. Article 3 reports that "LaCivita, through the campaign, denied any wrongdoing over the $22 million," and that most of the money was made up of commissions based on advertising and voter outreach efforts. *Id.* at

3.  It also includes LaCivita's comment as originally published in Article 1, again noting his lack of denial of "any of the specific sums he stands to make." *Id.*

### 5. Article 4

On October 28, 2024, *The Daily Beast* published an article titled "Trump Campaign Worker Blows Whistle on 'Grift' and Bugging Plot" ("Article 4"), authored by Isikoff.  Compl. Ex. 4, Dkt. 1-5.  As relevant here, Article 4 links to Article 1 and reports on LaCivita and his firm's multimillion-dollar payments from the Trump campaign, largely from ad commissions.  *Id.* at 3.

### 6. Article 5

On November 2, 2024, *The Daily Beast* published an article originally titled "Trump Raged at Daily Beast Revelation That Campaign Boss Got $22 Million" ("Article 5"), authored by Lily Mae Lazarus.  Compl. Ex. 5, Dkt. 1-6.  Article 5 describes *The Atlantic*'s reporting on Trump's reaction to the reported payments received by LaCivita and his firm, including that LaCivita defended himself from Trump's anger.  It also includes the Trump campaign's denial that Trump was "angered," stating that, "Everyone recognized it came from disgruntled individuals." *Id.* at 2.

### C. *The Daily Beast* Clarifies Its Reporting

After publication of Articles 1-5, LaCivita's counsel sent *The Daily Beast* a correction and retraction demand on November 5, 2024.  Compl. ¶ 34.  Notably, the letter did not challenge the $22 million figure and did not provide any evidence to dispute *The Daily Beast* reporting. In the course of re-reviewing the Articles and underlying FEC Records, The Daily Beast discovered on its own a computational error (not identified in LaCivita's demand) showing that the total payments received by Advancing Strategies were in fact $19.2 million, not $22 million.  As a result, it made two clarifications to Articles 1-5: (1) for the avoidance of any doubt, making clearer that the payments in question were made in the first instance to LaCivita's firm, Advancing Strategies; and (2) proactively correcting the error and revising the total to $19.2 million.  On

November 8, 2024, *The Daily Beast* updated the Articles accordingly throughout, including headlines, captions, and copy, and appended the following editor's note to each:

> The original version of this article mistakenly reported that LaCivita's firm had received a total of $22 million from Trump's campaign and affiliated PACs. Based on a further review of FEC records, the correct total is $19.2 million. The Beast regrets the error. The article has also been updated to make clear that payments were to LaCivita's LLC not to LaCivita personally.

Bolger Ex. 1 at 10, Ex. 2 at 5, Ex. 3 at 4, Ex. 4 at 6, Ex. 5 at 1. On January 21, 2025, LaCivita's counsel sent *The Daily Beast* a retraction demand regarding the Podcast Episode but again provided no support for LaCivita's claims of falsity. Compl. ¶ 39. Because the Podcast Episode referenced the $22 million figure, *The Daily Beast* removed it from its website on January 24, 2025. *See id.* ¶ 40. Two months later, Plaintiffs brought this lawsuit. Dkt. 1. LaCivita asserts defamation *per se* and defamation *per quod* claims, and both LaCivita and Advancing Strategies assert a Virginia state-law business conspiracy claim. Compl. ¶¶ 44-65.

## ARGUMENT

This is an unfounded defamation claim. Plaintiffs seek to hold *The Daily Beast* liable for its truthful and privileged reporting that Plaintiffs were financially successful. And they do so by relying on the fact that *The Daily Beast* corrected an arithmetic error and apologized for it *without* Plaintiffs ever flagging the error or providing evidence to support their claim. In short, the reporting was neither defamatory nor knowingly false, and this Court should dismiss the Complaint.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Conclusory statements and facts" that are "merely consistent with a defendant's liability" do not render a complaint plausible. *Fairfax*, 2 F.4th at 292 (affirming Rule 12(b)(6) dismissal of defamation case).

Especially in defamation cases, courts play an "essential gatekeeping function" at the motion to dismiss stage. *Va. Citizens Def. League v. Couric (VCDL)*, 910 F.3d 780, 784 (4th Cir. 2018) (quoting *Pendleton v. Newsome*, 290 Va. 162, 172 (2015)). Early dismissal of defamation suits protects against the "additional cost, in the form of potentially deterred speech" resulting from "baseless defamation claims." *Arthur v. Offit*, 2010 WL 883745, at *3 (E.D. Va. Mar. 10, 2010). Indeed, "the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affs.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (Kavanaugh, J.). These considerations are especially apt where the "defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern." *Chapin v. Knight-Ridder*, 993 F.2d 1087, 1092 (4th Cir. 1993). Where, as here, "all" of these factors are present, the "constitutional protection of the press reaches its apogee." *Id.* As a result, "[c]ourts in Virginia and the Fourth Circuit routinely dismiss at the outset defamation claims that are based on constitutionally protected speech by media defendants." *Mirafuentes v. Estevez*, 2015 WL 8177935, at *3 (E.D. Va. Nov. 30, 2015) (citation omitted).

## I. THE COURT SHOULD APPLY NEW YORK LAW

As a threshold matter, the Court should decide LaCivita's defamation claims under New York law. As a federal court sitting in diversity, this Court "borrows the forum State's" choice-of-law rules. *Tika v. Jack*, 2022 WL 2955153, at *3 (W.D. Va. July 26, 2022). Virginia's choice-of-law rules establish that it is the "place of the [alleged] wrong (*lex loci delicti*) that determines which State's substantive law applies to a tort action brought in Virginia." *Quillen v. Int'l Playtex*, 789 F.2d 1041, 1044 (4th Cir. 1986). For defamation cases, Virginia courts "apply the substantive law of the state where the defamatory statements were published." *Tika*, 2022 WL 2955153, at *3 (applying D.C. law); *Fryfogle v. First Nat'l Bank of Greencastle*, 2009 WL 700161, at *3 (W.D. Va. Mar. 17, 2009) (collecting cases); *cf. Cockrum v. Donald J. Trump for President*, 365 F. Supp.

8

3d 652, 670 (E.D. Va. 2019) (Hudson, J.) (in analogous choice-of-law analysis for public disclosure of private facts claim, concluding that Virginia Supreme Court would find the place of the wrong is "*where the act of publication to the Internet occurred*") (emphasis added). Here, there is no dispute that *The Daily Beast*'s principal place of business is in New York, New York, and the Publications were published in New York. Compl. ¶ 4. Therefore, New York law applies to LaCivita's defamation claims. But to be clear, no matter what law applies, the Complaint fails to state a claim. Accordingly, this motion cites New York and Virginia law throughout.

