IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| CHRIS LACIVITA, an individual and ADVANCING STRATEGIES, LLC | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| THE DAILY BEAST COMPANY, LLC d/b/a THE DAILY BEAST | ) ) ) | Case No.: 3:25-cv-00227 |
| Defendant. | ) | |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Jonathan Shaw (VSB No. 98497)
Tel and Fax: (703) 574-1206
jshaw@dhillonlaw.com
Lee E. Goodman (VSB No. 31695)
Tel and Fax: (703) 637-8754
lgoodman@dhillonlaw.com
DHILLON LAW GROUP, INC.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314

Mark Geragos (*pro hac vice*)
Tina Glandian (*pro hac vice*)
Setara Qassim (*pro hac vice*)
644 S. Figueroa Street
Los Angeles, CA 90017
(213) 625-3900 Phone
geragos@geragos.com

*Counsel for Plaintiffs Chris LaCivita
 and Advancing Strategies, LLC*

TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

GOVERNING LAW ............................................................................................... 2

    I.    Defendant Faces a High Bar Under Rule 12(b)(6). ....................................... 2

    II.   Virginia Law Governs Because the Harm Was Inflicted and Felt Here. ............ 3

ARGUMENT ........................................................................................................... 8

    I.    Plaintiffs Have Stated Claims for Defamation Per Se and Per Quod. ............... 8

       A.    The Complaint Pleads Actual Malice with Specificity. ............................. 10

       B.    The Fair Report Privilege Fails When the Report Distorts the Truth. .............. 18

       C.    Statements Impugning Plaintiffs' Integrity Are Defamatory Per Se. .............. 20

       D.    Even if Not Per Se, The Statements Are Defamatory *Per Quod* with Special Damages. ........................................................................................................... 24

    II.   Defendants' Conduct Constitutes a Coordinated Business Conspiracy. ................ 25

CONCLUSION ........................................................................................................ 29

# TABLE OF AUTHORITIES

**Cases**

*Alaniz v. Hoyt,*
   105 S.W.3d 330 (Tex. App. 2003) ......................................................................... 15

*Alexandria Gazette Corp. v. West*,
   198 Va. 154 (1956) ............................................................................................... 18

*Allen Realty Corp. v. Holbert*,
   227 Va. 441 (1984) ............................................................................................... 25

Ashcroft v. Iqbal,
   556 U.S. 662 (2009) ......................................................................................... 2, 10

*AvalonBay Communities, Inc. v. Willden*,
   2009 WL 2431571 (E.D. Va. Aug. 7, 2009) ........................................................ 25

*Badame v. Lampke*,
   242 N.C. 755 (1955) ............................................................................................. 23

*Bandido's, Inc. v. J. Gazette Co.,*
   575 N.E.2d 324 (Ind. Ct. App. 1991) ................................................................... 11

*Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC,*
   261 F. Supp. 2d 483 (E.D. Va. 2003) ............................................................... 3, 20

*Baylor v. Comprehensive Pain Mgmt. Centers, Inc.,*
   2011 WL 1327396 (W.D. Va. Apr. 6, 2011) ........................................................ 23

Bell Atl. Corp. v. Twombly,
   550 U.S. 544 (2007) ............................................................................................... 2

*Birkhead v. Sims,*
   3 Va. Cir. 271 (1985) ............................................................................................... 9

Broussard v. Meineke Disc. Muffler Shops,
   155 F.3d 331 (4th Cir. 1998). ................................................................................. 4

*Brown & Williamson Tobacco Corp. v. Jacobson*,
   827 F.2d 1119 (7th Cir. 1987) .............................................................................. 11

Buschi v. Kirven,
   775 F.2d 1240 (4th Cir. 1985) .............................................................................. 26

*Carwile v. Richmond Newspapers*,
196 Va. 1 (1954) ................................................................................................ 22

*Cf. Theologis v. Weiler,*
76 Va. App. 596 (2023) .................................................................................... 26

*Clark v. Brown*,
99 N.C. App. 255 (1990) .................................................................................. 23

*Cockrum v. Donald J. Trump for President, Inc.,*
365 F. Supp. 3d 652 (E.D. Va. 2019) ................................................................ 5

*Com. Bus. Sys., Inc. v. Bellsouth Servs., Inc.,*
249 Va. 39 (1995) ...................................................................................... 25, 28

*Curtis Publishing Co. v. Butts,*
388 U.S. 130 (1967) .......................................................................................... 17

*Dangerfield v. WAVY Broad., LLC,*
228 F. Supp. 3d 696 (E.D. Va. 2017) .............................................................. 18

*Dixon v. Ogden Newspapers, Inc.*,
187 W. Va. 120 (1992) ..................................................................................... 11

*Dunlap v. Cottman Transmission Sys., LLC,*
287 Va. 207 (2014) .................................................................................... 25, 26

*Eastwood v. Nat'l Enquirer, Inc.*,
123 F.3d 1249 (9th Cir. 1997) ......................................................................... 10

*Echtenkamp v. Loudon Cnty. Pub. Sch.*,
263 F. Supp. 2d 1043 (E.D. Va. 2003). ...................................................... 21, 23

*Eramo v. Rolling Stone,*
*LLC*, 209 F. Supp. 3d 862 (W.D. Va. 2016) ................................................... 10

Erie R.R. Co. v. Tompkins,
304 U.S. 64 (1938) .............................................................................................. 4

*Etter v. Axonics Modulation Techs., Inc.,*
2021 WL 12180431 (E.D. Va. Aug. 5, 2021) ................................................. 24

*Fed. Deposit Ins. Corp v Nat'l Union Fire Ins. Co. of Pittsburgh*,
205 F.3d 66 (2d Cir. 2000) ................................................................................. 6

*FERC v. Powhatan Energy Fund, LLC*,
    286 F. Supp. 3d 751 (E.D. Va. 2017) ................................................................... 29

Fleming v. Moore,
    221 Va. 884 (1981) ..................................................................................... 20

Food Lion, Inc. v. Melton,
    250 Va. 144 (1995) ...................................................................................... 5

Gen. Prods. v. Meredith Corp.,
    526 F. Supp. 546 (E.D. Va. 1981) ...................................................................... 20

*Gertz v. Welch*,
    418 U.S. 323 (1974) ...................................................................................... 28

Gilmore v. Jones,
    370 F. Supp. 3d 630 (W.D. Va. 2019) ...................................................... 5, 6, 13, 23

*GTSI Corp. v. Wildflower Int'l, Inc.*,
    2009 WL 2160451 (E.D. Va. 2009) ..................................................................... 26

*Handberg v. Goldberg*,
    297 Va. 660 (2019) ....................................................................................... 8

*Harte-Hanks Communications, Inc.*,
    491 U.S. 657 (1989) .................................................................................. 10, 16

*Hatfill v. New York Times Co.*,
    416 F.3d 320 (4th Cir. 2005) ......................................................................... 4, 20

*Horne v. WTVR*,
    *LLC* 2017 WL 1330200 (E.D. Va. Apr. 6, 2017), .............................................. 19, 20

*Hunt v. Liberty Lobby*,
    720 F.2d 631 (11th Cir. 1983) ........................................................................... 11

*James v. Haymes*,
    160 Va. 253 (1933) ..................................................................................... 20

*Jarrett v. Goldman*,
    67 Va. Cir. 361 (2005) .................................................................................... 9

Johnson v. Kaugars,
    14 Va. Cir. 172 (1988) .................................................................................. 27

Jones v. R.S. Jones & Assocs., Inc.,
   246 Va. 3 (1993) ................................................................................................................ 4

Katz v. Odin, Feldman & Pittleman, P.C.,
   332 F. Supp. 2d 909 (E.D. Va. 2004) ................................................................................ 5

King v. Rubenstein,
   825 F.3d 206 (4th Cir. 2016) ............................................................................................ 3

Martin Marietta Corp. v. International Telecomms. Satellite Org.,
   991 F.2d 94 (4th Cir. 1993) .............................................................................................. 3

McHale v. Lake Charles Am. Press,
   390 So. 2d 556 (La. Ct. App. 1980) ................................................................................ 11

Meadows v. Northrop Grumman Innovation Sys., Inc.,
   436 F. Supp. 3d 879 (W.D. Va. 2020) .............................................................................. 5

Meredith v. Nestle Purina Petcare Co.,
   516 F. Supp. 3d 542 (E.D. Va. 2021) ............................................................................. 22

Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,
   108 F.3d 522 (4th Cir. 1997) .......................................................................................... 26

Murray v. Bailey,
   613 F. Supp. 1276 (N.D. Cal. 1985) ............................................................................... 11

