**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

|  |  |
|---|---|
| CHRIS LACIVITA, an individual, and ADVANCING STRATEGIES, LLC,<br><br>     Plaintiffs,<br><br>v.<br><br>THE DAILY BEAST COMPANY, LLC d/b/a/THE DAILY BEAST,<br><br>     Defendant. | Case No.: 3:25-cv-227<br><br><br>**HEARING REQUESTED** |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT'S
MOTION TO DISMISS**

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger (*pro hac vice*)
Meenakshi Krishnan (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone:  (212) 489-8230
katebolger@dwt.com
meenakshikrishnan@dwt.com

MCGAVIN, BOYCE, BARDOT,
THORSEN & KATZ, P.C.
John D. McGavin (VSB 21794)
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
Phone: (703) 385-1000
jmcgavin@mbbtklaw.com


*Attorneys for Defendant The Daily
Beast Company LLC*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT .....................................................................................................................1

I.    NEW YORK LAW APPLIES TO THIS CASE ....................................................1

II.   LACIVITA'S DEFAMATION CLAIMS FAIL AS A MATTER OF LAW ...................3

    A.    LaCivita Does Not—and Cannot—Plead Actual Malice ...........................3

        1.   The FEC Records Do Not Contradict the Articles........................4

        2.   The Court May Consider *The Daily Beast*'s Clarified Articles, Which Rebut Actual Malice........................8

        3.   The Publications' Brief Reference to Corey Lewandowski's Audit Cannot Establish Actual Malice........................9

        4.   Plaintiffs Do Not Bring Home Their Actual Malice Allegations .............11

    B.    The Fair Report Privilege Protects the Publications .............................12

    C.    The Publications Are Not Defamatory ..................................................14

        1.   The Publications Are Not Defamatory *Per Quod*......................14

        2.   The Publications Are Not Defamatory *Per Se* ..........................16

III.  PLAINTIFFS' BUSINESS CONSPIRACY CLAIM FAILS............................18

CONCLUSION...................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AB Staffing Sols. v. Asefi Cap.*,
   2022 WL 16555707 (E.D. Va. Oct. 31, 2022) ...........................................................................2

*ABLV Bank v. Ctr. for Advanced Def. Stud.*,
   2015 WL 12517012 (E.D. Va. Apr. 21, 2015) ...........................................................................2

*Alexandria Gazette v. West*,
   93 S.E.2d 274 (1956) ...............................................................................................................14

*Brimelow v. N.Y. Times*,
   2021 WL 4901969 (2d Cir. Oct. 21, 2021) ................................................................................6

*Broughty v. Bouzy*,
   2024 WL 1739866 (D.N.J. Apr. 22, 2024) ...............................................................................15

*Brown & Williamson Tobacco Corp. v. Jacobson*,
   827 F.2d 1119 (7th Cir. 1987) ...................................................................................................5

*Bryant v. Woodall*,
   1 F.4th 280 (4th Cir. 2021) ........................................................................................................8

*Buschi v. Kirven*,
   775 F.2d 1240 (4th Cir. 1985) .................................................................................................19

*Carwile v. Richmond*,
   82 S.E.2d 588 (1954) ...............................................................................................................18

*Chapin v. Knight-Ridder*,
   993 F.2d 1087 (4th Cir. 1993) .................................................................................................17

*Cockrum v. Donald J. Trump for President*,
   365 F. Supp. 3d 652 (E.D. Va. 2019) ....................................................................................2, 3

*Curtis Publ'g v. Butts*,
   388 U.S. 130 (1967)..................................................................................................................11

*Depp v. Heard*,
   2019 WL 8883669 (Va. Cir. Ct. 2019) ......................................................................................3

*Dragulescu v. Virginia Union Univ.*,
   223 F. Supp. 3d 499 (E.D. Va. 2016) .......................................................................................17

*Dubnick v. Henderson Cnty. Hosp.*,
2009 WL 2426309 (W.D.N.C. July 6, 2009) ........................................................................4

*Dunlap v. Cottman Transmission Sys.*,
754 S.E.2d 313 (2014) ..........................................................................................................19

*Edwards v. Schwartz*,
378 F. Supp. 3d 468 (W.D. Va. 2019) ...................................................................................15

*Fairfax v. CBS*,
2 F.4th 286 (4th Cir. 2021) ................................................................................................8, 10

*Fairfax v. N.Y. Pub. Radio*,
2023 WL 3303125 (E.D. Va. Apr. 4, 2023), *aff'd*, 2024 WL 3935041 (4th Cir.
Aug. 26, 2024) ........................................................................................................................2

*Freedlander v. Edens Broad.*,
734 F. Supp. 221 (E.D. Va. 1990), *aff'd*, 923 F.2d 848 (4th Cir. 1991) ..........................16, 18

*Gertz v. Welch*,
418 U.S. 323 (1974) ..............................................................................................................20

*Gilmore v. Jones*,
370 F. Supp. 3d 630 (W.D. Va. 2019) ...................................................................................3

*Harte- Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) ..............................................................................................................12

*Harvey v. CNN*,
48 F.4th 257 (4th Cir. 2022) ..................................................................................................10

*Henry v. Fox News Network*,
629 F. Supp. 3d 136 (S.D.N.Y. 2022) ...................................................................................15

*Horne v. WTVR*,
2017 WL 1330200 (E.D. Va. Apr. 6, 2017), *aff'd*, 893 F.3d 201 (4th Cir.
2018) ......................................................................................................................................13

*Hunt v. Liberty Lobby*,
720 F.2d 631 (11th Cir. 1983) ................................................................................................5

*Jacob v. Lorenz*,
2023 WL 4106298 (S.D.N.Y. June 21, 2023) ......................................................................12

*Liberty Lobby v. Dow Jones & Co.*,
838 F.2d 1287 (D.C. Cir. 1988) ..............................................................................................9

*Masson v. New Yorker Mag.*,
501 U.S. 496 (1991) ............................................................................................7

*Mejia v. Telemundo Mid-Atl.*,
440 F. Supp. 3d 495 (D. Md. 2020) ...................................................................12

*Meredith v. Nestle Purina Petcare*,
516 F. Supp. 3d 542 (E.D. Va. 2021) ................................................................18

*Milton v. IIT Rsch. Inst.*,
138 F.3d 519 (4th Cir. 1998) ...............................................................................3