## II.     LACIVITA'S DEFAMATION CLAIMS FAIL AS A MATTER OF LAW

LaCivita's *sole* theory of defamation is based on the Publications' original reporting of LaCivita's receipt of $22 million through his work on the Trump 2024 campaign.[4] To state a defamation claim under either New York or Virginia law, LaCivita must plead publication of an actionable statement—a (1) false statement; (2) published to a third party without authorization or privilege; (3) through the requisite fault; and (4) that either constitutes defamation *per se* or caused special damages. *Jacob v. Lorenz*, 626 F. Supp. 3d 672, 686 (S.D.N.Y. 2022); *Fairfax*, 2 F.4th at 292 (Virginia law). As to fault, in either jurisdiction LaCivita must plead "actual malice," or publication "with knowledge that [the statement] was false or … reckless disregard of whether it was false or not." *Cestaro v. Prohaska*, 681 F. Supp. 3d 121, 126 (S.D.N.Y. 2023); *Fairfax*, 2 F.4th at 292 (same). And the Court must decide as a "threshold matter of law whether a statement

---

[4] As a threshold matter, LaCivita improperly pleads defamation *per se* and defamation *per quod* as separate claims. Compl. ¶¶ 44-65. To the extent that Virginia law applies, there is "only one cause of action in Virginia for defamation." *Weinstein v. Booz Allen Hamilton*, 2021 WL 12180434, at *1 n.1 (E.D. Va. June 1, 2021). "*Per quod*" and "*per se*" simply refer to different categories of defamatory statements. *Id*. Therefore, LaCivita may only bring one cause of action based on defamation in Virginia. *Sepmoree v. Bio-Med. Applications of Va.*, 2014 WL 4444435, at *3 (E.D. Va. Sept. 8, 2014).

is reasonably capable of defamatory meaning." *VCDL*, 910 F. 3d at 784; *Celle v. Filipino Rep. Enters.*, 209 F.3d 163, 178 (2d Cir. 2000). LaCivita's defamation claims fail for several reasons.

### A.    LaCivita Fails to Allege Actual Malice

This Court can and should dismiss this case in its entirety for one fundamental reason: The Complaint fails to plead actual malice as to any of the Publications.

### 1.    LaCivita Is Required to Plead Actual Malice

To state a cognizable defamation claim against *The Daily Beast*, LaCivita must sufficiently plead actual malice for three independent reasons: (1) LaCivita is at minimum a limited-purpose public figure subject to the constitutional requirement of actual malice; (2) New York's anti-SLAPP law applies, requiring actual malice, N.Y. Civ. Rights Law §§ 70-a, 76-a; and (3) should Virginia law apply, Virginia's anti-SLAPP law applies, also requiring actual malice, Va. Code Ann. § 8.01-223.2.

### a.    LaCivita Is at Minimum a Limited-Purpose Public Figure

Public figures or limited public figures, like LaCivita, must show the allegedly defamatory statements were made with "actual malice"—i.e., that *The Daily Beast* knowingly made a false statement about LaCivita or made the statement with reckless disregard for its truth. *N.Y. Times v. Sullivan*, 376 U.S. 254, 279-80, 285-86 (1964). Whether a plaintiff is a public figure is a question of law. *Horne v. WTVR*, 2017 WL 1330200, at *4 (E.D. Va. Apr. 6, 2017), *aff'd*, 893 F.3d 201 (4th Cir. 2018). Accordingly, at the motion to dismiss stage, courts routinely determine both whether the plaintiff is a public figure and whether he adequately alleges actual malice. *Biro v. Condé Nast*, 807 F.3d 541, 547 (2d Cir. 2015) (dismissal on public figure's failure to allege actual malice); *Fairfax*, 2. F.4th at 296; *Prince v. Intercept*, 634 F. Supp. 3d 114, 139 (S.D.N.Y. 2022) (same).

LaCivita, co-campaign manager for Trump's 2024 presidential campaign and a high-

ranking RNC official with a decades-long national career as a campaign operative, is unquestionably a public figure.[5] *See* Compl. ¶ 2. Courts around the country have repeatedly found political operatives with equivalent or far lesser profiles to be public figures. *See Sipple v. Found. for Nat'l Progress*, 83 Cal. Rptr. 2d 677, 690 (Cal. Ct. App. 1999) ("nationally known political strategist" who was "profiled, quoted, interviewed, and [] used the media for his professional advantage many times" and "represents national leaders" was public figure); *United States v. Sryniawski*, 48 F.4th 583, 588 (8th Cir. 2022) (same, for state legislature candidate's campaign manager and wife); *Miller v. Gizmodo Media*, 407 F. Supp. 3d 1300, 1302-03, 1309 n.9 (S.D. Fla. 2019) (same, for political strategist), *aff'd*, 994 F.3d 1328 (11th Cir. 2021); *G.D. v. Kenny*, 15 A.3d 300, 307 (N.J. 2011) (same, for part-time state senate campaign aide); *cf. Donald J. Trump for President v. WP*, 2023 WL 1765193, at *3 (D.D.C. Feb. 3, 2023) ("Trump campaign concedes that it is a public figure"). Here, LaCivita co-managed the campaign for the nation's most high-profile political race and serves as a leading operative in the RNC's national apparatus. Compl. ¶ 2. He is a public figure.

---

[5] As the Articles report, *e.g.*, Bolger Ex. 1 at 9; Ex. 2 at 2-5, LaCivita has long been spotlighted as a national Republican operative, long before the Articles. *See, e.g.*, David Freedlander, "Chris LaCivita, the Swiftboater Coming for Biden," N.Y. Mag. (Feb. 22, 2024), https://nymag.com/intelligencer/article/trump-campaign-chris-lacivita-swift-boat-veteran.html; Michael Scherer & Josh Dawsey, "Trump eyes longtime Virginia operative for senior 2024 campaign role," Wash. Post (Oct. 25, 2022), https://www.washingtonpost.com/nation/2022/10/25/trump-campaign-lacivita. And he gave several media interviews as the Trump campaign co-chief. *See, e.g.*, POLITICO, "Full interview with Trump adviser Chris LaCivita at RNC," YouTube (July 18, 2024), https://www.youtube.com/watch?v=EJy5m2ZIrZs; Gabriel Hays, "Trump senior campaign advisor slams left," Fox News (July 27, 2024), https://www.foxnews.com/media/trump-senior-campaign-advisor-slams-left-taking-vances-cat-lady-comments-blatantly-out-context. While the Court need not determine "whether the contents of those articles were in fact true" at the motion-to-dismiss stage, it may take judicial notice of them "to indicate what was in the public realm at the time[.]" *Ash v. PowerSecure Int'l*, 2015 WL 5444741, at *4 (E.D.N.C. Sept. 15, 2015).