Nunes v. Cable News Network, Inc.,
   31 F.4th 135 (2d Cir. 2022) ......................................................................................... 7, 8

Patton v. Royal Indus., Inc.,
   263 Cal. App. 2d 760 (1968) .......................................................................................... 23

Quillen v. Int'l Playtex, Inc.,
   789 F.2d 1041 (4th Cir. 1986) .......................................................................................... 4

Reynolds v. Pionear, LLC,
   2016 WL 1248866 (E.D. Va. Mar. 25, 2016) ................................................................. 25

Rohrbaugh v. Kreidler,
   71 Va. Cir. 298 (2006) .................................................................................................... 28

Roth v. Greensboro News Co.,
   6 S.E.2d 882 (1940) ........................................................................................................ 15

Schaecher v. Bouffault,
 290 Va. 83 (2015) ........................................................................................... 8

Shirvinski v. U.S. Coast Guard,
 673 F.3d 308 (4th Cir. 2012) ........................................................................ 26

Short v. Portsmouth Redevelopment & Hous. Auth.,
 2018 WL 1833873 (E.D. Va. Mar. 8, 2018) .................................................. 4

Simmons v. Miller,
 261 Va. 561 (2001) ....................................................................................... 26

Spirito v. Peninsula Airport Comm'n,
 350 F. Supp. 3d 471 (E.D. Va. 2018) ............................................ 10, 13, 18, 20

St. Amant v. Thompson,
 390 U.S. 727 (1968) ...................................................................................... 17

St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.,
 365 F.3d 263 (4th Cir. 2004) .......................................................................... 5

Thalhimer Bros. v. Shaw,
 156 Va. 863 (1931) ......................................................................................... 5

Tolman v. Doe,
 988 F. Supp. 582 (E.D. Va. 1997) .................................................................. 9

Tronfeld v. Nationwide Mut. Ins. Co.,
 272 Va. 709 (2006) .......................................................................... 20, 21, 23

Uneedus v. California Shoppers, Inc.,
 86 Cal. App. 3d 932 (1978) .......................................................................... 28

United States v. Jin Fuey Moy,
 241 U.S. 394 (1916) ...................................................................................... 29

Wells v. Liddy,
 186 F.3d 505 (4th Cir. 1999) ...................................................................... 5, 6

Wilder v. Johnson Pub. Co.,
 551 F. Supp. 622 (E.D. Va. 1982) ................................................................ 24

Yeagle v. Collegiate Times,
 255 Va. 293 (1998) ......................................................................................... 8

*Young v. Gannett Satellite Info. Network, Inc.,*

    734 F.3d 544 (6th Cir. 2013) ................................................................................ 11

**Statutes**

Virginia Code § 18.2-499 ................................................................................ 7, 28

Virginia Code § 8.01-46 ................................................................................ 18

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................ 4

Fed. R. Civ. P. 8(a)(2) ................................................................................ 7

Rule 12(b)(6) ................................................................................ 5, 6, 7


**Miscellaneous**

Restatement (Second) of Torts, § 561 (1976) ................................................................................ 20

Restatement (Second) of Torts, § 573 (1976) ................................................................................ 20

Plaintiffs Chris LaCivita and Advancing Strategies, LLC (collectively "Plaintiffs") submit this memorandum of law in opposition to the motion to dismiss the Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6) by Defendant The Daily Beast Company ("Defendant" or "The Daily Beast").

## INTRODUCTION

This lawsuit arises from a deliberate and politically-timed smear targeting one of President Donald J. Trump's top campaign officials, Plaintiff Chris LaCivita, and his Virginia-based firm, Plaintiff Advancing Strategies, LLC.  In the final, high-stakes days before the 2024 presidential election, Defendant The Daily Beast published—and then amplified—a false narrative accusing Mr. LaCivita of personally "pocketing" $22 million (later revised to $19.2 million) in campaign funds.  The claim was not only sensational—it was provably false and contradicted by the very Federal Election Commission (FEC) records Defendant had in hand.  Those records show that the payments were made to Advancing Strategies, a media buying firm, and that the overwhelming majority of those funds (over $17.5 million) were immediately passed through to purchase advertising and pay for other campaign expenses.

The facts reveal more than sloppy reporting—they expose calculated malice by The Daily Beast.  Defendant ignored direct evidence in its possession which contradicted its reporting, relied on opposition research from a known political rival of Mr. LaCivita, and ignored detailed factual corrections pointing to the truth.  Indeed, in the face of a detailed correction and retraction demand by Plaintiffs' counsel, The Daily Beast refused to retract its defamatory statements; instead, it doubled down on its false narrative and republished the defamatory statements—multiple times, including on its own podcast—ensuring maximum political and reputational damage during the

most sensitive stretch of the campaign. As a result, Plaintiffs suffered reputational and professional harm in their home state of Virginia, where they live, work, and maintain longstanding relationships in the political consulting industry.

Defendant now seeks to evade accountability under defenses that cannot withstand even preliminary scrutiny. Its choice-of-law argument ignores Virginia authority applying the law of the state where reputational harm is felt—which here is indisputably Virginia. Its invocation of the fair report privilege fails because its reporting was neither "fair" nor "accurate," where Defendant twisted the plain meaning of the FEC records to fit a predetermined storyline. And its suggestion that Plaintiffs have not pled actual malice collapses under the weight of the Complaint's detailed allegations showing that Defendant either knew its claims were false or acted with reckless disregard for the truth. Defendant asks this Court to bless a playbook where falsehoods are timed for maximum damage and then cloaked in the language of journalism. The Court should decline to do so.

Under Rule 12(b)(6), the Court must accept the Complaint's well-pled allegations and draw every reasonable inference in Plaintiffs' favor. Doing so leaves no doubt: Plaintiffs have stated viable claims for defamation *per se*, alternatively for defamation *per quod*, and statutory business conspiracy. This case warrants full discovery so that Defendant's timing, sourcing, and disregard for the truth can be brought to light.

## GOVERNING LAW

### I.    Defendant Faces a High Bar Under Rule 12(b)(6).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

In evaluating the sufficiency of the complaint, the court must "accept as true all well-pleaded allegations and draw all reasonable inferences in the plaintiff's favor." *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). A complaint need not contain detailed factual allegations, but it must provide more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The plaintiff must plead "enough facts to raise a right to relief above the speculative level." *Id.*

A dismissal pursuant to Rule 12(b)(6) should only be awarded when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Martin Marietta Corp. v. International Telecomms. Satellite Org.,* 991 F.2d 94, 97 (4th Cir. 1993); *Bay Tobacco, LLC v. Bell Quality Tobacco Prods., LLC,* 261 F. Supp. 2d 483, 498 (E.D. Va. 2003) (Hudson, J.).

Notwithstanding the fact that the Court's role, at this stage, is not to weigh evidence or resolve factual disputes, Defendant has attached 14 exhibits to the Declaration of its counsel, Katherine Bolger, in support of its motion to dismiss. *See* ECF Nos. 23-1-23-15. The first five exhibits are articles published by The Daily Beast. *See* ECF Nos. 23-1-23-5. However, they are not the same version of the articles attached to the Complaint. *Cf.* ECF No. 1-2-1-6. The articles are also not authenticated by anyone with personal knowledge, stating when such articles were, for instance, updated. *See* ECF No. 23-15. In any event, the Court should exclude the extraneous materials submitted in support of Defendant's motion, with the exception of the FEC records which demonstrate Defendant's actual malice, as discussed *infra*. *See Bay Tobacco,* 261 F. Supp. 2d at 498 ("Unless it intends to treat the motion as one for summary judgment pursuant to Federal Rule of Civil Procedure 56, the Court should expressly exclude any attached, supporting materials.").

## II.    Virginia Law Governs Because the Harm Was Inflicted and Felt Here.

In diversity cases, federal courts apply federal procedural law and pleading standards[1]—including Rule 12(b)(6)—but state substantive law governs the elements of Plaintiffs' claims.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 346 (4th Cir. 1998).  Defendant argues that New York law should apply to Plaintiffs' defamation claims[2] because Defendant's principal place of business is in New York and that is where it claims the defamatory statements were published.  ECF No. 23 at 9.  That assertion is misplaced here, where the defamatory content was published simultaneously in multiple jurisdictions.

Under Virginia's choice-of-law rules—which Defendant concedes apply in this diversity case—Virginia generally applies the *lex loci delicti* rule to determine the applicable substantive law in tort cases.  Under that rule, "the place of the wrong" is the place where the last event necessary to make the defendant liable occurred. *See Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (applying Virginia law); *Jones v. R.S. Jones & Assocs., Inc.*, 246 Va. 3, 5-6 (1993).