*Nelson Auto Ctr. v. Multimedia Holdings*,
951 F.3d 952 (8th Cir. 2020) ...............................................................................9

*Patel v. CNN*,
910 S.E.2d 532 (Va. Ct. App. 2025) ..................................................................12

*Prince v. Intercept*,
634 F. Supp. 3d 114 (S.D.N.Y. 2022) ..................................................................6

*Reed Constr. Data v. McGraw-Hill Cos.*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) .........20

*Reliance Ins. v. Barron's*,
442 F. Supp. 1341 (S.D.N.Y. 1977) ...................................................................10

*Reuber v. Food Chem. News*,
925 F.2d 703 (4th Cir. 1991) .............................................................................10

*Rohrbaugh v. Kreidler*,
2006 WL 2032640 (Va. Cir. 2006) ....................................................................20

*Rosanova v. Playboy Enters.*,
580 F.2d 859 (5th Cir.1978) ................................................................................9

*Shirvinski v. U.S. Coast Guard*,
673 F.3d 308 (4th Cir. 2012) .............................................................................19

*Spirito v. Peninsula Airport Comm'n*,
350 F. Supp. 3d 471 (E.D. Va. 2018) ................................................................13

*St. Amant v. Thompson*,
390 U.S. 727 (1968) ......................................................................................4, 11

*Suulutaaq v. Williams*,
782 F. Supp. 2d 795 (D. Alaska 2010) ...............................................................17

iv

*Tah v. Glob. Witness Publ'g*,
   991 F.3d 231 (D.C. Cir. 2021) ..................................................................................6

*Tannerite Sports v. NBCUniversal*,
   864 F.3d 236 (2d Cir. 2017)......................................................................................7

*Uneedus v. Cal. Shoppers*,
   86 Cal. App. 3d 932 (1978) .....................................................................................20

*Wadnola v. City of Norfolk*,
   111 Va. Cir. 367A (2023), *aff'd*, 2025 WL 375969 (Va. Ct. App. Feb. 4,
   2025) ........................................................................................................................15

*Wells v. Liddy*,
   186 F.3d 505 (4th Cir. 1999) .....................................................................................3

*Young v. Gannett Satellite Information Network*,
   734 F.3d 544 (6th Cir. 2013) .....................................................................................5

Defendant The Daily Beast Company LLC ("*The Daily Beast*") submits this reply in further support of its Motion to Dismiss Plaintiffs Chris LaCivita ("LaCivita") and Advancing Strategies, LLC's ("Advancing Strategies") (collectively, "Plaintiffs") Complaint ("Compl.") with prejudice.

## PRELIMINARY STATEMENT

The Opposition confirms that Plaintiffs have failed to allege a viable claim against *The Daily Beast*.  As to the defamation claim, LaCivita has not demonstrated that the Complaint adequately pleads actual malice, has failed to explain why the Articles are not protected by the fair report privilege, and has even failed to establish the Articles are capable of a defamatory meaning in the first place.  Nor have Plaintiffs shown that their fabricated business "conspiracy" claim—which seeks treble damages—is consistent with the First Amendment.  And they could never successfully plead their claims, rendering any amendment futile.

What the Opposition does show is that, far from seeking recompense for a real harm, LaCivita brings this lawsuit to punish *The Daily Beast* for publishing facts he does not like.  The Articles reported on the finances of then-candidate Donald Trump's presidential campaign, based on official records made publicly available by federal law designed to encourage transparency in American elections. When *The Daily Beast* discovered there were errors in its reporting, within three weeks of publication, it corrected those errors and apologized.  In sum, *The Daily Beast* responsibly reported on a matter of public interest.  Yet Plaintiffs insist that they should be awarded millions of dollars in damages.  LaCivita's transparent attempt to silence and punish a speaker with whom he does not agree should be rejected.  The Complaint should be dismissed with prejudice.

## ARGUMENT

### I.    NEW YORK LAW APPLIES TO THIS CASE

In its Motion, *The Daily Beast* established that, while it believes it will prevail under both

New York and Virginia law, New York law governs because it is the place of publication and, therefore, the *lex loci delicti*. Mot. at 8-9. The Opposition argues that Virginia law applies because the *lex loci delicti* is where LaCivita, a Virginia resident, allegedly suffered injury. Opp. at 3-8.

In so arguing, however, Plaintiffs all but ignore the case law cited in the Motion, including this Court's decision in *Cockrum v. Donald J. Trump for President*, which explicitly rejects the very argument Plaintiffs advance here. 365 F. Supp. 3d 652, 666 (E.D. Va. 2019). There, this Court held that because public disclosure of private facts, like defamation, is a "publication-based tort," the "point of publication" "completes the pivotal act of public disclosure," and therefore "the place where the act of publication to the Internet occurred," not the plaintiff's residence, determines the "place of the wrong." *Id.* at 666, 668, 670. In so holding, this Court concluded that this approach "most closely aligns" with Virginia Supreme Court authority.[1] *Id.* at 669.

This same approach has been accepted in several recent defamation actions in this District that conclude the place of publication governs the choice of law. *See, e.g.*, *Fairfax v. N.Y. Pub. Radio*, 2023 WL 3303125, at *2 n.3 (E.D. Va. Apr. 4, 2023) ("[U]nder Virginia's choice of law rules, a defamation claim is governed by the law where the defamatory statement was published."), *aff'd*, 2024 WL 3935041 (4th Cir. Aug. 26, 2024); *AB Staffing Sols. v. Asefi Cap.*, 2022 WL 16555707, at *19 (E.D. Va. Oct. 31, 2022) ("place of publication constitutes the place of the wrong"); *ABLV Bank v. Ctr. for Advanced Def. Stud.*, 2015 WL 12517012, at *1 (E.D. Va. Apr. 21, 2015) ("Virginia looks to where the statement was published.") (citation omitted). And this is consistent with the concern, expressed by the Fourth Circuit, that following Plaintiffs' approach and focusing only on domicile would "effectively replace Virginia's traditional rule for tort cases

---

[1] Unlike in *Cockburn*, where there were no allegations as to the publishing party's headquarters, the Complaint here alleges that *The Daily Beast* is based in New York. Compl. ¶ 4.

2

with default application of the law of plaintiff's domicile," an approach that the Virginia Supreme Court has "declined . . . to adopt." *Milton v. IIT Rsch. Inst.*, 138 F.3d 519, 522 (4th Cir. 1998). In short, the majority view—all but ignored in the Opposition—is that the place of publication, not the plaintiff's domicile, determines the choice of law. Here, that means New York law applies.