In addition, LaCivita is a paradigmatic limited-purpose public figure, or someone who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues." *BYD v. VICE Media*, 531 F. Supp. 3d 810, 819 (S.D.N.Y. 2021) (citation omitted), *aff'd*, 2022 WL 598973 (2d Cir. Mar. 1, 2022). Courts examine "the nature and extent of the individual's participation in the particular controversy giving rise to the [alleged] defamation," here, the 2024 Trump campaign and LaCivita and his firm's associated financial success. *Hourani v. Psybersolutions*, 164 F. Supp. 3d 128, 142 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017). Courts have readily concluded that analogous campaign advisers and operatives—including specifically those working for the Trump campaign—are limited public figures. *See, e.g.*, *Page v. Oath*, 270 A.3d 833, 845 (Del. 2022) (Carter Page, 2016 Trump campaign foreign policy adviser, was limited public figure); *Norris v. Bangor Publ'g*, 53 F. Supp. 2d 495, 505 (D. Me. 1999) (same, for political consultant and opposition researcher for state senate race); *Fuller v. Russell*, 842 S.W.2d 12, 13 (Ark. 1992) (same, for political consultant hired for state general assembly primary); *Burns v. Times Argus Ass'n*, 430 A.2d 773, 775 (Vt. 1981) (same, for plaintiff whose political activities "aimed at affecting the outcome of a … political campaign"); *Gleichenhaus v. Carlyle*, 597 P.2d 611, 613 (Kan. 1979) (same, for political campaign donor). If these lower-level campaign advisers or participants were considered limited public figures, then LaCivita—the Trump campaign's apex operative, its *co-manager*—must be as well.

### b. New York's and Virginia's Anti-SLAPP Laws Require Pleading Actual Malice

Independently of the federal constitutional actual malice requirement, New York's anti-SLAPP law applies to this action, requiring LaCivita to show actual malice. N.Y. Civ. Rights Law §§ 70-a, 76-a. The law requires that, in any action "involving public petition and participation," the plaintiff must establish by clear and convincing evidence that the publication was made with

"knowledge of its falsity or with reckless disregard of whether it was false," i.e., actual malice. N.Y. Civ. Rights Law § 76-a(1)-(2). In turn, the law defines public petition and participation to include "any communication in a place open to the public or a public forum in connection with an issue of public interest." *Id.* § 76-a(1). Further, substantive provisions of the law—such as the actual malice standard and the mandatory fee-shifting provision—apply in federal diversity cases like this one. *See 1st Amend. Praetorian v. N.Y. Times*, 2025 WL 949575, at *7 (S.D.N.Y. Mar. 28, 2025); *Bobulinski v. Tarlov*, 758 F. Supp. 3d 166, 184-85 (S.D.N.Y. 2024).

And here, there is no doubt that the Publications were made in a public forum about a matter of public interest. LaCivita alleges *The Daily Beast* defamed him in several publications on its website, which is undoubtedly a public forum. *See Satanic Temple v. Newsweek*, 774 F. Supp. 3d 688, 699 (S.D.N.Y. 2025) (public forum where article "published on Newsweek's online website."). And as to "public interest," which the statute "construe[s] broadly" as "any subject other than a purely private matter," N.Y. Civ. Rights Law § 76-a(1)(d), reporting about substantial payments to the co-manager of the successful campaign to elect the current President plainly qualifies. *See Lindberg v. Dow Jones*, 2021 WL 3605621, at *8 (S.D.N.Y. Aug. 11, 2021) (public interest matters are those "of political, social, or other concern to the community").

In the alternative, if this Court finds that Virginia law applies, LaCivita must plead actual malice under Virginia's anti-SLAPP statute, which immunizes actions involving statements regarding matters of public concern unless a plaintiff pleads and proves that the defendant made the statements with actual malice. Va. Code Ann. § 8.01-223.2(A)-(B); *see Fairfax v. CBS*, 534 F. Supp. 3d 581, 598 (E.D. Va. 2020) (same), *aff'd*, *Fairfax*, 2 F.4th at 286. There is no question, therefore, that LaCivita must plead actual malice to proceed.

### 2. LaCivita Does Not Allege Actual Malice

To plead actual malice, LaCivita must plausibly allege *The Daily Beast* "realized that [its]

statement was false or that [it] subjectively entertained serious doubt as to the truth of [its] statement." *Bose v. Consumers Union of U.S.*, 466 U.S. 485, 511 n.30 (1984); *see also Carr v. Forbes*, 259 F.3d 273, 282 (4th Cir. 2001) ("Proof of falsity is not enough[.]").  The Complaint may not simply rely on "conclusory" allegations reciting actual-malice boilerplate to survive dismissal.  *Besen v. Parents & Friends of Ex-Gays*, 2012 WL 1440183, at *6 (E.D. Va. Apr. 25, 2012) (Hudson, J.).  Recklessness "is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Nor does actual malice mean "ill will." *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 666 (1989).  Instead, LaCivita must plead facts showing *The Daily Beast* had "actual knowledge" that the statement in question was false before publishing, meaning a "high degree of awareness of [the statement's] probable falsity." *Lively v. Wayfarer Studios*, 2025 WL 1637019, at *49 (S.D.N.Y. June 9, 2025).  Courts routinely grant and affirm dismissals of defamation claims for failure to so plead.  *See, e.g.*, *Biro*, 807 F.3d at 547; *Harvey v. CNN*, 48 F.4th 257, 273 (4th Cir. 2022); *Fairfax*, 2. F.4th at 93; *Mayfield v. NASCAR*, 674 F.3d 369, 378 (4th Cir. 2012).

Timely and diligent clarification affirmatively negates actual malice.  *See, e.g., Nelson Auto Ctr. v. Multimedia Holdings*, 951 F.3d 952, 958–59 (8th Cir. 2020) (no actual malice where, in response to plaintiff's complaint, defendant "promptly corrected the mistake on its website"); *New Times Inc. v. Isaacks*, 146 S.W.3d 144, 166 (Tex. 2004) (defendant's "labeling and clarification … as well as its explanatory responses to readers, evidence a lack of actual malice"); *Zerangue v. TSP Newspapers*, 814 F.2d 1066, 1071 (5th Cir. 1987) ("readiness to print a retraction weighs against 'malice'"); *Logan v. D.C.*, 447 F. Supp. 1328, 1332 (D.D.C. 1978) ("[T]he correction published the next day . . . 'is significant and tends to negate any inference of actual malice'").  *The Daily Beast*'s responsible behavior in correcting its error unprompted all but precludes any

finding that it published the alleged defamatory statements with actual malice.

Here, the Complaint entirely lacks any facts to create a plausible inference that *The Daily Beast* acted with actual malice. Nor could it ever, because *The Daily Beast*, acting on its own, corrected its arithmetic error within days of discovering it. It then further clarified the Articles to emphasize that all of the funds at issue were paid to Advancing Strategies (rather than to LaCivita personally), and added an editor's note and apology explaining those changes.[6] There was no knowing falsification here; there was only knowing correction.