"In defamation actions, the place of the harm has traditionally been considered to be the place where the defamatory statement was published, i.e., seen or heard by non-parties." *Wells v.*

---

[1] As for the appropriate pleading standard, "the Fourth Circuit has clearly held that defamation claims in federal court are not subject to any heightened pleading requirements." *Short v. Portsmouth Redevelopment & Hous. Auth.,* 2018 WL 1833873, at *3 (E.D. Va. Mar. 8, 2018), *report and recommendation adopted*, 2018 WL 1830733 (E.D. Va. Apr. 17, 2018) (citing *Hatfill v. New York Times Co.,* 416 F.3d 320, 329 (4th Cir. 2005)). Rather, the liberalized requirements of the federal rules only require "notice pleading" for defamation claims.  *See* Fed. R. Civ. P. 8(a)(2) (requiring only a short and plain statement of the claim showing that the pleader is entitled to relief).

[2] By citing to Virginia law, Defendant appears to concede that Virginia law applies to Plaintiffs' business conspiracy claim.  *See* ECF Doc. 23 at 27-30.  Indeed, Plaintiffs' statutory conspiracy claim arises under Virginia Code § 18.2-499, which is expressly limited to injuries suffered within Virginia.  By pleading a claim under this statute, Plaintiffs necessarily invoke Virginia law and its application is appropriate.

*Liddy*, 186 F.3d 505, 521-22 (4th Cir. 1999). This is because under Virginia law, a statement is not considered to be published until it is seen or heard by a third party. *See Food Lion, Inc. v. Melton*, 250 Va. 144, 150-51 (1995) (holding that publication requires a third party to have heard the words spoken); *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 915 (E.D. Va. 2004) ("[P]ublication of a defamatory statement requires that it be communicated to a third party 'so as to be heard and understood by such person.'" (quoting *Thalhimer Bros. v. Shaw*, 156 Va. 863, 871 (1931)); *Meadows v. Northrop Grumman Innovation Sys., Inc.*, 436 F. Supp. 3d 879, 886 (W.D. Va. 2020) (collecting cases for the proposition that, in the context of purportedly defamatory emails, the place of publication is where the email was "opened and read").

As this Court has recognized, the Supreme Court of Virginia has not addressed how this rule would apply in situations where defamatory content is published simultaneously in multiple jurisdictions, as is the case here. *See Cockrum v. Donald J. Trump for President, Inc.,* 365 F. Supp. 3d 652, 688-89 (E.D. Va. 2019) (Hudson, J.) ("This Court notes, as it previously has, that it remains 'far from clear' how the Supreme Court of Virginia would apply *lex loci* in situations where defamatory content is published in multiple jurisdictions, such as on a national television broadcast or . . . a website that can be accessed worldwide."); *see also Gilmore v. Jones*, 370 F. Supp. 3d 630, 664 (W.D. Va. 2019) (stating that the Supreme Court of Virginia has not addressed how the "place of the wrong" should be defined "in situations where the defamatory content is published in multiple jurisdictions").

When the Virginia Supreme Court "has spoken neither directly nor indirectly on the particular issue," a federal court sitting in diversity must "predict how that court would rule if presented with the issue." *St. Paul Fire & Marine Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 365 F.3d 263, 272 (4th Cir. 2004) (internal quotation marks omitted). "In so predicting . . . we

may consider the teachings of treatises, as well as the practices of other states." *Id.* (internal quotation marks omitted); *see also Fed. Deposit Ins. Corp. v Nat'l Union Fire Ins. Co. of Pittsburgh*, 205 F.3d 66, 71 (2d Cir. 2000) ("Where there is no decision of a state's highest court directly, this court may look to any sources on which the state's highest court might rely in order to determine what that court may decide.").

In *Wells v. Liddy*, the Fourth Circuit, applying Maryland law, contemplated that "[b]ecause of the widespread simultaneous publication of the allegedly defamatory statement in many different jurisdictions, application of the traditional *lex loci delicti* rule becomes cumbersome, if not completely impractical." 186 F.3d at 527. "Because multistate defamation is a tort for which the *lex loci delicti* rule fails to reach a satisfactory result on the choice of applicable substantive law," the Fourth Circuit predicted that Maryland's highest court would apply the "significant relationship" test in cases of multistate broadcast defamation or publication from a world wide web site. *Id.* at 528.

More recently, in *Gilmore v. Jones*, 370 F. Supp. 3d at 664-65, the United States District Court for the Western District of Virginia predicted that "the Supreme Court of Virginia, if applying *lex loci delicti* in a multi-defendant, multi-state Internet tort case, would define 'the place of the wrong' as the state where the plaintiff is injured as a result of the allegedly tortious content, as opposed to the state where publication occurs." The court explained that "defining the 'place of the wrong' as the place of publication in a case like this raises thorny questions about the nature of online publication, a process that does not necessarily occur at one readily identifiable geographic point." *Id.* at 665. Indeed, "[i]f 'publication' is defined as the place where content is communicated to third parties, it is unclear whether 'publication' of online content occurs in the state where an individual uploads content, the state where the relevant media platform or

6

publication maintains headquarters, the state where a website's servers are located, or the state where third parties actually view the content (which, absent restrictions on the geographic reach of a particular online publication, will be in all fifty states and across the world)." *Id.*

Similarly, in *Nunes v. Cable News Network, Inc.,* 31 F.4th 135, 141 (2d Cir. 2022), the Second Circuit considered the Virginia Supreme Court's adherence to *lex loci delicti* and how it would be applied in the context of simultaneous multi-state defamation cases. In doing so, the court rejected the same argument Defendant makes here—that New York law should apply because that is "the state from which the statement emanated." *Id.* Rather, the Second Circuit "agree[d] with the district court that the Virginia Supreme Court would—in the context of online defamatory content published simultaneously in multiple jurisdictions—follow the lead of numerous other courts in *lex loci delicti* jurisdictions and apply the law of the state where a plaintiff incurs the greatest reputational injury, with a presumption that a plaintiff suffers the brunt of the injury in their home state." *Id.* at 143.

Here, the Complaint alleges that the tortious impact of the Defendant's defamatory statements was primarily felt in Virginia**,** where Plaintiff LaCivita resides and where his business, Advancing Strategies, LLC, operates and maintains its place of business. *See* Complaint, ¶¶ 2-3, 11-13, 42. The Complaint alleges injury to Plaintiffs' professional reputations, business opportunities, and relationships, which inevitably affect them most in their home state. *See id.*, ¶¶ 14, 38, 41 52, 60, 68. Virginia is thus the place where the harm occurred and where the tort was completed. Nothing alleged in the Complaint suggests countervailing circumstances sufficient to overcome the presumption that Plaintiffs' greatest reputational harm occurred in their home state of Virginia. And, as the court in *Nunez* recognized, "as a factual matter, we note that [Defendant's] theory—that New York is the place where the allegedly defamatory statements were made—is

unsupported by the allegations of the complaint, to which we are limited on a motion to dismiss. The complaint says nothing about where the content was uploaded or where the relevant server resided, much less that either event occurred in New York." *Nunes*, 31 F.4th at 142.[3]  On the contrary, the Complaint alleges that the Articles, which targeted a Virginia audience by exclusively focusing on and publishing defamatory statements about a Virginia resident and a Virginia business, and which relied on a Virginia source, were published in Virginia. *See* Complaint, ¶¶ 11-13.  Moreover, the defamatory statements involved Virginia-based political activity, including the alleged receipt of funds in Virginia. *See id.*, ¶¶ 11-13.  The Court should therefore apply Virginia law to Plaintiffs' defamation claims against Defendant.

## ARGUMENT

### I.    Plaintiffs Have Stated Claims for Defamation Per Se and Per Quod.

To state a claim for defamation in Virginia, the plaintiff must allege that the defendant published an actionable statement about the plaintiff with the requisite intent. *Schaecher v. Bouffault*, 290 Va. 83, 91, 99 (2015). To be "actionable," the statement must be both false and defamatory. *Id.* at 91.

Whether a statement is actionable is a threshold determination to be decided as a matter of law by the court. *Handberg v. Goldberg,* 297 Va. 660, 666 (2019).  That legal determination requires the court to assess, *inter alia,* whether the statement can "reasonably be interpreted as stating actual facts," as well as whether it "contain[s] a provably false factual connotation." *Yeagle v. Collegiate Times,* 255 Va. 293, 295 (1998).  Additionally, for a statement to be actionable as

---

[3] In *Nunez*, defendant CNN submitted affidavits asserting "that the allegedly defamatory article was prepared in New York, its writer lived in New York, and that CNN telecast its nightly show discussing the article from that state." *Nunez*, 31 F.4th at 142.  The court refused to consider such extraneous materials on a motion to dismiss under Rule 12(b)(6).

defamation, it must have "the requisite defamatory 'sting' to one's reputation," which also must be established as a matter of law.  *Schaecher*, 290 Va. at 92.