Ignoring this well-reasoned view, the Opposition cites a handful of cases espousing a minority injury-based approach, but each of these is distinguishable. Opp. at 6-7. For example, in *Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir. 1999), the Fourth Circuit, applying Maryland law, endorsed a "most significant relationship" test. Opp. at 6. But as this Court has recognized, the Virginia Supreme Court has "explicitly rejected" this test. *Cockrum*, 365 F. Supp. 3d at 669 (citing *Jones v. R.S. Jones & Assocs., Inc.*, 431 S.E.2d 33, 34 (1993)). And the injury-based approach in *Gilmore v. Jones*, 370 F. Supp. 3d 630, 664 (W.D. Va. 2019), was considered—and rejected—in a high-profile defamation case in Virginia state court, expressly because that approach "tracks closely to the underlying rationale behind the significant relationship test" that has been repudiated by the Virginia Supreme Court. *Depp v. Heard*, 2019 WL 8883669, at *4 (Va. Cir. Ct. 2019). Instead, that court explicitly endorsed this Court's approach in *Cockrum* to conclude that "the place of the wrong" in a defamation case is "where the act of publication" occurred. *Id.* at *4-5. *Wells* and *Gilmore* thus do not help Plaintiffs. Instead, given the weight of precedent and this Court's directly analogous reasoning in *Cockrum*, New York law should apply.

## II.   LACIVITA'S DEFAMATION CLAIMS FAIL AS A MATTER OF LAW

### A.   LaCivita Does Not—and Cannot—Plead Actual Malice

As set forth in the Motion, LaCivita[2] was required to, but did not plead, that the allegedly

---

[2] At various points, the Opposition suggests that Advancing Strategies brings defamation claims. *See, e.g.*, Opp. at 21 (describing "negative aspersions" on its reputation). But the Complaint is clear that only <u>LaCivita</u> brings defamation *per se* and *per quod* claims, Compl. ¶¶ 44-65, and

defamatory statements were published with actual malice, i.e. that *The Daily Beast* "in fact entertained serious doubts as to the truth of [its] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *see* Mot. at 10-13. In response, LaCivita offers four unpersuasive arguments.

### 1.    The FEC Records Do Not Contradict the Articles

The Opposition primarily contends that LaCivita pleads actual malice because in its reporting *The Daily Beast* "misrepresent[ed] the information" in the FEC Records, which "flatly contradicted" the Articles. Opp. at 10, 12. Specifically, LaCivita insists that the FEC Records "clearly show" that the "substantial multi-million figure" paid to his firm "represents gross expenditures," not "income received." Opp. at 14 (citing Compl. ¶ 58). But the FEC Records show no such thing.

The FEC Records do not, as LaCivita posits, indicate that the "overwhelming majority of [the] funds [paid to LaCivita's firm] . . . were immediately passed through to purchase advertising and pay for other campaign expenses." Opp. at 1. In accordance with FEC disclosure requirements, the FEC Records identify an umbrella category in the "Description" column for each payment made to LaCivita's firm (which are required to meet FEC disclosure requirements).[3] These general categories include, for example, "media consulting," Mot. Ex. 10 at 2; "placed media: TV," Mot. Ex. 8 at 2; "production cost: TV ad," Mot. Ex. 10 at 2; and "political strategy consulting," Mot. Ex. 12 at 3. Thus, the FEC Records provide information about payments made *to* LaCivita's firm. But the FEC Records say nothing about disbursements made *from* LaCivita's

---

Plaintiffs cannot rewrite their allegations to add Advancing Strategies as a defamation plaintiff. *Dubnick v. Henderson Cnty. Hosp.*, 2009 WL 2426309, at *2 n.2 (W.D.N.C. July 6, 2009) ("[T]he universe of plaintiff's claims is limited to allegations in [the] Complaint . . . This court has no authority to address controversies other than those presented to it.") (citing U.S. Const., Art. III).

[3]    *See Purposes of disbursement*, FEC, https://www.fec.gov/help-candidates-and-committees/purposes-disbursements (disbursement purposes are "brief but specific description[s] of why the disbursement was made").

4

firm. And thye certainly do not establish that the "overwhelming majority" of the payments made to LaCivita's firm "immediately" passed through to other recipients. *Contra* Opp. at 1. To the contrary, the FEC Records do not provide *any* details regarding how much, if any portion, of each payment "passed through" to third parties, much less the timing of any such pass-throughs. Plaintiffs have simply made up that part.[4]

Moreover, even if the FEC Records on their face had indicated any "pass-through" payments on their face *from* LaCivita's firm (and they do not), there still could be no actual malice because the Articles (both as originally published and as revised) explicitly and repeatedly acknowledged the possibility that a substantial portion of the payments to LaCivita's firm "passed through" it and was not "income" to the firm. Article 1 stated:

> A senior campaign official argued that the amounts recorded on campaign finance records as being paid to Advancing Strategies are misleading because a chunk of these are "pass through" payments to other vendors . . .
>
> The official added that campaign finance reports showing hefty payments to Advancing Strategies under the contract were misleading because "much" of these funds were "pass through" payments to other vendors and "was not income" to LaCivita's company.

Compl. Ex. 1 at 4, 9; *see also* Bolger Ex. 1 at 4, 7 (same). *The Daily Beast* did not hide the possibility of substantial pass-through payments—it explicitly described them.

---

[4] Because the FEC Records are not at odds with the Articles, Plaintiffs' collection of cases where authors intentionally published statements despite possessing directly contradictory information is irrelevant. *See* Opp. at 11. For example, in *Hunt v. Liberty Lobby*, the court favorably cited a case where the publisher, though aware the plaintiff "was not a call girl but would be appearing on a show with a call girl," nonetheless plainly implied she was a call girl. 720 F.2d 631, 644 (11th Cir. 1983) (citation omitted). In *Brown & Williamson Tobacco Corp. v. Jacobson*, a jury found actual malice where the defendant's researcher destroyed several documents, including an FTC report, that established actual malice. 827 F.2d 1119, 1134 (7th Cir. 1987). And in *Young v. Gannett Satellite Information Network*, the jury found actual malice where an arbitrator's report squarely rejected several reported facts. 734 F.3d 544, 547-48 (6th Cir. 2013). Given what is and is not in the FEC Records, there are no such direct contradictions here.