Perhaps that is why the Complaint offers nothing more than conclusory and boilerplate allegations regarding *The Daily Beast*'s state of mind. *See, e.g.*, Compl. ¶ 1 ("The Daily Beast's malicious publication"; "The Daily Beast falsely reported"); ¶ 24 ("published by The Daily Beast with actual malice"). But such rote "recitation[s] of the legal standard" are "precisely the sort of allegations that *Twombly* and *Iqbal* rejected." *Mayfield*, 674 F.3d at 378. For example, in *BYD*, the court found that the plaintiff failed to plead actual malice where the complaint "allege[d] no nonconclusory facts that support the proposition that [the defendant] knew that it was reporting falsities," but instead, in "conclusory fashion," claimed that the defendant "knew" its reporting was false, without any supporting evidence. *BYD*, 531 F. Supp. 3d at 823. The same is true here.[7]

_____

[6] Because the actual malice standard is based on a defendant's subjective state of mind "*at the time of publication*," *Bose*, 466 U.S. at 512 (emphasis added), such clarification cannot form the basis for a claim that *The Daily Beast* acted with actual malice. *Biro*, 807 F.3d at 546 (allegations relating to events that occurred "after publication . . . cannot be relevant to the publisher's state of mind [regarding] [] alleged malice at the time of publication") (citation omitted).

[7] LaCivita also fails to "bring home" the actual malice standard to specific persons at *The Daily Beast* "having responsibility" for publishing the challenged statements, as is constitutionally required. *BYD*, 531 F. Supp. 3d at 823; *Patel v. CNN*, 910 S.E.2d 532, 544 (Va. 2025) (citing *Sullivan*, 376 U.S. at 287). To plead malice, a plaintiff must connect the dots between the challenged statements and the specific persons authoring the article. *Sullivan*, 376 U.S. at 287; *see BYD*, 531 F. Supp. 3d at 823 (no actual malice where no "allegations about specific individuals at [the media defendant] to whom such knowledge could be imputed"). Here, though journalists

At most, LaCivita unsuccessfully attempts to allege actual malice in three ways. But none of these allegations—whether considered individually or taken together—satisfy the stringent pleading requirements for actual malice.

*First*, LaCivita suggests that *The Daily Beast* acted with actual malice by publishing information about LaCivita's earnings that are supposedly "categorically false and belied by the publicly available campaign finance records themselves." Compl. ¶ 23. As discussed further *infra* Section II.B, this is simply not the case. The underlying FEC Records clearly show the payments made to LaCivita's firm, which is exactly what *The Daily Beast* reported. *The Daily Beast* also reported LaCivita's on-the-record response and statements from Trump campaign officials that a sizeable "chunk" of those funds were "pass through" payments to other vendors and "not income" to LaCivita or his firm.[8] Bolger Ex. 1 at 4, 7. Thus, nowhere in the reporting did *The Daily Beast* "falsely" report that LaCivita *personally* received $22 million in full, contrary to the Complaint. Compl. ¶ 1. LaCivita's conclusory, unsupported assertion that the FEC Records say something other than what *The Daily Beast* published is insufficient to plead actual malice.

*Second*, to the extent LaCivita suggests his blanket denials of the allegations are evidence of actual malice, Compl. ¶¶ 23, 35, this too is insufficient. Actual malice "cannot be predicated on mere denials, however vehement; such denials are so commonplace in the world of polemical

_____

Hugh Dougherty and Lily Mae Lazarus authored three out of the five challenged Articles, Bolger Exs. 2-3, 5, the Complaint does not include a *single* allegation regarding those individuals' subjective mindsets at the time of publication. *Patel*, 910 S.E. 2d at 544 (obligation to "bring home" actual malice is "particularly pronounced" where challenged publications had "different authors, rendering the state of mind of each person critical to discerning which of the statements, if any, may have been published with the requisite intent."). LaCivita fails to plead the requisite "state of mind" for the individuals authoring the challenged publications. *Id.*

[8] A "chunk" is defined as a "large noteworthy quantity or part." "Chunk," Merriam-Webster, https://www.merriam-webster.com/dictionary/chunk.

charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." *Cassava Scis. v. Bredt*, 2024 WL 1347362, at *26 (S.D.N.Y. Mar. 28, 2024). To the contrary, where a publisher "contact[s] [the plaintiff]" for comment on the issue and publishes those on-the-record responses, there is no actual malice. *Mayfield*, 674 F.3d at 378 (affirming dismissal on lack of actual malice); *see Freedom Newspapers of Tex. v. Cantu*, 168 S.W.3d 847, 858 (Tex. 2005) (article quoting plaintiff and "the opinions of his supporters is evidence of the absence of actual malice, not the opposite"). Here, *The Daily Beast* did both. LaCivita's prepublication denial, which was published in the Articles, and in fact did *not* dispute the sums of money he was paid, is not enough to plead malice.

*Third*, LaCivita speculates that *The Daily Beast* acted with actual malice by "knowing[ly] rel[ying] on unreliable information provided by Corey Lewandowski and others in a blatant act of revenge against Mr. LaCivita and the Republican National Committee." Compl. ¶ 24. LaCivita apparently rests this allegation on Article 1's reporting concerning Lewandowski's publicly known financial audit of the Trump campaign, which had already been reported by other outlets well before Article 1's publication, including *The Guardian* (as hyperlinked in Article 1).[9] This is something of an internecine sideshow, as LaCivita's defamation claim does not appear based on anything other than the reporting on the contents of the FEC Records. But in any event LaCivita's allegations are belied by the Articles themselves, none of which exclusively relies on Lewandowski or his audit.[10] Instead, it is clear on the face of Article 1 that Isikoff relied on

_____

[9] *See* Bolger Ex. 1 at 6 (hyperlinking to Hugo Lowell, "Trump aide Corey Lewandowski said to have lost campaign power struggle," Guardian (Oct. 7, 2024), https://www.theguardian.com/us-news/2024/oct/07/trump-aide-corey-lewandowski-sidelined).

[10] In fact, Article 1 even included comment from a Trump insider *critiquing* Lewandowski: "'[Lewandowski] was going around and acting like he was a Bain consultant,' one Trump insider told the Daily Beast, referring to Bain & Company, the global management consulting firm

numerous reliable sources, including the FEC Records, LaCivita's campaign contracts, Trump campaign sources, campaign finance experts, and prior reporting from other reputable news organizations, including *The Guardian*, NBC, and *The New York Times*.  Bolger Ex. 1 at 1, 4.

Such "good faith reliance" on reputable sources "precludes a finding of actual malice as a matter of law."  *Liberty Lobby v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988); *see also Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 947 (11th Cir. 2017) (a publisher's reliance on "trustworthy sources demonstrates [its] lack of subjective belief that the [allegedly defamatory] articles contained false statements").  Relevantly here, in *Schaefer v. Wash. Times*, 1988 WL 6203, at *3 (D. Md. Jan. 29, 1988), the court found no actual malice where the reporter reviewed numerous documents, including "plaintiff's filings with the [FEC]."