All defamation in Virginia is either *per se* or *per quod*.  *Jarrett v. Goldman*, 67 Va. Cir. 361, 368 (2005).  If the defamatory statement falls within certain specified categories, it is deemed to be defamatory *per se* and the resulting damage is presumed to exist without proof of injury or loss.  *Tolman v. Doe,* 988 F. Supp. 582, 587 (E.D. Va. 1997).  On the other hand, where the defamatory meaning of the statement is not immediately apparent from the words themselves, but requires knowledge of extrinsic facts, the statement is defamatory *per quod,* and special damages must be alleged.  *Birkhead v. Sims,* 3 Va. Cir. 271 (1985).

Here, the defamatory statements alleged in the Complaint, including that Mr. LaCivita received $22 million (later "corrected" to $19.2 million) from the Trump campaign and related PACs as compensation for his work on the campaign, clearly contain a provably false factual assertion, and Plaintiffs have specifically alleged that these defamatory statements were published by Defendant with actual malice.

Accusing a political consultant of profiteering at the expense of the campaign and claiming that he did so without the knowledge of the nominee, is a direct strike at the heart of Plaintiffs' professional reputation.  Since the defamatory statements impute a lack of integrity in Mr. LaCivita's performance of his job duties and prejudice him and his firm in their business and profession, Plaintiffs have demonstrated that the statements constitute defamation *per se*.  In the alternative, they have alleged that extrinsic facts, namely the FEC records, reveal the defamatory sting of the Articles, and the Complaint details the tangible business harm caused thereby.  Thus, Plaintiffs have adequately stated a claim for defamation *per se*, or in the alternative, defamation *per quod*.

### A.    The Complaint Pleads Actual Malice with Specificity.

Contrary to Defendant's contention, the Complaint clearly and adequately pleads that The Daily Beast published the defamatory articles with actual malice, namely with knowledge of falsity or reckless disregard of the truth. Because "actual malice is a subjective inquiry, a plaintiff 'is entitled to prove the defendant's state of mind through circumstantial evidence.'" *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 870 (W.D. Va. 2016) (quoting *Harte-Hanks Communications, Inc.*, 491 U.S. 657, 668 (1989)); *see also Eastwood v. Nat'l Enquirer, Inc.*, 123 F.3d 1249, 1253 (9th Cir. 1997) ("As we have yet to see a defendant who admits to entertaining serious subjective doubt about the authenticity of an article it published, we must be guided by circumstantial evidence. By examining the editors' actions, we try to understand their motives."). Accordingly, a plaintiff "need only plead sufficient facts that, if proven, create a plausible inference that the [defendant] published [its] statements with actual malice." *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 481 (E.D. Va. 2018) (citing *Ashcroft*, 556 U.S. at 678.

It is well settled that actual malice may be inferred from a defendant's failure to investigate, where such failure evinces a "purposeful avoidance of the truth." *See, e.g., Harte-Hanks Communications,* 491 U.S. at 692 (sustaining a finding of actual malice against a newspaper where "it [wa]s likely that the newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity of Thompson's charges"). But Defendant's conduct in this case is far worse than the purposeful avoidance of the truth. Rather, the authors of the defamatory Articles admittedly had in their possession and relied on the very FEC records which flatly contradicted their reporting, demonstrating their knowing falsity, and thus, actual malice.

Courts have repeatedly held that "[a]n inference of actual malice can be drawn when a defendant publishes a defamatory statement that contradicts information known to him." *Hunt v. Liberty Lobby,* 720 F.2d 631, 645 (11th Cir. 1983); *see also Dixon v. Ogden Newspapers, Inc.*, 187 W. Va. 120, 127 (1992) ("[e]vidence that a media defendant intentionally 'avoided' the truth in its investigatory techniques or omitted facts in order to distort the truth may support a finding of actual malice"); *see, e.g., McHale v. Lake Charles Am. Press*, 390 So. 2d 556, 568 (La. Ct. App. 1980) (constitutional actual malice was inferred where defendants were "in possession of knowledge so completely at odds with the published statement that only a reckless disregard of the truth can account for its utterance"); *Brown & Williamson Tobacco Corp. v. Jacobson*, 827 F.2d 1119, 1136-37 (7th Cir. 1987) (the fact that defendant had read an FTC staff report inconsistent with his presentation was evidence of actual malice); *Young v. Gannett Satellite Info. Network, Inc.,* 734 F.3d 544, 548 (6th Cir. 2013) (evidence was sufficient for the jury to find by clear and convincing evidence that newspaper had reckless disregard of the truth, and thus acted with actual malice, where the newspaper author had read an arbitrator's report containing several items she should have seen as "red flags" contradicting her conclusion); *Murray v. Bailey*, 613 F. Supp. 1276, 1286 (N.D. Cal. 1985) (where defendant admitted having actually seen "hard evidence" that contradicted his characterization, disputed issue of fact as to actual malice precluded summary judgment); *Bandido's, Inc. v. J. Gazette Co.,* 575 N.E.2d 324, 327-28 (Ind. Ct. App. 1991) (where defendant's headline defamatory statement was inconsistent with the health reports it had copies of, a disputed issue of fact precluded summary judgment).

Here, the Complaint alleges that Defendant published false and defamatory statements that Mr. LaCivita "pocketed" or "received" $22 million as compensation, "despite the fact that the

publicly available FEC records—on which it purportedly relied—contradicted those claims."[4] Complaint, ¶¶ 1, 23-24, 64.  As the Complaint explains, "these records clearly show that the $22 million figure is the gross spend (the overwhelming majority of which was for ad buys), *not* the money which Mr. LaCivita personally received, like the Articles falsely claim." *Id.*, ¶ 23.  Not only did Defendant misrepresent the information from the FEC records in their original reporting, but even "after further review of [the] FEC records" in the face of a correction and retraction demand by Plaintiffs' counsel, Defendant refused to correct its defamatory headlines and reporting. *Id.*, ¶¶ 34-35.[5]

Defendant argues that "[t]he underlying FEC Records clearly show the payments made to LaCivita's firm, which is exactly what *The Daily Beast* reported."  ECF No. 23 at 16.  But that is not what the Articles, in fact, state.  For instance, Article 1 refers to LaCivita's "22m Pay," claims that he "raked in $22 million and counting," and that he "reaped a $19 million financial windfall in 2022."  Doc. 1-2 at 1.  Article 1 further claims that LaCivita "has been paid $22m so far via the campaign and two PACs."  *Id.* at 2.  Article 2 then states that The Daily Beast reported that as the co-campaign manager of Donald Trump's presidential campaign, LaCivita "has banked $22m already and is on track to cash in even more before the election."  ECF Doc. 1-3 at 2.  Article 2 also reports that LaCivita "has not until now had large sums of cash like the $22 million he has

---

[4] Rather than cite to the Articles attached to the Complaint, Defendant improperly cites to the "corrected" articles it attaches to the declaration of its counsel, which is matter outside the pleadings which should not be considered on a motion to dismiss.

[5] In its motion to dismiss, Defendant admits that "Article 1 reports on LaCivita and his firm's *earnings* from two periods" and that "Article 1 originally reported LaCivita's 2022 *earnings* to be $22 million."  ECF Doc. 23 at 3 (emphases added).  According to Oxford Dictionary, "earnings" is defined as "money obtained in return for labor or services."  *See* http://www.oxforddictionaries. com/us/definition/american_english/ earnings.  Defendant also notes that "[e]mbedding a link to Article 1, Article 2 originally reported that LaCivita received $22 million *based on his campaign work*."  ECF Doc. 23 at 5 (emphasis added).  Thus, Defendant acknowledges, as it must, that the Articles reported the multi-million figure as Mr. LaCivita's compensation for his campaign work.

already been paid through Trump's campaign and PACs." *Id.* at 5. Article 3 refers to "investigative journalist Michael Isikoff's discovery that LaCivita made $22 million (and counting) in just two years." ECF Doc. 1-4 at 2. Article 4 likewise claims that LaCivita "has been paid $22m so far via the campaign and two PACs." ECF Doc. 1-5 at 3. Article 5, which states in the headline that LaCivita "Got $22 Million," goes on refer to "allegations that LaCivita had pocketed $22 million from his work on the Trump campaign and related super PACs." ECF Doc. 1-6 at 2.