This is an undisputed and critical fact of *The Daily Beast*'s reporting that effectively forecloses any finding of actual malice—yet it barely gets a nod in the Opposition.  In their three-line response to a fact that dooms LaCivita's defamation claims, Plaintiffs somehow contend that this reporting on pass-through payments "support[s] an inference of actual malice" because *The Daily Beast* was "warned of the falsity of its conclusions and advised how to properly interpret the FEC [R]ecords."  Opp. at 17.  This contention is risible.  As LaCivita sees it, the Articles were defamatory because they falsely reported that the $19.2 million flowing into his firm was all "income."  But *The Daily Beast* actually reported that a great deal of it might be a mere "pass-through."  That cannot be actual malice.

More broadly, *The Daily Beast*'s handling of Plaintiffs' pre-publication denials and comments does not remotely suggest actual malice.  It is "well settled that denials without more do not support a plausible claim of actual malice," even less so where, as here, the denial itself was reported.  *Brimelow v. N.Y. Times*, 2021 WL 4901969, at *3 (2d Cir. Oct. 21, 2021); *see also Prince v. Intercept*, 634 F. Supp. 3d 114, 141 (S.D.N.Y. 2022) (same).  That is particularly true where the denials contain "no 'evidence that could be readily verified' of the sort that would provide 'obvious reasons to doubt the veracity of [the] publication," nor even "contest the facts" that are stated.  *Tah v. Glob. Witness Publ'g*, 991 F.3d 231, 242 (D.C. Cir. 2021) (citation omitted).  Here, there was no such evidence.  LaCivita and the Trump campaign suggested that much of the money received by LaCivita's firm may have been passed through to vendors, but did not show—nor could they—how the FEC Records could be "interpret[ed]" to determine the size or timing of any such pass-through payments.  Nor have they ever disputed the payment amounts in the FEC Records by providing invoices, agreements, or any other empirical evidence.  Thus, neither the FEC Records themselves nor the Trump campaign and LaCivita's statements put *The Daily Beast*

on notice of the falsity of anything reported in the Articles.[5]  Those statements merely took the unsubstantiated position that a sizeable portion of the payments "passed through" to other vendors and were not direct income to LaCivita's firm.  That is exactly what *The Daily Beast* reported.

Finally, to the extent that Plaintiffs quibble that the FEC Records indicate payments to LaCivita's firm, while the original Articles in part attributed payments to LaCivita individually, this is a distinction without any difference for actual malice purposes.  To establish knowing falsity, LaCivita is required to establish that *The Daily Beast* knew the statement would have produced a "different effect on the mind of the reader" from the pleaded truth.  *Tannerite Sports v. NBCUniversal*, 864 F.3d 236, 242–43 (2d Cir. 2017).  And here, there would be no such different effect.  As the Articles reported—and Plaintiffs concede—LaCivita's firm has "no apparent website and appears to be headquartered in his home," according to state corporate records, and the firm's sole member is LaCivita.  For lay reader purposes, then, LaCivita and his firm are functionally indistinguishable, Compl. ¶ 3; Compl. Ex. 1 at 3, and there is no meaningful difference for actual malice purposes.  Regardless, because of *The Daily Beast*'s diligence, the Articles were subsequently revised for the avoidance of any doubt that per the FEC Records, the payments were made to LaCivita's firm in the first instance, definitively undercutting any actual malice.  *See* Mot. at 14 (collecting cases showing that such clarification affirmatively negates actual malice).

---

[5] Plaintiffs claim *The Daily Beast* "did not include [] LaCivita's full response," Opp. at 17 n.8, but they do not point to any specific omissions.  In any event, editorial truncation of quotes is commonplace and can inform the actual malice inquiry only if the alteration "results in a material change in the meaning conveyed" by the plaintiff's statement.  *Masson v. New Yorker Mag.*, 501 U.S. 496, 517 (1991).  Plaintiffs do not allege any such material alteration, nor could they.

### 2. The Court May Consider *The Daily Beast*'s Clarified Articles, Which Rebut Actual Malice

LaCivita fails to rebut the commonsense argument that *The Daily Beast*'s timely and diligent correction of the original Articles affirmatively negates actual malice.

LaCivita first implores the Court to "pay no attention" to *The Daily Beast*'s corrected Articles (Bolger Exs. 1-5) because they are supposedly outside the pleadings. Opp. at 12 n.4. But the Court plainly can—and should—consider the revised Articles. The revised Articles, described at Paragraph 35 of the Complaint, are "integral to and relied upon in the [C]omplaint," and therefore are incorporated by reference therein. *Fairfax v. CBS,* 2 F.4th 286, 292 (4th Cir. 2021). Moreover, the Court may "take judicial notice of the fact of the publication of" the revised Articles. *Bryant v. Woodall,* 1 F.4th 280, 289 n.2 (4th Cir. 2021) (judicially noticing the publication of an opinion piece in *The Washington Post*). And further, LaCivita's position that the Court cannot consider the revised Articles is belied by his own reliance on them in arguing about actual malice. Opp. at 1, 14-15, 18. The parties thus agree that the revised Articles should be considered on this Motion.

LaCivita argues that *The Daily Beast*'s revisions somehow are "damning evidence of actual malice." Opp. at 15, 18. This counterintuitive argument reprises Plaintiffs' principal contention that the FEC Records contradict the Articles. So, the argument goes, *The Daily Beast*'s clarifications, which followed a "further review of the FEC [R]ecords," confirm rather than negate actual malice. As shown above, however, the FEC Records do *not* contradict the Articles. Specifically, the FEC Records do not identify or specify the amount of any pass-throughs, and Plaintiffs themselves repeatedly have declined to provide any such information.

But more than that, after re-review of the FEC Records, *The Daily Beast*, on its own accord, discovered and corrected an arithmetic error, and for the avoidance of any doubt, further clarified

that all of the payments in question were made to LaCivita's firm in the first instance.[6]  Such

prompt and assiduous correction affirmatively negates actual malice.  *See, e.g.*, *Nelson Auto Ctr.*

*v. Multimedia Holdings,* 951 F.3d 952, 958–59 (8th Cir. 2020) (no actual malice where, in response

to plaintiff's complaint, defendant "promptly corrected the mistake on its website").  In fact, by

explicitly *not* challenging the revised Articles in this case, Plaintiffs have effectively conceded that

those Articles are accurate and non-actionable.  The revised Articles are thus significant evidence

of the absence of actual malice.