Finally, even if *The Daily Beast* had relied on Lewandowski or his audit, whatever bias or motivations he may have had against LaCivita are irrelevant.  Courts have made clear that "self-interest and politics 'motivate[] many news sources; if dealing with such persons were to constitute evidence of actual malice on the part of a reporter, much newsgathering would be severely chilled.'"  *Fairfax*, 2 F.4th at 294; *see also Prince v. Intercept*, 2023 WL 4492413, at *7 (S.D.N.Y. 2023) (allegations about "improper political or personal biases" do not establish actual malice without allegations suggesting publisher "acted pursuant to that bias"); *Spacecon Specialty Contractors v. Bensinger*, 713 F.3d 1028, 1045 (10th Cir. 2013) ("That [defendant] knew [a source] ... may have been biased ... is not evidence [defendant] had obvious reasons to doubt [the source's] veracity or the accuracy of his report.").  LaCivita's ""naked assertion[s]' devoid of 'further factual enhancement'" that *The Daily Beast* "relied on unreliable or biased sources in

once headed by Mitt Romney.  'People thought it was weird.'"  Bolger Ex. 1 at 6.

researching" fail to plausibly allege actual malice. *Harvey*, 48 F.4th at 274. This is because actual malice requires the plaintiffs to plead a relationship between a source's purported bias and the publisher's publication of the challenged statements with knowing falsity. For that reason, courts have dismissed claims for failure to plead actual malice even where the reporter relied on sources with "many credibility flaws," such as having been "convicted of fraud," being "self-interested in providing [the reporter] with a profitable story," or being, as described by the reporter, a "liar . . . [who] misled directly, indirectly, compulsively." *Berisha v. Lawson*, 973 F.3d 1304, 1312 (11th Cir. 2020). If those publishers did not act with actual malice, *The Daily Beast* certainly did not do so here. In sum, LaCivita has failed to plead actual malice.

### B. The Fair Report Privilege Protects the Publications

LaCivita's claims also independently fail because the Publications are a fair report of public records filed with a government agency—the FEC Records.[11] Both New York's and Virginia's fair report privileges immunize publishers for fair and true reports of official proceedings. *See* N.Y. Civ. Rights Law § 74; *Ramey v. Kingsport Publ'g*, 905 F. Supp. 355, 358 (W.D. Va. 1995).[12]

---

[11] The Complaint extensively discusses and cites to the underlying FEC Records, and therefore these records, attached as Bolger Exhibits 8, 10, and 12, are central to the Complaint, incorporated by reference therein, and may be considered by the Court on this motion. *E.g.*, Compl. ¶¶ 1 ("public campaign finance records demonstrating [alleged] falsity" of reporting), 23 ("publicly available campaign finance records"); 37 ("publicly available FEC records"). Particularly when considering the applicability of the fair report privilege at the 12(b)(6) stage, the Court "must have access" to the underlying public records to "compare the contents of the [public records] with the [challenged] articles." *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 486 (E.D. Va. 2018) (considering VDOT report in its entirety on motion to dismiss for purposes of fair report); *see also Cobin v. Hearst-Argyle Television*, 561 F. Supp. 2d 546, 552 (D.S.C. 2008) (similar, as to police report). Moreover, the Court is permitted to take judicial notice of undisputed, official public records, like the FEC records submitted with this Motion. *Spirito*, 350 F. Supp. 3d at 486.

[12] New York's fair report privilege is "absolute" and not defeated by "allegations of malice or bad faith." *Kinsey v. N.Y. Times*, 991 F.3d 171, 176 (2d Cir. 2021). Whether Virginia's fair report privilege is absolute or qualified has been a "subject of debate." *Reuber v. Food Chem. News*, 925 F.2d 703, 714 (4th Cir. 1991). But no matter which law applies, because the Complaint fails to

A report need not extensively explain every part of the public record for the privilege to apply, so long as its summary is "substantially accurate." *Friedman v. Bloomberg*, 884 F.3d 83, 93 (2d Cir. 2017); *Alexandria Gazette v. West*, 198 Va. 154, 163 (1956) (similar).

Application of the privilege is a question of law, ripe for adjudication at the motion-to-dismiss stage, especially to avoid chilling reporting on public activity. *Cummings v. City of New York*, 2021 WL 1163654, at *14-15 (S.D.N.Y. Mar. 26, 2021), *aff'd*, 2022 WL 2166585 (2d Cir. June 16, 2022); *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 485-88 (E.D. Va. 2018); *Agbapuruonwu v. NBC Subsidiary (WRC-TV)*, 821 F. App'x 234, 239 (4th Cir. 2020).

### 1.    The Fair Report Privilege Applies to the FEC Records

Here, there can be no dispute that the FEC Records are within the purview of the New York and Virginia fair report privileges. The fair report privilege applies to official documents, which serve as "the basic data of governmental operations." *Cox Broad. v. Cohn*, 420 U.S. 469, 492 (1975); *see also Spirito*, 350 F. Supp. 3d at 485 (fair report privilege applies to the "publication of public records"). Courts in this Circuit and the Second Circuit have applied the fair report privilege to a wide range of official documents and communications, including: the announcement of an investigation by a public agency prior to the beginning of the investigation, *Cummings*, 2021 WL 1163654, at *14-15; forms filed "as part of the broad regulatory scheme required by the SEC," *Nineteen Eighty-Nine, LLC v. Icahn Enters. L.P.*, 953 N.Y.S.2d 4, 6 (2012); a leaked reprimand letter issued by a government agency contractor, *Reuber*, 925 F.2d at 712-713; remarks made by a legislator, *Chapin*, 993 F.2d at 1096-1098; state transportation audit reports, *Spirito*, 350 F. Supp. 3d at 489; tweets and report summarizing instant messages appearing in official documents from

---

plead actual malice, *see supra* Section II.A, both the New York and Virginia fair report privileges protect the Publications.

an impeachment proceeding, *Harvey*, 48 F.4th at 274; a magistrate judge's notes, *Agbapuruonwu*, 821 F. App'x at 240; and a DOJ human trafficking report and press releases, *Nanji v. Nat'l Geographic Soc'y*, 403 F. Supp. 2d 425, 434 (D. Md. 2005).

Likewise, courts outside these Circuits have applied the privilege to everything from forms "filed for the purpose of complying with the [Securities and Exchange Commission's] mandatory disclosure requirements," akin to the FEC disclosures here, *Sugarman v. Brown*, 288 Cal. Rptr. 3d 165, 172 (Cal. Ct. App. 2021); to a dossier consisting of memoranda compiling verified and unverified allegations about public officials, *Gubarev v. BuzzFeed*, 340 F. Supp. 3d 1304, 1308 (S.D. Fla. 2018); to letters sent by a police organization regarding irregularities in the department's drug testing program, *White v. Fraternal Ord. of Police*, 909 F.2d 512, 514 (D.C. Cir. 1990); to internal government agency memoranda "not intended for public disclosure," *Ingenere v. ABC*, 1984 WL 14108, at *2 (D. Mass. Sept. 8, 1984); and to a public employee's emails regarding his official duties, *Folta v. N.Y. Times*, 2019 WL 1486776, at *3 (N.D. Fla. Feb. 27, 2019).