The Complaint further alleges that Defendant relied on opposition research from Corey Lewandowski, a known political adversary, while ignoring information provided by Plaintiffs' counsel showing the truth. *Id.*, ¶¶ 24, 34, 37-38. Moreover, the timing and context of the publication—amidst a politically charged environment and driven by opposition research—further support an inference of knowing falsity or reckless disregard. *See id.*, ¶¶ 1, 67 (alleging that the defamatory statements were published "[i]n the weeks and days leading up to the 2024 presidential election"); *see also* ECF Doc. 1-2 at 4 (Article 1 noting that "[q]uestions over LaCivita's consulting fees come at a sensitive time, with the Trump operation lagging far behind Harris' fundraising juggernaut"); ECF Doc. 1-6 at 2 ("The [Daily] Beast's story, published on Oct. 15, reportedly fueled the GOP presidential nominee's paranoia about disloyalty within his inner circle.").

Far from being a "mere recitation" of the actual malice standard, these concrete allegations "are sufficient at this stage to create a 'plausible inference' that [Defendant] published [its] statements with actual malice." *Gilmore,* 370 F. Supp. 3d at 673; *see, e.g., Spirito,* 350 F. Supp. 3d at 481 (court could plausibly infer that defendants entertained serious doubts about whether Plaintiff's shredding on March 2 was improper based on allegations which suggested that PAC employees were aware of Plaintiff's regular shredding as an innocent activity).

13

Defendant claims that its purported "[t]imely and diligent clarification" negates actual malice. Specifically, Defendant alleges that "*The Daily Beast*, acting on its own, corrected its arithmetic error within days of discovering it." ECF Doc. 23 at 15. As an initial matter, The Daily Beast did not make the correction "on its own," as it claims. Rather, as the Complaint alleges, the correction was made in direct response to a correction and retraction demand sent to The Daily Beast by Plaintiffs' counsel. Complaint, ¶¶ 34-35. But more fundamentally, the arithmetic error is not the crux of Defendant's defamation. It is the fact that The Daily Beast falsely reported the substantial multi-million figure (initially $22 million and later $19.2 million) as income received by Mr. LaCivita, when the FEC records clearly show they were not.[6] *See, e.g., id.*, ¶ 58 ("Campaign finance records, readily available to The Daily Beast, and admittedly reviewed by Mr. Isikoff, clearly demonstrate that the multimillion-dollar figure represents gross expenditures, not Mr. LaCivita's personal compensation."); *id.*, ¶ 23 ("[M]any of the details in the Articles about the payments Mr. LaCivita allegedly received, are categorically false and belied by the publicly available campaign finance records themselves."); *id.*, ¶ 1 ("Despite the availability of public campaign finance records demonstrating the falsity of the contentions it published, and even after Mr. LaCivita, through counsel, sent Defendant a correction and retraction demand directing Defendant to publicly available data disproving its claims, Defendant failed to retract or meaningfully correct its false reporting."). As the Complaint alleges, "in an email sent by The Daily Beast's counsel on November 8, 2024, the Daily Beast expressly stated that it "st[ood] by the central truth of [its] reporting." *Id.*, ¶ 35.

---

[6] Defendant has included as part of its motion to dismiss certain FEC records, which Defendant's counsel avers are publicly available FEC campaign finance data showing independent expenditures and disbursements from Make America Great Again, Inc. and a related campaign committee for Donald J. Trump to Advancing Strategies, LLC. *See* ECF No. 23-15 [Declaration of Katherine Bolger], ¶¶ 10-16.

Far from negating actual malice, the fact that Defendant admittedly conducted a further review of the FEC records and still refused to correct the false and misleading headlines and statements (beyond correcting its "arithmetic error" and clarifying receipt of the funds by Mr. LaCivita's LLC) is damning evidence of actual malice. *See id.*, ¶ 35 (alleging that even "after further review of FEC records," other than reducing Mr. LaCivita's purported compensation from $22 million to $19.2 million and clarifying to which entity the funds were paid, "the rest of the reporting remained substantially the same, and despite the addition of the editor's notes and corrections, the Articles continue to falsely imply that Mr. LaCivita personally pocketed $19.2 million over the course of two years from the Trump campaign."). *See, e.g., Alaniz v. Hoyt,* 105 S.W.3d 330, 335 (Tex. App. 2003) (abrogated on other grounds) (where defendant continued to repeat charges of "skimming" about plaintiff-college financial officer after receiving a copy of a professional audit report refuting such charges (and after he had been counseled twice by academic colleagues not to use such a term), evidence of constitutional malice was shown).   In any event, Virginia does not have a law that allows a party to retract a statement and avoid liability for defamation; rather, Virginia Code § 8.01-46 allows a defendant in a defamation case to present evidence of an apology in mitigation of damages.[7]  Defendant has not offered any evidence of an apology, and the Complaint alleges the contrary: that Defendant stood by the "central truth" of its original reporting.  *See* Complaint, ¶ 35.

Defendant also argues that Plaintiffs "fail[] to 'bring home' the actual malice standard to specific persons at *The Daily Beast* 'having responsibility' for publishing the challenged

---

[7] Even in jurisdictions which have such a statute, a retraction is insufficient unless it "directly, fully and fairly, without any uncertainty, evasion or subterfuge, retract[s] and recall[s] the alleged false and defamatory statements and apologize[s] therefor."  *Roth v. Greensboro News Co.,* 6 S.E.2d 882, 888 (1940).

statements, as is constitutionally required." ECF No. 23 at 15 n.7. Defendant focuses on the fact that the Complaint does not make specific allegations of the subjective mindset of Hugh Dougherty and Lily Mae Lazarus, who authored three out of the five challenged Articles. *See id.* at 15-16 n.7. To be clear, the Complaint alleges that the allegations in all five articles about the payments Mr. LaCivita allegedly received, including the articles authored by Mr. Dougherty and Ms. Lazarus, "are categorically false and belied by the publicly available campaign finance records themselves [which] clearly show that the $22 million figure is the gross spend (the overwhelming majority of which was for ad buys), *not* the money which Mr. LaCivita personally received, like the Articles falsely claim." Complaint, ¶ 23. The Complaint further alleges that the campaign finance records were readily available to The Daily Beast, and Mr. Isikoff admitted, on behalf of himself and the other authors at The Daily Beast, that "[w]e came up with the figure by looking at campaign finance records. . ." *Id.*, ¶ 27.

The only reason the Complaint is able to make specific allegations about Mr. Isikoff's subjective mindset is because of admissions he made on The Daily Beast Podcast. *See* Complaint, ¶¶ 26-32. For instance, Mr. Isikoff admitted having "reviewed the campaign finance records before authoring his story," and "conceded that his purported analysis was based on information obtained from Corey Lewandowski and his informal 'audit.'" *Id.*, ¶¶ 28-29. The lack of specific allegations as to Mr. Dougherty and Ms. Lazarus is immaterial at this stage, since a plaintiff may prove the defendant's state of mind through circumstantial evidence. *See Harte-Hanks Communications,* 491 U.S. at 668.

In trying to defend against Defendant's actual malice, Defendant argues that The Daily Beast "reported LaCivita's on-the-record response and statements from Trump campaign officials that a sizeable 'chunk' of those funds were 'pass through' payments to other vendors and 'not

income' to LaCivita or his firm." ECF No. 23 at 16.[8]  But the inclusion of these responses and explanations (in a single article) further supports an inference of actual malice, since it demonstrates that The Daily Beast was warned of the falsity of its conclusions and advised how to properly interpret the FEC records it had in its possession—prior to publication.

Finally, Defendant's argument about "good faith reliance" on "reputable sources" has no application to Corey Lewandowski, who is alleged in the Complaint to be a known biased source. Complaint, ¶ 24; *see also* ECF Doc. 1-2 at 8 (explaining that when Corey Lewandowski, "known as a combative and polarizing figure," ordered the "informal audit" or review of the campaign's books, it resulted in a "nasty public blow-up over his role in the campaign," and "[i]t was no surprise that Lewandowski focused on LaCivita, who he apparently viewed as a rival for power"); *id.* at 9 ("Lewandowski . . . was seen as targeting LaCivita in a power struggle by launching the 'audit' of campaign spending."); ECF Doc. 1-2 at 2 (referring to Lewandowski's audit as "informal and controversial").

When actual malice is based on the republication of a third party's defamatory falsehoods, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."  *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *see, e.g., Curtis Publishing Co. v. Butts*, 388 U.S. 130, 157 (1967) (affirming a finding of actual malice against a magazine publisher where the evidence showed that the magazine had published an accurate account of an unreliable informant's false description of an athletic director's purported agreement to "fix" a college football game).