### 3. The Publications' Brief Reference to Corey Lewandowski's Audit Cannot Establish Actual Malice

Despite the fact that *The Daily Beast*'s Motion makes clear that the Articles on their face

do not rely on Corey Lewandowski as a source for the payments to LaCivita's firm, LaCivita

nonetheless insists that he has pled actual malice because *The Daily Beast* relied on Lewandowski

who, he claims, is biased.[7]  Opp. at 1, 17.

To begin, it is simply not true that the Articles were based on Lewandowski or his audit.

It is clear on the face of Article 1 that it relied on numerous reliable sources, including the FEC

Records, LaCivita's own campaign-authorized contracts, Trump campaign sources, experts, and

prior reputable reporting, all of which "precludes a finding of actual malice as a matter of law."

*Liberty Lobby v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988); *see also Rosanova v.*

*Playboy Enters.*, 580 F.2d 859, 862 (5th Cir.1978) (actual malice "cannot be found where, as here,

the publisher's allegations are supported by a multitude of previous reports upon which the

publisher reasonably relied").  Article 1 references Lewandowski only in contextualizing the

---

[6] As Plaintiffs do not dispute, their retraction demand never even flagged the arithmetic error. Instead, *The Daily Beast* made that correction on its own after conducting further diligence.

[7] To be clear, the Articles do not reference any "opposition research" from Lewandowski, Opp. at 29, just an informal "audit."  Compl. Ex. 1 at 8.

payments received by LaCivita's firm against the Trump campaign's publicly reported financial struggles (as the headline reports, "Trump in Cash Crisis") and the related well-known "informal" audit that Lewandowski conducted in the waning months of the campaign.  Compl. Ex. 1 at 8.

Nor is it true that Isikoff "conceded" on the Podcast Episode that his reporting was based on Lewandowski and his audit.  Opp. at 16.  Instead, Isikoff simply pointed to Lewandowski's audit as an example of someone in Trump's camp "raising the question" of whether all the campaign expenditures were in fact necessary.  Bolger Ex. 7 at 2.  In short, neither the Articles nor the Podcast Episode relied solely on Lewandowski, and not at all for what LaCivita claims as the defamatory sting of the Publications.[8]

But even if *The Daily Beast had* relied on Lewandowski or his audit, his purported political rivalry against LaCivita has no relevance to actual malice.  Actual malice "cannot be proven simply because a source of information might also have provided the information to further the source's self-interest," as such "self-interest (and the related desire to place opposing views and persons in an unfavorable light)" motivates countless news sources.  *Reuber v. Food Chem. News*, 925 F.2d 703, 715 (4th Cir. 1991); *see also Harvey v. CNN*, 48 F.4th 257, 274 (4th Cir. 2022) ("[C]ourts have consistently held that reliance on tainted or troubled sources does not alone establish actual malice." (citation omitted)).  This is especially true where the publication discloses the source's bias, which "may actually rebut a claim of [actual] malice." *Harvey*, 48 F.4th at 274 (citation omitted).  That is exactly what *The Daily Beast* did here.  Compl. Ex. 1 at 8 ("Lewandowski's

---

[8] The Opposition also claims (without citation) that the "timing and context" of publication before the election supports actual malice.  Opp. at 13.  Even setting aside that publishing timely news is not evidence of actual malice, *Reliance Ins. v. Barron's*, 442 F. Supp. 1341, 1351 (S.D.N.Y. 1977) (no actual malice where editors "have an actual duty to publish at the time of greatest benefit"), "alleged political motivation" does not suffice to establish actual malice.  *Fairfax*,  2 F.4th at 294.

efforts were widely viewed as an attempt to trigger Trump's notorious fear of being ripped off. Lewandowski focused on LaCivita, who he apparently viewed as a rival for power.").

Tellingly, the Opposition completely disregards the myriad cases reinforcing the foundational principle that reliance on biased sources does not give rise to actual malice. *See* Mot. at 18 (collecting cases). And the only case LaCivita cites, *Curtis Publ'g v. Butts*, does not hold otherwise.[9]   388 U.S. 130 (1967). In that case, the Supreme Court determined that the publisher acted with actual malice by ignoring the most "elementary precautions," including that the story's sole source had been "placed on probation in connection with bad check charges." *Id.* at 157. The publisher nonetheless published the story "on the basis of [the source's] affidavit *without substantial independent support*," and "no attempt" was made to verify the source's claims. *Id.* (emphasis added). This is nothing like *The Daily Beast*'s reporting, which featured "substantial independent support," including undisputed governmental records; corroboration by a number of sources, including LaCivita's own contracts and the Trump campaign itself; and lengthy comment from both LaCivita and the Trump campaign. *Id.* There could never be actual malice stemming from the Publications' passing reference to Lewandowski.

### 4.   Plaintiffs Do Not Bring Home Their Actual Malice Allegations

Finally, LaCivita has no answer to the Motion's argument that he does not "bring home" his actual malice allegations to either Hugh Dougherty or Lily Mae Lazarus (who authored three of the five Articles at issue), as is constitutionally required. Mot. at 15 n.7. Instead, LaCivita simply claims that the "lack of specific allegations as to [] Dougherty and [] Lazarus is immaterial at this stage," since Plaintiffs may plead and prove their state of mind through "circumstantial

_____

[9] Plaintiffs also cite *St. Amant v. Thompson*, but the cited passage simply refers to *Curtis Publishing*. *St. Amant v. Thompson*, 390 U.S. 727, 732 & 732 n.3 (1968). In fact, in *St. Amant*, the Supreme Court found there was no actual malice and reversed on that ground. *Id.* at 733.

evidence." Opp. at 16 (citing *Harte- Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989)). But that is simply wrong. Courts often dismiss defamation claims at the pleading stage for just such a failure to plead malice. *See Patel v. CNN*, 910 S.E.2d 532, 545 (Va. Ct. App. 2025) (dismissal in part on this basis); *Mejia v. Telemundo Mid-Atl.*, 440 F. Supp. 3d 495, 502 (D. Md. 2020) (dismissal where no actual malice allegations against specific person responsible for creating banners); *Jacob v. Lorenz*, 2023 WL 4106298, at *10 (S.D.N.Y. June 21, 2023) (dismissal where plaintiffs "fail to sufficiently connect their factual assertions to [the specific] [d]efendants' state of mind"). The claims as to the Articles authored by Dougherty and Lazarus should be dismissed on this basis alone.