Here, the campaign finance disclosures at issue are mandated by federal reporting requirements and fall squarely within the fair report privilege. *See, e.g.*, 52 U.S.C. § 30104 (federal campaign reporting requirements); 11 CFR §§ 100.16, 104.4 (reporting requirements governing independent expenditures). The Supreme Court has recognized that campaign finance disclosures are a cornerstone of democratic transparency: they "minimize[] the potential for abuse of the campaign finance system," "provid[e] the electorate with information about the sources of election-related spending," "deter" corruption by "exposing large contributions and expenditures to the light of publicity," and ultimately "offer a particularly effective means of arming the voting public with information." *McCutcheon v. FEC*, 572 U.S. 185, 223–24 (2014) (online disclosures offer even more "robust protections" against corruption as they are available "almost immediately

after they are filed"); *see also Wash. Post v. McManus*, 355 F. Supp. 3d 272, 303 (D. Md.) (campaign finance disclosure requirements "substantially relate[] to … government's interests in promoting transparency and deterring corruption"), *aff'd*, 944 F.3d 506 (4th Cir. 2019). Moreover, as part of the "broad regulatory scheme" required by the FEC, *Nineteen Eighty-Nine*, 953 N.Y.S.2d at 6, campaign finance disclosures necessarily precede any "regulatory investigation where warranted." *Sugarman*, 288 Cal. Rptr. 3d at 172. The fair report privilege exists to protect reporting on precisely this type of official record, and therefore apply to the FEC Records at issue.

### 2. The Publications Are a Fair and Accurate Report of the FEC Records

The Publications fairly and accurately reflect the FEC Records. The key legal question in applying the fair report privilege is whether the Publications "would have a different effect" on the mind of a reasonable reader than would the full FEC Records. *Cummings*, 2021 WL 1163654, at *14. Here, *The Daily Beast*'s reporting of the monies paid to LaCivita's firm was accurate. *The Daily Beast* reported that the Trump-affiliated super PAC, Make America Great Again, Inc., paid Advancing Strategies $15.7 million in 2022, and the Trump campaign and the Republican National Committee (RNC) paid Advancing Strategies $3.4 million in 2023-2024. Bolger Ex. 1 at 2.[13] The FEC disclosures show these exact figures, Bolger Exs. 8-13:[14]

| Payment Source | FEC Disclosure Source | Amount |
|---|---|---|
| Trump-affiliated super PAC, Make America Great Again, Inc. (2022) | Independent Expenditures from Make America Great Again, Inc. to Advancing Strategies, LLC (2022). Bolger Exs. 8-9. | $14,788,600.16 |
| | Disbursements from Make America Great Again, Inc. to Advancing Strategies, LLC (2022). Bolger Exs. 10-11. | $962,917.96 |

[13] Because of rounding of the underlying figures, the actual total, as reported, was $19.2 million.

[14] For the Court's convenience, *The Daily Beast* attaches the underlying FEC records showing the payment line-items and corresponding appendices totaling those line-items. Bolger Exs. 8-9, 10-11, 12-13.

| | | Total: | $15,751,518.1, or $15.7 million, rounded down |
| --- | --- | --- | --- |
| Trump campaign (Donald J. Trump for President 2024, Inc.) and the Republican National Committee (RNC) | Disbursements from Donald J. Trump for President 2024, Inc. (now known as Never Surrender, Inc.) and the Republican National Committee to Advancing Strategies, LLC (2023-2024, predating publication of Article 1). Bolger Exs. 12-13.[15] | | $3,429,959.85, or $3.4 million, rounded down |
| | | Total: | $3,429,949.85, or $3.4 million, rounded down |
| | | Grand Total: | $19,181,468, or $19.2 million, rounded up |

In short, the FEC Records stated that Advancing Strategies received $19.2 million through super PAC and campaign payments. That is exactly what the Publications, as updated, reported.

LaCivita seeks to avoid this outcome, alleging that public "campaign finance records" show the Publications are "categorically false" because the documented payments purportedly did not go to LaCivita personally. Compl. ¶ 23. But that claim is belied by the FEC Records themselves, all of which show payment to Advancing Strategies, his firm, of which he is the sole member and which is located in his home. They are also belied by the Publications themselves, which include multiple Trump campaign comments asserting that the FEC Records were

---

[15] Two points of clarification: *First*, at the time Article 1 was published, the relevant Trump campaign entity was known as "Donald J. Trump for President 2024, Inc." Following the 2024 election, the organization was renamed "Never Surrender, Inc.," which is how it currently appears in FEC campaign disclosures. *See* Bolger Ex. 14 (FEC record stating: "Financial data for this committee [Never Surrender, Inc.] contains funds raised and spent under the former name DONALD J. TRUMP FOR PRESIDENT 2024, INC. which, before it was converted, was a principal campaign committee."). The Court may take judicial notice of Ex. 14 as an official U.S. government agency record. *See* Va. Code Ann. § 8.01-388; *Spirito*, 350 F. Supp. 3d at 486 (court may "take judicial notice of official public records"). *Second*, this motion only references those line-items in the FEC Records prior to Article 1's publication date, October 15, 2024.

"misleading" because "much" or a "chunk" of the funds were passed through to other vendors, and were not income to LaCivita or his firm.  Bolger Ex. 1 at 4, 7.  Article 1 further quoted the campaign's statement that "[t]here is a difference between an LLC being paid funds vs collecting a personal 'take.'"  *Id.* at 7.  The Publications are fair reports of the FEC Records.

That is so even for *The Daily Beast*'s initial report that Advancing Strategies received $22 million.  This is a classic example of how the fair report privilege protects reporting where, even "despite minor inaccuracies, it does not produce a different effect on a reader than would a report containing the precise truth."  *Kinsey v. N.Y. Times*, 991 F.3d 171, 178 (2d Cir. 2021); *see Alexandria Gazette*, 198 Va. at 163 (fair report privilege covered "not exactly correct" article because it "constituted no substantial departure" from record).  Here, the gist of the Publications is that LaCivita and Advancing Strategies were paid a substantial amount of money; the difference between $19 million and $22 million does not produce a "different effect" on the reader.  Accordingly, the calculation error does not obviate the privilege.

### C.  The Publications Are Not Defamatory

LaCivita's defamation claim separately fails because the Publications are not defamatory, whether *per se* or *per quod*.