---

[8] Defendant did not include Mr. LaCivita's full response.  For instance, Article 1 includes selected excerpts of his response "to the revelation" (not allegation) of his $22 million pay, while noting that "[h]e did not . . . directly deny the huge sums of money revealed by the [Daily] Beast."  ECF No. 1-3 at 2; *see also* ECF No. 1-4 at 3 (quoting excerpt of Mr. LaCivita's response while noting that he did not "deny[] any of the specific sums he stands to make").

Defendant amplified and republished claims rooted in an "opposition research" document from a rival political actor while possessing and having reviewed public records demonstrating the falsity of its allegations. Plaintiffs' allegations, coupled with Defendant's own post-publication revisions and corrections, give rise to a plausible inference that Defendant either knew its reporting was false or acted with reckless disregard as to their falsity. In short, this was not a "mistake" corrected in good faith—it was the knowing or reckless use of misinformation as a political weapon, which is the very definition of actual malice under the First Amendment.

## B.    The Fair Report Privilege Fails When the Report Distorts the Truth.

Defendant's attempt to hide behind the fair report privilege fails in this case. Virginia law affords a fair report privilege, in which "[t]he publication of public records to which everyone has a right of access is privileged, if the publication is a fair and substantially correct statement of the transcript of the record." *Dangerfield v. WAVY Broad., LLC,* 228 F. Supp. 3d 696, 701 (E.D. Va. 2017) (quoting *Alexandria Gazette Corp. v. West*, 198 Va. 154, 159 (1956)). A defendant who abuses the fair report privilege cannot invoke it; such abuse includes a publication that is not a "substantially accurate account of the public record or proceeding." *Spirito*, 350 F. Supp. 3d at 486 (internal citations omitted).

The fair report privilege does not protect Defendant here because the FEC records clearly and unequivocally show that the Articles are not a fair and accurate report of such records. For instance, Exhibit 8 is an FEC record of expenditures from Make America Great Again Inc. to Advancing Strategies LLC with each expenditure ranging from thousands of dollars to over a million dollars. ECF No. 23-8 [Ex. 8 to Bolger Decl.]. The description for each and every expenditure in Exhibit 8 is either "PLACED MEDIA:TV," "PLACED MEDIA: RADIO," "PRODUCTION COST: TV AD," or "PRODUCTION COST: RADIO AD." *See id.* Exhibit 9 is

an appendix corresponding to Exhibit 8 which calculates the total of such expenditures as $14,788,600.16.  *See* ECF No. 23-9 [Ex. 9 to Bolger Decl.].  Exhibit 10 reflects a $930,000.00 expenditure for "PLACED MEDIA: TV" and a $16,020.00 expenditure for "PRODUCTION COST: TV AD."  ECF No. 23-10 [Ex. 10 to Bolger Decl.].  And Exhibit 12 shows dozens of other expenditures including expenses for "ONLINE ADVERTISING," "DIRECT MAIL SERVICES," DIRECT MAIL SERVICES & POSTAGE," "PLACED MEDIA," "ONLINE ADVERTISING," "VIDEO PRODUCTION SERVICES," and "TRAVEL EXPENSES" totaling at least $1,816,101.00.  *See* ECF No. 23-12 [Ex. 12 to Bolger Decl.].

Thus, of the nearly $19.2 million in expenditures during the relevant time-period, over $17.5 million are clearly and unambiguously described in the FEC records as pass-through expenses, and not income to Plaintiffs.

Courts have consistently held the fair report privilege to be inapplicable where material omissions or the way in which the article was edited convey a false message to the reader.  For instance, in *Horne v. WTVR, LLC*, the court declined to apply the fair report privilege to a news station moving for summary judgment.  2017 WL 1330200, at *5 (E.D. Va. Apr. 6, 2017), *aff'd*, 893 F.3d 201 (4th Cir. 2018).  There, a Virginia school mistakenly hired the plaintiff, an ex-felon, which was against the law.  *Id.* at *1.  In reporting the story, the defendant-news station aired an interview of a school official describing the hiring process, while the banner at the bottom of the screen read: "Felon Hired, Then Fired: How Prince George Schools Prevents This."  *Id.* at *2. The Fourth Circuit found that the juxtaposition of the interview, which did not concern the plaintiff, and the TV banner created a defamatory implication that the school was commenting on its hiring of the plaintiff.  *Id.*  As such, it found that WTVR had abused its fair report privilege and was thus not entitled to its protection.

19

As this Court recognized, "*Horne* illustrates that abuse occurs when a news station adds information to its original source, changing the source's substantial meaning." *Spirito,* 350 F. Supp. 3d at 487.  That is precisely what happened here.  Defendant abused its fair report privilege by providing a misleading summary of the campaign finance data it was purportedly reporting on, giving readers a materially false impression.  Specifically, The Daily Beast presented false and distorted conclusions based on the FEC records by affirmatively and repeatedly claiming that Mr. LaCivita "received $22 million" (later $19.2 million) from the Trump campaign as compensation—a claim Defendant later admitted was factually incorrect.  Having abused the privilege, Defendant cannot invoke it as a defense to its defamation.  *See Horne*, 2017 WL 1330200, at *5.  To the extent the Court deems the evidence on this issue to be conflicting, Defendant's motion should be denied so that the applicability of the fair report privilege can be decided by a jury.  *See James v. Haymes*, 160 Va. 253, 262 (1933).

### C.    Statements Impugning Plaintiffs' Integrity Are Defamatory Per Se.

Virginia law recognizes certain statements as defamatory *per se*, including statements which impugn the plaintiff's fitness for his or her profession or trade, or prejudice the plaintiff in pursuit of his or her profession or trade.  *Hatfill*, 416 F.3d at 330; *Bay Tobacco*, 261 F. Supp. 2d at 501; *Tronfeld v. Nationwide Mut. Ins. Co.*, 272 Va. 709, 713 (2006).  A corporation may be defamed *per se* by statements that "cast aspersion on its honesty, credit, efficiency or its prestige or standing in its field of business."  *Gen. Prods. v. Meredith Corp.,* 526 F. Supp. 546, 549-50 (E.D. Va. 1981) (citing Restatement (Second) of Torts, §§ 561, 573 (1976)).  If a plaintiff establishes a claim for defamation *per se,* Virginia law presumes that the plaintiff suffered actual damage to its reputation and, therefore, the complainant does not have to present proof of such damages. *Fleming v. Moore,* 221 Va. 884, 889 (1981).  Under Virginia law, whether a statement

20

is defamatory *per se* is a matter of law for the trial judge to determine. *Echtenkamp v. Loudon Cnty. Pub. Sch.,* 263 F. Supp. 2d 1043, 1061 (E.D. Va. 2003).

Here, the Complaint alleges that "[t]he defamatory statements, which falsely imply that Mr. LaCivita was personally profiting excessively from his work on the campaign, that he was prioritizing personal gain over the campaign's success, and that he was doing so unbeknownst to President Trump and the campaign, impute a lack of integrity in Mr. LaCivita's performance of his job duties and prejudice him in his business and profession." Complaint, ¶ 46. Defendant portrayed Mr. LaCivita as a self-dealing campaign operative who is unethical and who lacks loyalty and integrity, "thereby harming his reputation as an honest, reasonable, and ethical political operative." *Id.*, ¶ 59. This goes to the heart of his professional reputation and standing. *See Tronfeld*, 272 Va. at 713. These same allegations cast negative aspersions on Plaintiff Advancing Strategies LLC's integrity and standing in its field of business, since this is Mr. LaCivita's consulting firm through which the payments at issue were received. *See, e.g.,* ECF No. 1-2 at 1-2 (noting that LaCivita's contracts "gave his tiny LLC a generous cut of Trump's TV and digital ads, direct mail and other campaign spending," "[t]hat has netted LaCivita's consulting firm $3 million from the campaign [with] plans to award his firm nearly $5 million more by the time the election is over"); ECF No. 1-5 at 4 (referring to the "the Daily Beast['s revelation that] LaCivita's consulting firm—headquartered in his Virginia home—had already collected $22 million from the campaign and two Trump super PACs since 2022").