### B.    The Fair Report Privilege Protects the Publications

In its Motion, *The Daily Beast* established that the Complaint may be dismissed on the alternate ground that the fair report privilege (whether of New York or Virginia) applies to—and shields—the Publications at issue. Mot. at 20-24. In response, LaCivita does not dispute that the FEC Records are within the scope of the fair report privilege or that they show $19.2 million was paid to LaCivita's firm. He contends, however, that the Articles are not a fair and accurate report of the FEC Records because they "clearly show" that payments to vendors "immediately passed through." Opp. at 1, 18. Not so.

As discussed above, the parties agree the FEC Records include a description of a payment's purpose, for example, "placed media: TV," "placed media: radio," "production cost: TV ad," "production cost: radio ad," "direct mail services," or "online advertising." But LaCivita's claim that these descriptions indicate that each itemized payment immediately "passed through" in full to a third-party is wholly unsupported by those records. Opp. at 18-19. *Nothing* in the FEC Records says that, much less "clearly and unambiguously," as Plaintiffs claim. Opp. at 19. Instead, they broadly categorize the purposes of payments made *to* LaCivita's firm, while saying nothing

about the amount or timing of any subsequent disbursements made *by* LaCivita's firm.

Indeed, Plaintiffs' apparent position that there is somehow a one-to-one correspondence between cash inflows to the firm and cash outflows to third parties is belied by LaCivita's own contracts (the Articles' reporting of which Plaintiffs have never disputed). Those contracts gave his firm "a generous cut of Trump's TV and digital ads, direct mail and other campaign spending" and provided him a "personal stake in the campaign's ad buys and direct mail operations." Compl. Ex. 1 at 1, 3. Article 1 further reported that LaCivita's renegotiated contract added a commission on "all campaign digital ads" on top of the commission he was already receiving on TV ads. *Id.* at 9. And, as Article 1 reports, it is "hardly unheard of" for senior campaign advisers to receive salaries "while simultaneously collecting commissions for media ad buys and direct mail." *Id.* at 3. LaCivita's contracts would make no sense if his firm were merely a "pass-through" for the advertising-related payments disclosed in the FEC Records. In sum, the Publications accurately describe the FEC Records and are, therefore, privileged.

Plaintiffs' cited cases are inapposite. For example, in *Horne v. WTVR*, the court declined to apply the fair report privilege because the defendant juxtaposed the plaintiff's interview with a banner describing a "'Felon Hired, Then Fired,'" creating the "defamatory implication" that the plaintiff was a fired felon. 2017 WL 1330200, at *5 (E.D. Va. Apr. 6, 2017), *aff'd*, 893 F.3d 201 (4th Cir. 2018). Here, there was no such misleading juxtaposition, simply straightforward reporting of the payments received by LaCivita's firm. And to the extent LaCivita argues that the Articles are not a fair report of the FEC Records because *The Daily Beast* excerpted materials from the Records, courts are clear that editorial judgment in summarizing an official record—even a "selective representation of the [record's] contents"—does not constitute abuse of the privilege. *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 487-488 (E.D. Va. 2018); *see also*

*Alexandria Gazette v. West*, 93 S.E.2d 274, 281-82 (1956) (fair report applied when, "while the news article was not exactly correct, it constituted no substantial departure from the [record's] language"). A simple comparison of the FEC Records and the Publications establishes that the Articles are a fair report, and the Complaint can be dismissed on this ground, as well.

### C.    The Publications Are Not Defamatory

The Motion makes clear that the Publications do not defame LaCivita, whether *per se* or *per quod*. Mot. at 24-27. The Opposition fails to rebut that showing.

### 1.    The Publications Are Not Defamatory *Per Quod*

As to the *per quod* claim, the Motion argued that this claim contradicts the *per se* claim, fails to allege extrinsic facts rendering the Publications defamatory, and fails to allege special damages. Mot. at 26-27. In response, LaCivita first retreads his now well-worn argument that extrinsic facts—the FEC Records—purportedly render the Articles defamatory by showing that the "majority" of the payments to LaCivita's firm were "pass-through payments." Opp. at 24. For all the reasons stated *supra* Section II.1, this is simply incorrect. And regardless, neither the FEC Records nor the idea of pass-through payments is even extrinsic to the Publications. Even as originally published, the Articles both referenced the FEC Records and acknowledged that a not insubstantial "chunk" of the reported payments may have passed through LaCivita's firm. Compl. Ex. 1 at 1, 4, 9.

LaCivita next weakly argues that he has pled special damages by citing two paragraphs in the Complaint's conclusory recitations. Opp. at 24 (citing Compl. ¶¶ 52, 60, alleging that LaCivita "has suffered both special and general damages, including severe emotional distress, out-of-pocket costs, and damage to his business and professional reputation and standing," "has suffered special damages, including damage to his reputation and loss of business income," and "on information and belief [] has also lost business opportunities"). These nebulous, boilerplate allegations fall far

short of the pleading requirements for a defamation *per quod* claim, let alone the heightened pleading requirements under Fed. R. Civ. P. 9(g) for special damages (a standard Plaintiffs completely ignore). *Henry v. Fox News Network*, 629 F. Supp. 3d 136, 151 (S.D.N.Y. 2022) ("conclusory allegations" regarding "loss of economic opportunities" and "loss of revenues" are insufficient); *see also Wadnola v. City of Norfolk*, 111 Va. Cir. 367A (2023) (that plaintiff has been "greatly injured" in his employment "was not a sufficient allegation of special damages"), *aff'd*, 2025 WL 375969 (Va. Ct. App. Feb. 4, 2025). The *sole*, somewhat more specific, special damages allegation that LaCivita musters is that his and his firm's business was affected in "Albania . . . demonstrated by two Albanian articles referencing the defamatory allegations." Opp. at 33 (citing Compl. ¶ 53). But this does not satisfy the pleading standard—both Virginia and New York courts have made clear that such bare-bones special damages allegations cannot support a *per quod* claim. *See* Mot. at 27 (collecting cases). And in any event, this allegation is contradicted by LaCivita's own pleading. One of the articles the Complaint cites reports on LaCivita's securing of a lucrative contract with Sali Berisha, a prominent Albanian politician, four months *after* Article 1 was published, thus undercutting the notion that LaCivita suffered any damages at all as a result of *The Daily Beast*'s reporting.[10] The defamation *per quod* claim must be dismissed.[11]

---

[10] Compl. ¶ 53 (citing https://www.gazetatema.net/politika/fatura-e-cmendur-e-berishes-per-fushaten-vetem-konsulenti-amerikan-i-ku-i479822). The other cited article simply links to a news outlet's homepage, not any specific publication. Compl. ¶ 53 (citing https://shqiptarja.com/home).