### 1.  The Publications Are Not Defamatory *Per Se*

Defamation *per se* claims involve words that are actionable on their face, including as relevant here, if they "disparage" a person "in the way of his office, profession, or trade."  *Celle*, 209 F.3d at 179; *see Tronfeld v. Nationwide Mut. Ins.*, 272 Va. 709, 711-715 (2006) (similar, Virginia law).  In assessing whether statements are defamatory *per se*, the Court need not accept a plaintiff's "tortured interpretation," but rather should assess what the Publications actually say.  *Freedlander v. Edens Broad.*, 734 F. Supp. 221, 225 (E.D. Va. 1990) (granting motion to dismiss in part based on lack of defamatory meaning), *aff'd*, 923 F.2d 848 (4th Cir. 1991).  Here, while

LaCivita claims that the Publications defame him *per se* by "falsely imply[ing] … [he] was personally profiting excessively from his work on the campaign, that he was prioritizing personal gain over the campaign's success, and that he was doing so unbeknownst to President Trump and the campaign," the Publications themselves do not reasonably imply anything of the kind.

To the contrary, the Publications report on the payments to LaCivita and his firm as entirely legitimate expenditures by Trump-affiliated political organizations and the Trump campaign. For example, Article 1 reports that the payments to LaCivita and his firm originated from super PAC expenditures and campaign contract negotiations, not any illegitimate or suspect sources. Bolger Ex. 1 at 2; *see Bobulinski*, 758 F. Supp. 3d at 181 (allegation that plaintiff was "accepting third-party payment from a PAC would not be a violation of his ethical duties" and not defamatory *per se*). Article 1 also quotes the campaign's statement that all of LaCivita's contracts were signed by the campaign treasurer and authorized by campaign lawyers. Bolger Ex. 1 at 4. Article 1 further describes how LaCivita was able to increase his earnings by renegotiating his contracts at certain campaign milestones, including when Trump clinched the Republican nomination and if Trump won the presidency. *Id.* at 2, 6-7. Other Articles include repeated commentary emphasizing LaCivita's qualifications and many successes. For example, Article 2 recounts how LaCivita "helped win some of the toughest races in modern GOP history," and quotes a former Democratic operative describing LaCivita as "one of the most effective campaign operatives I have ever known," as well as Donald Trump Jr. describing him as "just a supremely competent nuts-and-bolts guy." Bolger Ex. 2 at 3-4. Such praise is the *exact opposite* of suggesting that LaCivita is "unfit in his . . . trade," or that he lacked "the skills or character required to carry out [his] particular occupation" as a political operative, required for defamation *per se*. *VCDL*, 910 F.3d at 784-85.

If anything, reporting on the significant payments to LaCivita and his firm, coupled with

laurels about his job performance, "particularly in a capitalistic society such as ours … could be considered more complimentary than derogatory." *Freedlander*, 734 F. Supp. at 225 (concluding similarly as to phrase "money jockey"); *see Coles v. Wash. Free Wkly.*, 881 F. Supp. 26, 33-34 (D.D.C. 1995) (describing lawyer as "well-paid" was not defamatory, as "[m]ost professionals hope to get paid well for their services"), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996). Connecting LaCivita to legitimate campaign payments simply can neither prejudice him in his profession nor be grounds for any hatred, distrust, or ridicule. The Publications do not defame LaCivita *per se*.[16]

## 2. The Publications Are Not Defamatory *Per Quod*

LaCivita also contradictorily claims these same statements are defamatory *per quod*. This claim fails for two reasons. First, a claim for defamation *per quod* arises when a statement is actionable not because of any defamatory meaning present "on the face of the communication," but rather by "reference to facts extrinsic to the communication." *Henry v. Fox*, 629 F. Supp. 3d 136, 145 (S.D.N.Y. 2022); *see Wilder v. Johnson Pub'g*, 551 F. Supp. 622, 623 (E.D. Va. 1982) (Virginia). Asserting such a claim (requiring extrinsic facts to make the Articles defamatory) in tandem with a *per se* claim (requiring the Articles to be defamatory on their face) is illogical. But even setting aside LaCivita's paradoxical pleading, the purported "extrinsic facts"—that payments to LaCivita and his firm were "used for campaign advertising expenses" and "gross expenditures"—do not render the Publications defamatory because they themselves actually explain that. The Publications explicitly reference Trump campaign officials' statements that an unspecified "chunk" of the payments were "pass through" payments to other vendors, "not

---

[16] Courts have found far more suspect characterizations of a plaintiff not defamatory. *See Medcalf v. Walsh*, 938 F. Supp. 2d 478, 487 (S.D.N.Y. 2013) (statements that plaintiff "did not know her job and did not know what she was doing" not defamatory *per se*); *Yeagle v. Collegiate Times*, 255 Va. 293, 297-298 (1998) (rejecting claim that phrase "Director of Butt Licking" defames *per se* because it suggests job performance in a "manner that generally lacks integrity").

income" to LaCivita's firm. Bolger Ex. 1 at 4. Nothing about these purportedly "extrinsic" facts (which are not actually extrinsic to the Publications) can render the Publications defamatory.

Second, in order to proceed under a defamation *per quod* theory under either New York or Virginia law, LaCivita must also allege special damages, or "actual harm," the failure to plead which is a "fatal defect." *Henry*, 629 F. Supp. 3d at 145; *Hanks v. Wavy Broad.*, 2012 WL 405065, at *13 (E.D. Va. Feb. 8, 2012) (Virginia). Further, FRCP 9(g) applies a heightened pleading standard to special damages, requiring they be "specifically stated" in the complaint. Fed. R. Civ. P. 9(g); *see Carnell Const. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 725 (4th Cir. 2014) (same). Here, LaCivita fails completely to do so, offering only a vague, two-line allegation that he has suffered "special damages, including damage to his reputation and loss of business income" and "lost business opportunities." Compl. ¶ 60. But LaCivita does not specifically allege how the Publications jeopardized any business prospects, led to any out-of-pocket losses or lost income, or caused any other special damages. New York and Virginia courts routinely dismiss *per quod* claims similarly supported only by bare-bones special damages claims. *See Henry*, 629 F. Supp. 3d at 151 ("conclusory allegations" regarding "loss of economic opportunities" and "loss of revenues" are insufficient); *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 255 (S.D.N.Y.) (similar), *aff'd*, 578 F. App'x 24 (2d Cir. 2014); *Price Auto. II v. Mass Mgmt.*, 2015 WL 300418, at *11 (W.D. Va. Jan. 22, 2015) (similar); *Hanks*, 2012 WL 405065, at *13 (E.D. Va. Feb. 8, 2012) (similar). LaCivita's boilerplate recitals and conclusory assertions are insufficient to meet the "unbending" special damages pleading requirement. *Henry*, 629 F. Supp. 3d at 151.