Defendant's attempt to spin the defamatory allegations as "more complimentary than derogatory" is entirely disingenuous. For instance, Article 1 reports that "[t]he stunning sums made by LaCivita, 57, have other Republicans accusing him of 'cashing in,' even while the campaign itself is strapped for cash and badly lagging behind the Kamala Harris campaign in

spending power.").  ECF No. 1-2 at 3.  Article 4, entitled *Trump Raged at Daily Beast Revelation That Campaign Boss Got $22 Million*, reports that the allegations of LaCivita's alleged $22 million pay from his work on the campaign "left Trump 'fuming' and feeling like the story 'made him look like a fool.'"  ECF No. 1-6 at 2.  Article 4 reports that Article 1 "fueled the GOP presidential nominee's paranoia about disloyalty within his inner circle" and that Trump would have fired LaCivita "and potentially his entire team, if it weren't so close to Election Day."  *Id.  See also* ECF No. 1-4 at 1 (Article 3, entitled *'Sucker' Trump Mocked for Campaign Chief's Multi-Million Haul*, reporting how Donald Trump was "being mocked as a 'fool' and a 'sucker' in a new ad by his Republican haters based on the Daily Beast's revelations of his campaign chief's massive payday").  *See also* Complaint, ¶ 31 ("To further falsely suggest that Mr. LaCivita had engaged in wrongdoing, the podcast's co-host, Joanna Coles, asked Mr. Isikoff, "Michael, what will be the repercussions?  Because it's only three weeks to the election now, so even if Trump were upset to hear that his co-campaign manager had paid or had gotten paid in excess of $22 million, nearer to $30 probably by the time the whole thing is over, it's very late to fire him."); *id.*, ¶ 32 (Isikoff describing Mr. LaCivita as "the grifter who was milking [Donald Trump] for all his money"); *id.*, ¶ 33 (listeners of the podcast describing Mr. LaCivita, based on the false allegations, as a "grifter," a "scammer," "crooked," and as having "conned" Trump).

In Virginia, a statement that imputes a lack of "integrity in the discharge of the duties of . . . employment" is defamatory *per se.  Carwile v. Richmond Newspapers*, 196 Va. 1, 7 (1954); *see, e.g., id.* at 8 (newspaper publication which was capable of interpretation that attorney was guilty of unethical conduct for which he should be subjected to a disbarment proceeding was actionable as defamatory *per se*); *Meredith v. Nestle Purina Petcare Co.,* 516 F. Supp. 3d 542, 554 (E.D. Va. 2021) (former employer's alleged statements impugning employee's abilities or character to

suggest that she was unfit for her job alleged actionable defamation *per se* under Virginia law); *Tronfeld,* 272 Va. at 714 (statement that lawyer "just takes people's money" was actionable as defamatory *per se* because it implies dishonesty and the crimes of larceny by trick or obtaining money by false pretenses); *Echtenkamp,* 263 F. Supp. 2d at 1064 (statement that school psychologist's behavior is unprofessional and in need of corrective action was actionable as defamatory *per se*); *Baylor v. Comprehensive Pain Mgmt. Centers, Inc.,* 2011 WL 1327396, at *10 (W.D. Va. Apr. 6, 2011) ("stating that Dr. Baylor's integrity was not high and that he was fired for ethical reasons, if proven, could prejudice him in the practice of his profession").  Similarly, courts around the country routinely hold allegations charging the plaintiff with a dishonorable course of business conduct to be defamatory *per se.  See, e.g., Badame v. Lampke*, 242 N.C. 755, 757 (1955) (imputing to plaintiff the character of a disreputable business man who had the reputation of engaging in "shady deals" was defamatory *per se*); *Clark v. Brown*, 99 N.C. App. 255, 261 (1990) (defendant's statement to newspaper reporter, indicating that plaintiff was fired because of incompetence, was defamatory *per se*); *Patton v. Royal Indus., Inc.,* 263 Cal. App. 2d 760, 765 (1968) (former employer's letter to customers and potential customers implying that plaintiffs had been discharged and that their services had not been satisfactory was a serious reflection on plaintiffs' abilities and a libel as a matter of law).

Thus, the defamatory allegations about Mr. LaCivita's exorbitant pay and his lack of transparency, coupled with allegations that this was grounds for President Trump to fire him, which he considered doing, impugn Mr. LaCivita's fitness for his trade and tend to prejudice Plaintiffs in their profession, and thus, constitute defamation *per se.  See, e.g., Gilmore,* 370 F. Supp. 3d at 673 ("Gilmore adequately alleges that Creighton's statements are defamatory *per se* under Virginia law because, at a minimum, they would tend to 'prejudice' Gilmore in his

'profession or trade.'").  By portraying Plaintiffs as profiteers betraying their client, Defendant inflicted reputational damage that Virginia law recognizes as presumptively harmful.

      **D.**      **Even if Not Per Se,** The Statements Are Defamatory *Per Quod* with Special Damages.

Even if the Court were to find the statements not to be defamatory *per se*, they are certainly defamatory *per quod*.[9]  Under Virginia law, defamation *per quod* occurs when a defamatory statement is not clear on its face but requires additional context or explanation from "extrinsic facts" to show how it harms the plaintiff's reputation.  *See Wilder v. Johnson Pub. Co.,* 551 F. Supp. 622, 623 (E.D. Va. 1982).  The plaintiff must plead special damages to recover for defamation *per quod*.  *Id.*

Here, Plaintiffs have identified the extrinsic facts necessary to understand the defamatory meaning—namely, the FEC records which are not part of the Articles and which clearly show that the majority of the $19.2 million in expenditures were pass-through payments to other vendors, not income to Mr. LaCivita or his company.[10]  Complaint, ¶¶ 56-58.

Moreover, contrary to Defendant's argument, Plaintiffs have adequately pled special damages, including lost business opportunities and the loss of business income based on the false impression of the exorbitant fees he charges for his services, as well as severe emotional distress, out-of-pocket costs, and damage to Plaintiffs' business and professional reputation and standing.

---

[9] Defendant argues that pleading claims for defamation *per se* and defamation *per quod* is paradoxical, but it is well recognized that such claims may be alleged alternatively.  *See, e.g., Etter v. Axonics Modulation Techs., Inc.,* 2021 WL 12180431, at *2 (E.D. Va. Aug. 5, 2021).

[10] Defendant points to a single statement by Trump campaign officials in a single article (which is not even the same article attached to Plaintiffs' Complaint) to claim that such facts are not actually "extrinsic" to the publications.  However, the extrinsic facts here proving the defamation are the FEC records, not the statement Defendant cites to.

*Id.*, ¶¶ 52, 60.  Plaintiffs have also alleged that the defamatory allegations were republished internationally, negatively impacting Plaintiffs' business worldwide including in Albania, where he was working, as demonstrated by two Albanian articles referencing the defamatory allegations. *Id.*, ¶ 53.  The Complaint further alleges that in representing current clients, "the opposition party has used the defamatory allegations against Mr. LaCivita to cast doubt on his honesty, transparency, loyalty, and integrity, and he has been forced to spend time, money, and resources to combat this false narrative."  *Id.*, ¶ 42.  The foregoing allegations are more than sufficient to satisfy the special damages pleading requirement under Virginia (or even New York) law.  *See, e.g., Reynolds v. Pioneer, LLC,* 2016 WL 1248866, at *7 (E.D. Va. Mar. 25, 2016) (less detailed allegations of special damages sufficient to survive Rule 12(b)(6) scrutiny).  Weaponized misinformation has tangible costs, and those damages are pled with specificity.

II.    Defendants' Conduct Constitutes a Coordinated Business Conspiracy.

Virginia's business conspiracy statute, Virginia Code §§ 18.2-499 *et seq.,* "prohibits concerted action intended to harm another's business."  *AvalonBay Communities, Inc. v. Willden,* 2009 WL 2431571, at *8 (E.D. Va. Aug. 7, 2009), *aff'd,* 392 F. App'x 209 (4th Cir. 2010).  To recover under the statute, one must prove "'(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business[;] and (2) resulting damage to plaintiff.'"  *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214 (2014) (quoting *Allen Realty Corp. v. Holbert*, 227 Va. 441, 449 (1984)).  It is not necessary for a plaintiff to allege that the defendant conspirators acted with actual malice, i.e., ill-will, hatred, or spite directed toward the plaintiff.  *Com. Bus. Sys., Inc. v. Bellsouth Servs., Inc.,* 249 Va. 39, 47 (1995).  Rather, a plaintiff need only allege that one party to the alleged conspiracy acted with legal malice, i.e., "intentionally, purposely, and without lawful justification.  *Id.*; *Multi-Channel TV Cable Co. v.*

*Charlottesville Quality Cable Operating Co.*, 108 F.3d 522, 527 (4th Cir. 1997); *GTSI Corp. v. Wildflower Int'l, Inc.*, 2009 WL 2160451, *6 (E.D. Va. 2009). Furthermore, it is not necessary to allege that the defendant's primary and overriding purpose in the conspiracy was to injure another in his trade or business. *See Simmons v. Miller,* 261 Va. 561, 577 (2001).