[11] The Opposition also points to Isikoff's statement in the Podcast Episode that LaCivita was a "grifter who was milking him [Trump] for all this money." Opp. at 22. To the extent any part of LaCivita's defamation claim is premised on that statement (and the Complaint does not so allege), it is protected opinion. Statements that are not readily "provable as false," meaning the language cannot be proved "true or false by a 'core of objective evidence,'" as well as "statements of subjective belief based on disclosed facts," are non-actionable statements of opinion. *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 504–05 (W.D. Va. 2019). The phrase "grifter" is a subjective evaluation that is incapable of being proven true or false, as courts have held. *Broughty v. Bouzy*, 2024 WL 1739866, at *5 (D.N.J. Apr. 22, 2024) (tweets describing plaintiff as a "grifter" and "fraud" are protected opinion). Moreover, the Podcast Episode's use of this phrase is based on

## 2.    The Publications Are Not Defamatory *Per Se*

As to the *per se* claim, the Motion established that the Publications did not reasonably imply the alleged defamatory meaning.  Mot. at 24-26.  But LaCivita fails to grapple with these arguments, choosing instead to impermissibly distort the content of the Publications.  The false premise of LaCivita's defamation *per se* claim is that the Publications harmed his professional reputation by "falsely imply[ing] that [] LaCivita was personally profiting excessively from his work on the campaign, that he was prioritizing personal gain over the campaign's success . . . that he was doing so unbeknownst to President Trump and the campaign," and that these were grounds for Trump to "fire him."  Opp. at 21, 23.  But this argument is nothing more than a "tortured interpretation" of the Publications that this Court ought not credit.  *Freedlander v. Edens Broad.,* 734 F. Supp. 221, 225 (E.D. Va. 1990), *aff'd*, 923 F.2d 848 (4th Cir. 1991).

First and foremost, the Publications *do not* assert that LaCivita or his firm committed any illicit or deceptive action in connection with their receipt of the payments documented in the FEC Records.  And far from these payments being "unbeknownst to the President Trump and the campaign," Opp. at 21, the Publications repeatedly make clear that the payments were entirely legitimate, authorized expenditures by Trump-affiliated political organizations and the campaign. For example, Article 1 reports that the payments originated from super PAC expenditures and campaign contract negotiations, not any dubious sources.  It specifically twice quotes a senior Trump campaign official who "said all of LaCivita's contracts—which were signed by the campaign's treasurer—had been approved by the campaign's lawyers," and that "[a]ll contracts were negotiated and approved by legal counsel as is appropriate."  Compl. Ex. 1 at 4, 9.  Article 1

---

disclosed facts—namely, that LaCivita's firm had received millions in campaign payments through official channels, and LaCivita's campaign co-manager's comparative compensation.

also includes a campaign official's defense of direct mail expenditures by LaCivita's firm, that "'in primaries, the voting electorate is older, relies less on digital advertising to obtain information and mail has consistently proven its worth.'" *Id.* at 9-10. And the reporting points to LaCivita's successful renegotiation of his contracts, further underscoring that all payments flowed through legitimate and transparent channels.[12]

Nor do the Articles defame LaCivita by asserting that the substantial payments were "grounds for President Trump to fire him." Opp. at 23. In reality, Article 5 reports it was LaCivita *himself* who, according to a report in *The Atlantic*, told friends he felt like he was in an episode of *The Apprentice* waiting to be told "you're fired." Compl. Ex. 5 at 2. And that same Article states that a campaign spokesman "denied that Trump was angered by the Beast's report." *Id.*

Finally, LaCivita completely ignores that when "read as a whole," as defamation law requires, the Articles repeatedly heap laurels on LaCivita regarding his campaign experience, which only *bolster* his reputation as a seasoned and skillful campaign operative worthy of high-level compensation. *Dragulescu v. Virginia Union Univ.*, 223 F. Supp. 3d 499, 510 (E.D. Va. 2016). The Articles variously describe LaCivita as a "veteran political knife-fighter," a "no-holds-barred political brawler," one of the "toughest . . . in politics," Compl. Ex. 1 at 3, 11, 12; and as "one of the most fearsome figures in American politics," a "cutthroat strategist who plays to win," "one of the most effective campaign operatives," a "brass knuckle brawler who understands what

---

[12] While the Publications may have sparked debate about the appropriateness (*not* the legality) of the scale of LaCivita and his firm's compensation—just as those questions were "circulating in GOP circles for some time," Compl. Ex. 1 at 7—it is not defamatory merely to "provoke[] public scrutiny of the plaintiffs' activities." *Chapin v. Knight-Ridder*, 993 F.2d 1087, 1094 (4th Cir. 1993) (statements questioning organizer's financial motives provoked scrutiny but did not imply illicit "pocket-lining" and were not defamatory); *see also Suulutaaq v. Williams*, 782 F. Supp. 2d 795, 814-15 (D. Alaska 2010) (article not defamatory where it "never states or implies" that plaintiffs "violated any laws or regulations," but rather their conduct was perfectly "lawful" albeit "controversial," playing into "ongoing high profile public debate about government spending").

moves voters better than almost any operative … on either side of the aisle," and a "supremely competent nuts-and-bolts guy" with an "ability to turn around campaigns at the last minute," Compl. Ex. 2 at 2-4.  And the Articles lengthily expound on LaCivita's storied career as a political operative.  *See, e.g.*, Compl. Ex. 2 at 2-5.  As for LaCivita's loyalty to Trump, Article 1 quotes a senior campaign official, "'I don't think anybody questions his bona fides' as a pro-Trump conservative."  Compl. Ex. 1 at 7.  It strains credulity that such a portrayal in any way prejudices LaCivita in his profession; rather, these are exactly the qualities that would make him appeal to candidates facing tough races.  For that reason, the cases cited by LaCivita, where the publications conveyed the plaintiffs' fundamental unfitness for their jobs, are entirely inapposite.  Opp. at 22-23 (collecting cases).[13]  In fact, as the cases cited in the Motion and ignored in the Opposition state, LaCivita's ability to secure significant payments "could be considered more complimentary than derogatory."  *Freedlander*, 734 F. Supp. at 225; *see* Mot. at 26 (collecting cases).  At bottom, the Publications' portrayal of LaCivita as a veteran campaign operative who successfully negotiated lucrative contracts and compensation simply cannot impugn his professional fitness.  They are not defamatory *per se*.