## III. PLAINTIFFS' BUSINESS CONSPIRACY CLAIM FAILS

Finally, Plaintiffs attempt to repackage LaCivita's defamation claim by asserting a separate claim under Virginia's business conspiracy statute, which imposes civil and criminal liability on those engaged in a conspiracy to injure another's trade, business, or profession. Compl. ¶¶ 66-69

(citing Va. Code § 18.2-499). Plaintiffs seek treble damages under this theory, by claiming that *The Daily Beast* and non-party reporter Isikoff "acted in concert and agreed to publish defamatory statements" about LaCivita and Advancing Strategies "for the purpose of willfully and/or maliciously injuring their reputation, trade, business, and profession." Compl. ¶ 67. But Virginia's "business conspiracy statute was not designed to provide treble damages for defamation suits cloaked as conspiracy claims." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 321 (4th Cir. 2012); *see also Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir. 1985) (rejecting business conspiracy claim based on "injury to the professional reputation of the plaintiffs" because it was "in essence, an action in slander and libel"). Plaintiffs' business conspiracy claim fails for three reasons.

### A. Plaintiffs' Business Conspiracy Claim Fails With the Defamation Claim

Plaintiffs cannot state a claim for business conspiracy because it "hinge[s]" on LaCivita's invalid defamation claim "as the predicate tort." *Theologis v. Weiler*, 76 Va. App. 596, 611 (2023) (affirming dismissal of claim on this ground); *see also Davis v. Roessler*, 2022 WL 195496, at *7 (E.D. Va. Jan. 21, 2022) (conspiracy claim "cannot survive" where "inextricably linked" to underlying invalid defamation claim). As discussed above, the defamation claim fails. This Court should dismiss Plaintiffs' business conspiracy claim on this ground alone.

### B. Plaintiffs Do Not Plead the Required State-Law Elements

In any event, the Complaint does not state a business conspiracy claim. To recover under this statute, a plaintiff must prove (1) concerted action of two or more persons "for the purpose of willfully and maliciously injuring" plaintiff in his business; (2) legal malice, or that at least "'*one* of the purposes of the conspiracy' … was 'to injure the plaintiff's reputation, trade or business'"; and (3) causally related injury. *Covington Specialty Ins. v. Omega Rest. & Bar*, 666 F. Supp. 3d 528, 540 (E.D. Va. 2023). Importantly, as the Virginia Supreme Court has made clear, a business conspiracy claim requires "an unlawful act or an unlawful purpose" because "there can be no

conspiracy to do an act that the law allows." *Dunlap v. Cottman Transmission*, 287 Va. 207, 214 (2014). Here, Plaintiffs have not alleged any of these elements.

First, Plaintiffs have impermissibly pled the "requisite concert of action and unity of purpose" using "mere conclusory language." *Schlegel v. Bank of Am.*, 505 F. Supp. 2d 321, 326 (W.D. Va. 2007); *see* Compl. ¶ 67 (*The Daily Beast* and Isikoff "acted in concert"). But courts have confirmed such skeletal pleading cannot survive. *See Bay Tobacco v. Bell Quality Tobacco Prods.*, 261 F. Supp. 2d 483, 499 (E.D. Va. 2003) (Hudson, J.) (allegations "woefully inadequate" where only pled "concerted action" was "defendants' entry into a 'secret' agreement"); *Turbomin AB v. Base-X*, 2009 WL 1024713, at *4 (W.D. Va. Apr. 15, 2009) (dismissing case where no allegations "describ[ed] a preconceived design or plan among the alleged conspirators").

Second, Plaintiffs have not pled legal malice, which would require them to show one of *The Daily Beast*'s purposes was to injure Plaintiffs' "reputation, trade or business." *Schlegel*, 505 F. Supp. 2d at 328-29. But nothing in the Complaint supports *any* such inference. *See All. Tech. v. Achieve 1*, 2013 WL 143500, at *9 (E.D. Va. Jan. 11, 2013) (Hudson, J.) (dismissing conspiracy claim given lack of malice allegations). At most, Plaintiffs apparently suggest *The Daily Beast* and Isikoff engaged in First Amendment-protected reporting, which cannot support their claim.

Third, Plaintiffs fail to meet the statute's "particularity" requirement by vaguely invoking "business-related damages" without any specificity. *Turbomin*, 2009 WL 1024713, at *4 (W.D. Va. Apr. 15, 2009). Plaintiffs also cannot recover under the statute for injury to their "professional reputation"; the statute is directed solely to conduct directed at "one's business, not one's person." *Buschi*, 775 F.2d at 1259 (collecting cases); *Andrews v. Ring*, 266 Va. 311, 319 (2003) (business conspiracy statute, as a "matter of law," may not "embrace" claims for "injury" to personal interests). Yet, by incorporating their defamation allegations by reference and pleading damages

to their "professional reputations," Plaintiffs are explicitly seeking damages other than those to which they are entitled.  Compl. ¶¶ 66, 68.  Their business conspiracy claim cannot survive.

### C.  Plaintiffs Cannot Recover Treble Damages for Allegedly False Speech

Moreover, the treble damages sought by Plaintiffs under the Virginia business conspiracy statute would be unconstitutional in light of the Supreme Court's guidance in *Gertz v. Welch*, 418 U.S. 323 (1974).  The statute suggests that treble damages may be available solely under a "legal malice" standard.  Va. Code §§ 18.2-499, 18.2-500.  But the *Gertz* Court set forth the available categories of damages in a defamation case and made clear that without proving actual malice, plaintiffs who seek to recover based on false speech are limited to actual damages.  *Gertz*, 418 U.S. at 349 ("It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury.").  Put otherwise, States "may not permit recovery" of other categories of damages, like presumed or punitive damages, without requiring a showing of actual malice.  *Id.*  The same logic applies to enhanced damages such as the treble damages at issue here, as "States have no substantial interest in securing for plaintiffs … gratuitous awards of money damages far in excess of any actual injury." *Id.*  Assuming that the Virginia business conspiracy statute makes treble damages available on false speech-related claims without a showing of actual malice, any such damages would be unconstitutional under *Gertz*, and the statute would be unconstitutional to that extent.  And even if the statute did require actual malice, as discussed *supra* Section II.A, Plaintiffs have failed to allege actual malice.  Plaintiffs' business conspiracy claim fails on this independent ground as well.

### CONCLUSION

For the foregoing reasons, *The Daily Beast* respectfully requests dismissal with prejudice.

Dated: July 14, 2025

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger (*pro hac vice*)
Meenakshi Krishnan (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone: (212) 489-8230
katebolger@dwt.com
meenakshikrishnan@dwt.com

/s/ John D. McGavin
MCGAVIN, BOYCE, BARDOT,
THORSEN & KATZ, P.C.
John D. McGavin (VSB 21794)
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
Phone: (703) 385-1000
jmcgavin@mbbtklaw.com

*Attorneys for Defendant The Daily Beast Company, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of July 2025, a true and correct copy of the foregoing was served via the court's CM/ECF system upon the Clerk of the Court and to all counsel of record.

*/s/ John D. McGavin*
John D. McGavin