Defendant's three arguments against the sufficiency of Plaintiffs' business conspiracy claim are not persuasive. First, Defendant's argument that business conspiracy cannot be based on defamation is unavailing where the conspiracy is alleged to involve more than mere publication and includes malicious coordination. Indeed, Virginia law does not preclude defamation-based conspiracy claims where, as here, the conspiracy claim is independently grounded in concerted conduct with intent to harm. *See, e.g., Dunlap*, 287 Va. at 218-19 (an independent intentional tort may constitute the requisite "unlawful act" to proceed on a Virginia business conspiracy claim). In any event, because Plaintiffs have stated a valid claim for defamation, as explained above, this is not a basis for dismissing Plaintiffs' related claim for statutory business conspiracy, as Defendant claims. *Cf. Theologis v. Weiler,* 76 Va. App. 596, 611 (2023).

*Shirvinski v. U.S. Coast Guard*, 673 F.3d 308 (4th Cir. 2012), cited by Defendant, supports the denial of Defendant's motion. There, plaintiffs' defamation-based business conspiracy claim was not dismissed at the pleadings stage; rather, the claim failed on a motion for summary judgment because (1) plaintiff offered no evidence, other than speculation, that a second individual participated in the composition of the defamatory e-mail or even knew about it before it was sent, and (2) plaintiff did not demonstrate an injury to a business interest. *Id.* at 320-21.

Defendant misstates the holding in *Buschi v. Kirven*, 775 F.2d 1240 (4th Cir. 1985), by suggesting that the court rejected the business conspiracy claim in that case "because it was 'in essence, an action in slander and libel'." ECF Doc. 23 at 28 (quoting *Buschi*, 775 F.2d at 1259).

26

In fact, plaintiffs' business conspiracy claim failed in that case because "[plaintiffs] ma[d]e no claim of a business-related injury." *Buschi*, 775 F.2d at 1259. The Fourth Circuit explained that "the federal district courts in Virginia have consistently held that a right of action is 'afforded [under these statutes] only when malicious conduct is directed at one's *business,* not one's *person,*' and that the statute 'focuses upon conduct directed at property, *i.e.,* one's business' and applies only to 'conspiracies resulting in business-related damages.'" *Id.* (internal citations omitted) (emphases in original).

Here, unlike in *Buschi*, Plaintiffs have expressly alleged that Defendant's malicious conduct was intended to harm Plaintiffs' "reputation, trade, business, and profession," and that "[a]s a direct and proximate result of Defendant and Mr. Isikoff's concerted actions, Plaintiffs suffered business-related damages, including but not limited to damage to their professional reputations and lost profits." Complaint, ¶¶ 67-68.

Defendant's argument that Plaintiffs have not sufficiently pled the state-law elements of a statutory business conspiracy claim lacks merit. Far from imposing an exacting standard, Virginia requires a plaintiff to merely allege "some details of time and place and the alleged effect of the conspiracy." *Johnson v. Kaugars,* 14 Va. Cir. 172, 176 (1988); *see id.* ("[I]t is not enough merely to state that a conspiracy took place.").

Here, the Complaint alleges that in the weeks and days leading up to the 2024 presidential election, The Daily Beast acted in concert with Michael Isikoff and others to publish defamatory content about Plaintiffs to harm their reputation, trade, business, and profession. Complaint, ¶ 67. The Complaint further alleges that "to bring more attention to the defamatory allegations about Mr. LaCivita," Michael Isikoff discussed this issue on The Daily Beast Podcast on an episode entitled "How Has Trump's Campaign Manager Made $22 MILLION," which first aired on

October 23, 2024. *Id.*, ¶ 26. The Complaint also alleges that in conspiring to defame Plaintiffs, The Daily Beast acted with actual malice, which is a more stringent standard than the legal malice required for a statutory business conspiracy claim.[11] *See, e.g., id.*, ¶¶ 24, 66-67. Plaintiffs have sufficiently pled the elements of common purpose, concerted action, malice, and resulting business damages—alleging that Defendant's publications were not isolated acts, but part of a coordinated campaign to discredit Plaintiffs politically and professionally. The allegations are sufficient under Virginia Code § 18.2-499 to survive a motion to dismiss. *See, e.g., Rohrbaugh v. Kreidler,* 71 Va. Cir. 298, *4 (2006) (complaint sufficiently stated a cause of action for statutory business conspiracy where "the Complaint allege[d] that Bonnie and Jerry Kreidler intentionally conspired to harm Mr. Rohrbaugh by imputing to him 'an unfitness to perform his job . . . a lack of integrity in the discharge of his job, and prejudiced [him] in his profession. . . .'"). Thus, construing the allegations in the light most favorable to Plaintiffs, as the Court must on a motion to dismiss, Plaintiffs have sufficiently stated a claim for business conspiracy under the Virginia statute.

Finally, Defendant's attempt to challenge the constitutionality of an award of treble damages under Virginia's business conspiracy statute, based on the Supreme Court's decision in *Gertz v. Welch*, 418 U.S. 323 (1974), is unavailing. A similar argument was made and rejected in *Uneedus v. California Shoppers, Inc.,* 86 Cal. App. 3d 932, 942-43 (1978). As the California Court of Appeal aptly noted in that case, "Gertz addressed the issue of awarding exemplary damages against a media defendant when that defendant engaged in defamatory speech. In the case before us treble damages are appropriate, not because of the type of speech engaged in, but because of unlawful business acts violative of the Unfair Practices Act." *Id.* Similarly, here, the *Gertz*

---

[11] *See Com. Bus. Sys.,* 249 Va. at 47 (explaining that the conspiracy statutes do not require proof of actual malice; "the statutes merely require proof of legal malice, *i.e.,* that [defendant] acted intentionally, purposely, and without lawful justification").

standard does not apply to the Virginia business conspiracy statute, which holds the defendant liable for business conspiracy, not defamation. Under the doctrine of constitutional avoidance, if a statute is susceptible to more than one reasonable construction, the court should choose an interpretation that avoids raising constitutional problems. *FERC v. Powhatan Energy Fund, LLC*, 286 F. Supp. 3d 751, 758 (E.D. Va. 2017); *see also United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.").

In any event, the Court need not reach this constitutional issue because, as explained above, Plaintiffs have adequately alleged actual malice by The Daily Beast, making treble damages indisputably an appropriate remedy for their statutory business conspiracy claim.

## CONCLUSION

In the heat of a presidential election, Defendant The Daily Beast used its platform not to inform, but to injure—publishing a politically charged falsehood that it knew, or should have known, was untrue. By misrepresenting campaign finance records and amplifying opposition research from a rival political operative, Defendant injected a false narrative into the national conversation at the exact moment it would cause maximum harm. The resulting damage— professional, reputational, and economic—was felt most acutely in Virginia, where Plaintiffs live, work, and have earned their standing in the political community.

Defendant's motion to dismiss should be denied in full because Plaintiffs have more than met their pleading burden. In the event Defendant's motion is granted in whole or in part, Plaintiffs respectfully request that such dismissal be granted without prejudice and with leave to replead.

Dated: August 11, 2025                    Respectfully submitted,


                                          s/Jonathan Shaw

                                          Jonathan Shaw (VSB No. 98497)
                                          Tel and Fax: (703) 574-1206
                                          jshaw@dhillonlaw.com
                                          Lee E. Goodman (VSB No. 31695)
                                          Tel and Fax: (703) 637-8754
                                          lgoodman@dhillonlaw.com
                                          DHILLON LAW GROUP, INC.
                                          2121 Eisenhower Avenue, Suite 608
                                          Alexandria, VA 22314


                                          Mark Geragos (*pro hac vice*)
                                          Tina Glandian (*pro hac vice*)
                                          Setara Qassim (*pro hac vice*)
                                          644 S. Figueroa Street
                                          Los Angeles, CA 90017
                                          (213) 625-3900 Phone
                                          geragos@geragos.com

                                          *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of August, 2025, I electronically filed the foregoing

pleading using the CM/ECF System, which will send notifications of the filing to all counsel of

record:

John D. McGavin (VSB 21794)
McGavin, Boyce, Bardot, Thorsen & Katz, P.C.
9990 Fairfax Boulevard, Suite 400
Fairfax, VA 22030
Telephone: (703) 385-1000
Facsimile: (703) 385-1555
jmcgavin@mbbtklaw.com

Katherine M. Bolger, Esq.
Meenakshi Krishnan, Esq.
Davis Wright Tremaine LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
(212) 489-8230 Phone
(212) 489-8340 Fax
katebolger@dwt.com
meenakshikrishnan@dwt.com

*Counsel for Defendant*
*The Daily Beast, LLC d/b/a The Daily Beast*

                      */s/ Jonathan Shaw*
                      Jonathan Shaw (VSB No. 98497)