## III.    PLAINTIFFS' BUSINESS CONSPIRACY CLAIM FAILS

The Motion establishes that Plaintiffs' business conspiracy claim fails for three reasons: (1) such a claim cannot survive where inextricably linked to a fatally defective defamation claim; (2) Plaintiffs do not plead the required state-law elements; and (3) the treble damages sought under

---

[13] For example, in *Meredith v. Nestle Purina Petcare* (cited by Opp. at 22-23), the defendant stated the plaintiff was fired for "insubordination" and that she might "sabotage its products," thus suggesting that she had "motive to again commit acts of sabotage."  516 F. Supp. 3d 542, 554 (E.D. Va. 2021).  Likewise, in *Carwile v. Richmond Newspapers* (cited by Opp. at 22), a publication implied that an attorney was guilty of conduct that would subject him to a disbarment proceeding.  82 S.E.2d 588, 591-92 (1954).  *The Daily Beast* published nothing analogous here.

Virginia's business conspiracy statute are unconstitutional. None of Plaintiffs' responses are persuasive.

First, Plaintiffs argue that because their defamation claim is valid, their state-law business conspiracy claim can stand. Opp. at 26. But Plaintiffs' defamation claim is fatally deficient, for the reasons stated in the preceding sections.[14] Otherwise, Plaintiffs puzzlingly argue that their conspiracy claim is "independently grounded in concerted conduct with intent to harm" beyond the act of publication, but neither they (nor their Complaint) ever says what this alleged additional "unlawful act" is. Instead, the only acts Plaintiffs allege *The Daily Beast* and Isikoff participated in are writing and publishing the Articles. This case is not like *Dunlap* (cited by Opp. at 26), where the plaintiff's claims for tortious interference with contract and business expectancy each constituted a permissible predicate "unlawful act" to proceed on a business conspiracy claim. *Dunlap v. Cottman Transmission Sys.*, 754 S.E.2d 313, 319 (2014). This is a defamation claim. And the law is clear that the business conspiracy statute is not designed to provide treble damages for a failed defamation claim. *Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir. 1985) (dismissing business conspiracy claim that "in essence, [is] an action in . . . libel").

Second, Plaintiffs maintain they have sufficiently pled the state-law elements of a business conspiracy claim by regurgitating allegations that "*The Daily Beast* acted in concert with Michael Isikoff and others to publish defamatory content about Plaintiffs to harm their reputation, trade, business, and profession" and that they did so with "actual malice." Opp. at 27-28. Plaintiffs ignore all the cases cited in the Motion making clear that their skeletal allegations on each of the

---

[14] In *Shirvinski* (cited by Opp. at 26), the court only entertained a business conspiracy claim because the plaintiff did not replead defamation, but rather framed the dispute as a procedural due process case. *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 316 (4th Cir. 2012). And the Fourth Circuit dismissed the claim because the "business conspiracy statute was not designed to provide treble damages for defamation suits cloaked as conspiracy claims." *Id.* at 321.

statutory elements—concerted action, legal malice, and causally related injury—are woefully insufficient, Mot. at 29 (collecting cases). In fact, the only case cited by Plaintiffs, *Rohrbaugh v. Kreidler*, 2006 WL 2032640 (Va. Cir. 2006), makes that point. In *Rohrbaugh*, the court found the business conspiracy claim could proceed when the complaint specifically alleged that one of the defendant's "disclosed confidential information" to another defendant, and allegedly told the plaintiff's employer that he had formed another firm and was leaving, resulting in his termination and loss of stock options. *Id.* at *1. Here, there is no equivalent specificity pled. Instead, at maximum, Plaintiffs apparently claim that the editorial relationship between *The Daily Beast* and Isikoff comprises a business conspiracy. It plainly does not.

Finally, Plaintiffs claim the treble damages sought are constitutional based on one paragraph in a 50-year-old, out-of-circuit case that came down four years after *Gertz v. Welch*, 418 U.S. 323 (1974). Opp. at 28 (citing *Uneedus v. Cal. Shoppers*, 86 Cal. App. 3d 932, 942-43 (1978)). But even *Uneedus* does not support Plaintiffs. There, the court found that *Gertz* did not apply to a case where the alleged unlawful business acts were related to advertising space sales—i.e., commercial speech. 86 Cal. App. 3d at 942-43. But this case does not involve commercial speech—it involves editorial speech, subject to the full protection of the First Amendment. *See Reed Constr. Data v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 411 (S.D.N.Y. 2014) (concluding that compared to commercial speech, "protected editorial speech on a topic of public significance" "warrant[s] heightened First Amendment protection"), *aff'd*, 638 F. App'x 43 (2d Cir. 2016). Because the speech at issue is squarely protected by the rule in *Gertz*, awarding treble damages would be unconstitutional.

## CONCLUSION

For the foregoing reasons, as well as those set forth in *The Daily Beast*'s Motion, the Court should dismiss Plaintiffs' Complaint with prejudice.

Dated:  August 25, 2025

DAVIS WRIGHT TREMAINE LLP
Katherine M. Bolger (*pro hac vice*)
Meenakshi Krishnan (*pro hac vice*)
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Phone:  (212) 489-8230
katebolger@dwt.com
meenakshikrishnan@dwt.com

Respectfully submitted,

*/s/ John D. McGavin*
MCGAVIN, BOYCE, BARDOT,
THORSEN & KATZ, P.C.
John D. McGavin (VSB 21794)
9990 Fairfax Boulevard, Suite 400
Fairfax, Virginia 22030
Phone: (703) 385-1000
jmcgavin@mbbtklaw.com

*Attorneys for Defendant The Daily Beast Company, LLC*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of August 2025, a true and correct copy of the

foregoing was served via the court's CM/ECF system upon the Clerk of the Court and to all

counsel of record.

*/s/ John D. McGavin*
John D. McGavin